## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 25-cv-00881-NYW-KAS

Jeanette Vizguerra-Ramirez,

       Petitioner-Plaintiff,

v.

Dawn Ceja,
       Warden, Aurora ICE Processing Center,
Robert Guadian,
       Field Office Director, U.S. Immigration and Customs Enforcement, U.S.
       Department of Homeland Security,
Kristi Noem,
       Secretary, U.S. Department of Homeland Security,
Pamela Bondi,
       U.S. Attorney General, U.S. Department of Justice,

          in their official capacities,

       Respondents-Defendants

---

## AMENDED AND VERIFIED PETITION FOR WRIT OF HABEAS CORPUS

---

### INTRODUCTION

Petitioner-Plaintiff, Jeanette Vizguerra-Ramirez (hereinafter "Petitioner") a citizen of Mexico and nationally prominent advocate for immigrant rights, was detained on Monday, March 17, 2025, without statutory authority and in apparent retaliation for her outspoken criticisms of this country's immigration enforcement policies and practices.

Ms. Vizguerra-Ramirez's case is in legal limbo. She has not been placed in removal proceedings, under 8 U.S.C. § 1229a, which would permit her detention under 8 U.S.C. § 1226 pending a decision on whether she is to be ordered removed from the

U.S. While Respondents-Defendants ("Respondents") believe Ms. Vizguerra-Ramirez has a prior order of removal which has been reinstated, authorizing her detention under 8 U.S.C. § 1231(a)(5), the administrative record shows the putative order to be so procedurally and substantively deficient such that it does not meet the regulatory definition of a reinstatement order and therefore cannot trigger the Respondents' claimed statutory authority to detain.

Furthermore, the decision of Respondents from the U.S. Department of Homeland Security ("DHS" or "the Department") to target Ms. Vizguerra-Ramirez for detention, substantially on account of her protected speech, strikes at the heart of the First Amendment. As the Supreme Court has held, "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Houston, Tex. v. Hill,* 482 U.S. 451, 462–63 (1987). As shown by the prominence of immigration issues in the recent election, immigration policy is a matter of heightened public concern, making discussions about the topic clearly covered within the scope of First Amendment protection. *See Connick v. Myers,* 461 U.S. 138, 145 (1983) ("[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection."); *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1034 (1991) ("[S]peech critical of the exercise of the State's power lies at the very center of the First Amendment."). By specifically targeting Ms. Vizguerra-Ramirez for detention due to her national prominence as an activist, a status achieved through her sharp critiques of government enforcement policies, the Department's actions—including the highly unusual moves of publicizing a photo of her shackled on

social medial and publicly commenting on her individual case—violated her rights under the First and Fifth Amendments of the U.S. Constitution, the Immigration and Nationality Act, and its own federal regulations. Unfortunately, Ms. Vizguerra-Ramirez's retaliatory arrest is not an aberration, as noncitizens exercising their speech rights have been targeted throughout the country in recent weeks. *See*, *e.g.*, *Khalil v. Joyce, et al.*, 2:25-cv-01963 (D.N.J. 2025); *Ozturk v. Hyde, et al.*, 1:25-cv-10695 (D. Mass 2025).

Inside detention, Respondents continued their retaliatory actions, treating Ms. Vizguerra-Ramirez differently than other people in detention by substantially limiting and interfering with her access to counsel when processing her for a reasonable fear interview ("RFI"), a mandatory screening as to whether Ms. Vizguerra-Ramirez's removal would subject her to harm if returned to Mexico. Rather than functioning as a protective mechanism for those fearing persecution or torture, the RFI process in this case has been administered in a manner that appears to subvert its intended purpose from protective to punitive.

Accordingly, to vindicate Ms. Vizguerra-Ramirez's constitutional, statutory, and regulatory rights, this Court should grant the instant petition for a writ of habeas corpus, declare Respondents' actions unlawful, order Ms. Vizguerra-Ramirez's release, and enjoin Respondents from detaining or deporting Ms. Vizguerra-Ramirez in the future unless Respondents can demonstrate an unambiguous statutory authority for such detention and clearly establish that their actions are untainted by impermissible First Amendment retaliation.

**JURISDICTION**

1.      This action arises under the Constitution of the United States and the

Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq*.

2.      This Court has subject matter jurisdiction under 28 U.S.C. § 2241 (habeas

corpus), 28 U.S.C. § 1331 (federal question), Article I, § 9, cl. 2 of the United States

Constitution (Suspension Clause), the First Amendment, and the Fifth Amendment.

3.      An actual and justiciable controversy exists between the parties under 28

U.S.C. § 2201. This Court may grant declaratory and injunctive relief under the

Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*; the All Writs Act, 28 U.S.C. §

1651; 28 U.S.C. § 2241(a); Fed. R. Civ. P. 57, 65; as well based on its inherent

authority to grant equitable relief. *See, e.g., Swann v. Charlotte-Mecklenburg Bd. of

Educ.*, 402 U.S. 1, 15 (1971).

4.      Petitioner is in custody for purposes of habeas jurisdiction because she is

detained at the Aurora ICE Processing Center in Aurora, Colorado.

## VENUE

5.      Venue is proper because Ms. Vizguerra-Ramirez is detained at the GEO

Group's ICE Processing Center in Aurora, Colorado, which is within the jurisdiction of

this District. 28 U.S.C. § 224(a). In addition, venue is proper in this District because a

substantial part of the events giving rise to Ms. Vizguerra-Ramirez's claims occurred in

this District, and she resides in this District and no real property is involved in this

action. 28 U.S.C. §§ 1391(b)(2) and (e)(1). *See Braden v. 30th Judicial Circuit*, 410

U.S. 484, 493–94 (1973).

## PARTIES

6.      Petitioner, Jeanette Vizguerra-Ramirez, is a 53-year-old native and citizen

of Mexico and mother of four children, three of whom are U.S. citizens. She has no

current, lawful status in the U.S., despite years of seeking a path to permanent, legal status based on her residence of nearly thirty years, substantial ties to the community, and broad public support due to her many years of social activism. She is being detained at the GEO Group's ICE Processing Center in Aurora, Colorado. She is in the custody, and under the direct control, of Respondents and their agents and/or others working in active concert or participation.

7.      Respondent Ceja is sued in her official capacity as the Warden of the GEO Group's ICE Processing Center in Aurora. She has immediate physical custody of Ms. Vizguerra-Ramirez pursuant to the GEO Group's contract with U.S. Immigration and Customs Enforcement ("ICE") to detain noncitizens. Respondent Ceja is a legal custodian of Ms. Vizguerra-Ramirez.

8.      Respondent Guadian is sued in his official capacity as the Field Office Director of the Denver ICE Office. ICE is a component agency of DHS. In this capacity, he is responsible for the administration of immigration laws and the execution of detention and removal determinations, including coordination with United States Citizenship and Immigration Services ("USCIS"), another component agency of DHS. Respondent Guadian is a legal custodian of Ms. Vizguerra-Ramirez and has authority to release her.

9.      Respondent Noem is sued in her official capacity as the Secretary of DHS. In this capacity, Respondent Noem is responsible for the implementation and enforcement of the immigration laws pursuant to 8 U.S.C. § 1103(a). She routinely transacts business in this District and is legally responsible for pursuing any effort to detain and remove the Petitioner, including coordination with ICE and USCIS.

Respondent Noem is a legal custodian of Ms. Vizguerra-Ramirez.

10.    Respondent Bondi is sued in her official capacity as the Attorney General of the United States and the senior official of the U.S. Department of Justice ("DOJ"). In that capacity, she has the authority to adjudicate removal cases and to oversee the Executive Office for Immigration Review ("EOIR"), which administers the immigration courts and the Board of Immigration Appeals. Respondent Bondi has the authority to release Ms. Vizguerra-Ramirez pending a decision on whether she is to be removed from the United States. Respondent Bondi is a legal custodian of Ms. Vizguerra-Ramirez.

## STATEMENT OF FACTS

### Procedural History of Putative Reinstatement Order

11.    Ms. Vizguerra-Ramirez is a 53-year-old citizen of Mexico. In 1997, at the age of 25, she fled to the U.S. with her husband and daughter due to the persecution her husband experienced at his job from criminal organizations. The family entered the United States without inspection.

12.    In 2009, Ms. Vizguerra-Ramirez was placed in removal proceedings. As a defense to removal, she applied for cancellation of removal, a form of relief that authorizes an Immigration Judge to "cancel" a noncitizen's deportation and grant lawful permanent residency if the applicant meets four statutory requirements, including a demonstration of exceptional and extremely unusual hardship to certain relatives with lawful status. Ms. Vizguerra-Ramirez sought relief based on the hardship that would befall her three U.S. citizen children.

13.     On November 18, 2011, an Immigration Judge in Denver denied Ms. Vizguerra-Ramirez's application for cancellation of removal, finding that she had not met the high standard for demonstrating her removal would constitute an exceptional and extremely unusual hardship. However, the Immigration Judge granted Ms. Vizguerra-Ramirez's alternate request for voluntary departure, giving her 60 days to leave the country in lieu of a removal order.

14.     On December 16, 2011, Ms. Vizguerra-Ramirez timely appealed the denial of her cancellation application to the Board of Immigration Appeals. Her timely appeal meant that her 60-day period of voluntary departure was tolled during the pendency of the appeal. 8 C.F.R. § 1003.6(a).

15.     In September 2012, while her appeal remained pending, Ms. Vizguerra-Ramirez learned that her mother was dying. Wanting to see her one last time, Ms. Vizguerra-Ramirez risked flying back to Mexico. Her departure from the country, by regulation, triggered a subsequent, automatic withdrawal of her appeal. 8 C.F.R. § 1003.4.

16.     Having attended her mother's funeral and grieved with family in Mexico, Ms. Vizguerra-Ramirez then returned to the U.S., without inspection, in April 2013. She was apprehended shortly after her entry and charged criminally for illegal entry, a misdemeanor, under 8 U.S.C. § 1325(a)(1), receiving a sentence of one year of unsupervised probation.

17.     After being released from criminal custody, Ms. Vizguerra-Ramirez was turned over to ICE custody in El Paso, Texas, where she remained until June 7, 2013.

Ms. Vizguerra-Ramirez was then released under an order of ICE supervision, which required her to report to the Denver ICE field office in Centennial, Colorado.

18.    On July 24, 2013, at her check-in, ICE officials detained Ms. Vizguerra-Ramirez. The next day, July 25, 2013, ICE officials presented her with a putative reinstatement order on Form I-871, which was filled out, signed and dated on both the top (notice of intent to reinstate) *and* bottom (final reinstatement order). Having been notified on July 25th that an order had already issued the day prior and without notice or opportunity to contest the determination, Ms. Vizguerra-Ramirez declined to sign the middle of the form. That order is attached and incorporated hereto as Exhibit A.

19.    The putative reinstatement order dated July 24, 2013, is the order on which Respondents seek to detain Ms. Vizguerra-Ramirez. However, it is unambiguously facially deficient and does not satisfy the minimum regulatory definition of a reinstatement order. 8 C.F.R. § 241.8(b). It clearly indicates that ICE officials issued the order on July 24th *before* letting Ms. Vizguerra-Ramirez know of its existence and of her right to raise an objection prior to the order becoming final. It also clearly indicates that the officer making the decision to reinstate did not review "all available evidence" or any "statements made or submitted in rebuttal" before signing the order portion of the form. Thus, the officer could not have credibly executed the "Certification" by signing the putative order.

20.    The procedural error was not immaterial. Had Ms. Vizguerra-Ramirez been notified of the possibility of a reinstatement order, she could have alerted officials to the fact that she did *not* have a prior removal order. Instead, she had a grant of voluntary departure that was issued in lieu of a removal order, and by leaving the U.S.

while her appeal was pending, she necessarily complied with the order's departure deadline and did not leave under an order of removal. Absent a prior removal order, there was nothing to be reinstated in 2013.

21.    Perhaps aware of the due process violation, ICE agents granted Ms. Vizguerra-Ramirez a stay of removal on August 8, 2013. Since that time, ICE repeatedly granted extensions of that stay of removal, with her most recent stay expiring in 2024. Under then-current guidance in 2024, Ms. Vizguerra-Ramirez was not an enforcement priority; an extension of stay was unnecessary and unlikely to be adjudicated.

22.    On Monday, March 17, 2025, Ms. Vizguerra-Ramirez was arrested by ICE agents while on her lunch break from work at Target. She was placed in shackles, photographed, and told in Spanish by one of the officers, "We finally got you!" She was transported to the GEO Aurora ICE Processing Center, where she has remained in custody since.

**Ms. Vizguerra-Ramirez's History as an Outspoken Activist**

23.    The reason ICE was glad they finally "got" Ms. Vizguerra-Ramirez appears to be tied to her long history as an immigration and labor activist. After years of union organizing, she first received significant national attention in 2017, shortly after the start of the first Trump term, when she took sanctuary in Denver's First Unitarian Society, and later in the First Baptist Church. *Advocates say ICE agent pursued a personal vendetta against undocumented immigrant Jeanette Vizguerra*, Denverite (March 3, 2017) (https://denverite.com/2017/03/03/advocates-say-ice-agent-pursued-personal-vendetta-undocumented-immigrant-jeanette-vizguerra/) (last visited April 8, 2025). Community members poured into the streets to march in support of her decision to seek

sanctuary. *Hundreds march from Civic Center Park to First Unitarian Church to support Jeanette Vizguerra*, Denverite (February 18, 2017)

(https://denverite.com/2017/02/18/hundreds-march-civic-center-park-first-unitarian-church-support-jeanette-vizguerra/) (last visited April 8, 2025). Her sanctuary stay made Ms. Vizguerra-Ramirez "perhaps the best-known undocumented immigrant in Colorado" as she became the "new face of the sanctuary movement." *Who is Jeanette Vizguerra, the Denver immigration activist detained by ICE?*, Denverite (March 18, 2025)

(https://denverite.com/2025/03/18/who-is-jeanette-vizguerra-ice-detained/) (last visited April 8, 2025). She was named one of Time Magazine's "100 most influential people" in April 2017, with actress America Ferrera writing the vignette for her entry. *Jeanette Vizguerra, undocumented Denver immigrant, honored as one of TIME's 100 most influential people*, Denverite (April 20, 2017).

(https://denverite.com/2017/04/20/denvers-jeanette-vizguerra-one-times-100-influential-people/) (last visited April 8, 2025). In the years since, Ms. Vizguerra-Ramirez "has been a regular face at protests," and "she has also been a vocal advocate in Facebook groups meant to spread the word about ICE's actions in the metro area." *Who is Jeanette Vizguerra, the Denver immigration activist detained by ICE?*, Denverite (March 18, 2025) (https://denverite.com/2025/03/18/who-is-jeanette-vizguerra-ice-detained/) (last visited April 8, 2025); https://www.facebook.com/jeanette.vizguerra.

### Evidence of Retaliatory Arrest

24.     There are strong indications that ICE's enforcement actions against Ms. Vizguerra-Ramirez were driven, to a large degree, by a desire for retaliation due to her

prominence as a critic of Trump immigration policies, and to send a message to other potential critics. The signs of a retaliatory motive include the following.[1]

   a.    On March 19, 2025, Denver ICE chose to publish news of Ms. Vizguerra-Ramirez's arrest on its X account (@ERODenver), with a picture of her in handcuffs and chained at the waist. The post was amplified by the main ICE X account (@ICEgov) on March 21, 2025, commenting, "In 2017, Jeanette Vizguerra-Ramirez hid in Denver churches for nearly three months to avoid arrest. Despite her being featured in national media for years, we arrested her in public March 17. A high-profile status does not exempt a person from immigration law [sic]." Among hundreds of posts about arrests and removals conducted by ICE in the last three months, the post about Ms. Vizguerra-Ramirez uniquely focuses on her activism and national prominence.

   b.    On March 19, 2025, Tricia McLaughlin said on X that, "Under President Trump and Secretary Noem, we are once again a nation of laws. We will find, arrest, and deport illegal aliens regardless of if they were a featured 'Time Person of the Year.'" Tricia McLaughlin is the Assistant Secretary for Public Affairs within DHS. She oversees the Department's public outreach, including its media, digital, strategic and crisis communications efforts, and serves as the principal advisor to Secretary Noem on all external and internal communications.

---

[1] Petitioner will shortly file a discovery motion, as she has good cause to believe additional evidence in support of the retaliation claim are within Respondents' possession and/or control.

c.      On March 18, 2025, John Fabbricatore responded in celebration on X in response to Ms. Vizguerra-Ramirez's arrest. He said, "She is a criminal, hates Trump, and is an open-borders, abolish-ICE advocate. Bye!!!!" Mr. Fabbricatore served several years as the Field Office Director of the Denver ICE Office. He was serving as the Assistant Field Office Director in 2013, when his office issued the putative reinstatement order against Ms. Vizguerra-Ramirez, and in early 2017, when she first went into sanctuary.

d.      On the same day, in response to his own post, Mr. Fabbricatore posted screenshots from Ms. Vizguerra-Ramirez's Facebook page indicating her strident opposition to ICE and to Trump.

e.      On the same day, and in a different post on X, Mr. Fabbricatore said people should "stop with their tear-jerking for a criminal and anti/ICE activist."

f.      On March 26, 2025, in response to news of Trump planning an executive order to end sanctuary cities, Mr. Fabbricatore said on X, "Let's go!!!! End Sanctuary!" Ms. Vizguerra-Ramirez is known nationally for her involvement with the sanctuary movement.

g.      As previously noted, at the time of Ms. Vizguerra-Ramirez's arrest, one of the agents told her, in Spanish, "We finally got you!"

**Continued Retaliation in Detention**

25.      Evidence of the government's retaliatory motives are also seen in how Ms. Vizguerra-Ramirez has been treated following her arrest. USCIS, acting in concert with ICE, initiated and has repeatedly pursued Ms. Vizguerra-Ramirez's reasonable fear

interview (RFI) without notice to counsel, in violation of its own protocols and due process protections. Not to mention, DHS mysteriously initiated this process almost twelve years *after* the putative order of reinstatement went into effect. In doing so, the agency has repurposed the RFI into a procedural formality designed not to assess potential harm if removed, but to eliminate a perceived barrier to enforcement of a legally defective removal order and to further retaliate against Ms. Vizguerra-Ramirez for her widely known public criticisms of ICE's enforcement policies and practices. Those actions are detailed below.

26.     On the day of Ms. Vizguerra-Ramirez's arrest, undersigned counsel contacted ICE via email and informed them, *inter alia*, of Ms. Vizguerra-Ramirez's fear of return to Mexico. She noted that if the agency had a valid reinstatement order (which counsel noted was in doubt), then Ms. Vizguerra-Ramirez was entitled to and formally requested referral to the USCIS Asylum Office for an RFI. Counsel also provided ICE with an executed G-28, Notice of Entry of Appearance as counsel of record.

27.     On the afternoon of Tuesday, March 18, 2025, Ms. Vizguerra-Ramirez was taken to meet with an ICE officer who advised her that she would have an RFI with a USCIS asylum officer to assess her fear of return to Mexico. The ICE officer made the referral to the Asylum Office the same day, providing a copy of counsel's G-28, Entry of Appearance.

28.     Between March 18, 2025 until the early morning of March 22, 2025, undersigned counsel could not communicate with Ms. Vizguerra-Ramirez. In response to two men escaping the Aurora facility, ICE and GEO engaged in a facility-wide lockdown. All phone access—including legal calls—was suspended. Even after phone

access was restored, Ms. Vizguerra-Ramirez's personal phone PIN remained inactive. Ms. Vizguerra-Ramirez was unable to speak with her attorney until approximately 7:15 a.m. on Saturday, March 22, 2025.

29.     Meanwhile, on Thursday, March 20, 2025, at approximately 8:30 am, a GEO guard pulled Ms. Vizguerra-Ramirez  from a medical appointment and took her to speak with "Asylum." She objected to the lack of notice and expressed her right to counsel. The interview was postponed.

30.     On Monday, March 24, 2025, Ms. Vizguerra-Ramirez was called again for an interview with an asylum officer without advance notice. She told the asylum officer that she was not ready because she could not communicate with counsel while the phones were down and her attorney was not present. The asylum officer placed Ms. Vizguerra-Ramirez on hold several times while consulting with a supervisor and ultimately informed her that the interview would be rescheduled.

31.     On March 25, 2025, Ms. Vizguerra-Ramirez was summoned by [ICE? GEO?] for a third attempted interview with an asylum officer. At approximately 8:15 a.m., she was escorted to an interview room and connected by phone with an asylum officer. After Ms. Vizguerra-Ramirez protested, the interview was discontinued.

32.     On the morning of Thursday, March 27, 2025, a GEO guard informed Ms. Vizguerra-Ramirez she had to choose between a legal visit and a visit with her children. Believing that her attorney needed to speak with her, she chose the legal visit, only to learn later that she was being brought to a fourth attempted RFI, despite having been told the interview would take place no earlier than Monday, March 31, 2025.

33.    The asylum officer attempted to start the interview, but Ms. Vizguerra-Ramirez said the prior asylum officer had told her it would be scheduled for Monday, March 31, at the earliest, as well as reiterated the reasons she was not fully prepared to proceed. The asylum officer attempted to call undersigned counsel, but she was unavailable. The RFI was again pushed back. The Asylum Office *never* provided counsel with advance notice prior to any of the four failed interview attempts.

34.    On March 29, 2025, USCIS contacted counsel via email to inform her that they would conduct the RFI on Monday, March 31, 2025, at 8:30 a.m.

35.    On March 30, 2025, undersigned counsel responded to the email, submitting a detailed letter to USCIS citing irregularities in the handling of Ms. Vizguerra-Ramirez's RFI. Counsel specifically requested that the RFI be held in abeyance pending resolution of jurisdictional issues in the pending federal litigation, or, at a minimum, that the RFI be rescheduled with sufficient notice to allow undersigned counsel to be present in person with her client. The letter cited the agency's own Reasonable Fear Procedures Manual, which authorizes such delay at counsel's request or where exceptional circumstances exist. USCIS Reasonable Fear Procedures Manual, Section III.B.3 ("The APSS processing clock may only be tolled due to: a request by the alien or the alien's representative to defer the reasonable fear interview; . . .  or exceptional circumstances.").

36.    On March 31, 2025, USCIS again attempted to conduct the RFI. At approximately 8:30 a.m., Ms. Vizguerra-Ramirez was taken to the interview room and placed on the phone with an asylum officer. After nearly 45 minutes, the asylum officer

called counsel. Counsel informed the officer of her prior correspondence requesting the RFI be held in abeyance.

37.     Despite counsel's objections, the asylum officer next attempted to place Ms. Vizguerra-Ramirez under oath and proceed with the RFI. Counsel continued her objections as the asylum officer attempted to steamroll through the interview upon direction from his supervisor, admonishing counsel and advising her that she was only permitted to observe. Counsel advised her client not to proceed with the interview and she disconnected at 9:45 a.m. Counsel requested to speak with a supervisor. After 15 minutes without resolution from a supervisor, counsel ended the call.

38.     Just minutes after counsel got off the phone, Ms. Vizguerra-Ramirez was recalled by a GEO officer who informed her—erroneously—that *both her attorney* and the asylum officer needed her to return to finish the interview. She was reconnected at 10:06 a.m.  The asylum officer stated to Ms. Vizguerra-Ramirez that he and her counsel had agreed that she must proceed with the RFI, despite counsel not being present. This was not true. Ms. Vizguerra-Ramirez refused to answer questions without hearing her attorney on the line. The officer then told Ms. Vizguerra-Ramirez that her counsel had the opportunity to participate but had instead chosen to take care of another client, and that the RFI would be considered abandoned if Ms. Vizguerra-Ramirez failed to go forward. Feeling she was being tricked, Ms. Vizguerra-Ramirez terminated the call.

39.     Counsel submitted a formal complaint to USCIS, describing how the asylum officer attempted to proceed with the RFI under false pretenses and without proper notification or inclusion of counsel.

40.     On April 7, 2025, USCIS Asylum contacted undersigned counsel via email to reschedule the RFI. At 6:40 a.m on April 8, 2025, counsel responded with her renewed request that USCIS respond to her letter. To date, however, no one from USCIS has addressed counsel's requests or complaints.

**Broader Context of First Amendment Retaliation**

41.     The government's retaliation against Ms. Vizguerra-Ramirez comes in a broader context of retaliation against other noncitizens who have exercised their First Amendment rights.

42.     During Trump's current term, there have already been numerous instances of federal immigration officials targeting noncitizens based on their protected speech. *See, e.g., Court Rules Rümeysa Öztürk's Lawsuit Should Move Forward in Vermont*, ACLU of Massachusetts (April 4, 2025) (noting that Ms. *Öztürk*, a noncitizen PhD student at Tufts, "was grabbed, arrested, and detained in Somerville, Massachusetts by plainclothes federal agents in apparent retaliation for an op-ed she co-authored in a student newspaper") (https://www.aclu.org/press-releases/court-rules-rumeysa-ozturks-lawsuit-should-move-forward-in-vermont) (last visited April 8, 2025); *Rubio Orders U.S. Diplomats to Scour Student Visa Applicants' Social Media*, New York Times (April 1, 2025) (noting "an effort to bar those suspected of criticizing the United States and Israel from entering the country") (https://www.nytimes.com/2025/04/01/us/politics/student-visas-social-media.html) (last visited April 8, 2025); *Rubio warns visas will be revoked for all foreign student 'activists' amid Tufts arrest*, Fox News (March 27, 2025) (quoting the Secretary of State that anyone found to be "creating a ruckus" will have their visa revoked)

(https://www.msn.com/en-us/news/world/rubio-warns-visas-will-be-revoked-for-all-foreign-student-activists-amid-tufts-arrest/ar-AA1BN7ww?ocid=BingNewsSerp) (last visited April 8, 2025); *Immigration agents arrest Palestinian activist who helped lead Columbia University protests*, AP (March 10, 2025) (https://apnews.com/article/columbia-university-mahmoud-khalil-ice-15014bcbb921f21a9f704d5acdcae7a8) (last visited April 8, 2025); *U.S. arrests second pro-Palestinian Columbia University protester*, BBC (March 15, 2025) (https://www.bbc.com/news/articles/c3rnzp4ye5zo) (last visited April 8, 2025); *Judge blocks deportation of Georgetown fellow detained by immigration authorities*, ABC News (March 20, 2025) (https://abcnews.go.com/US/georgetown-fellow-detained-alleged-hamas-ties-targeted-wifes/story?id=119983535) (last visited April 8, 2025); *Judge blocks Trump administration from deporting 21-year-old Columbia protester and green card holder*, CBS News (March 25, 2025) (https://www.cbsnews.com/news/yunseo-chung-columbia-student-south-korea-ice-deportation/) (last visited April 8, 2025).

43.    The recent actions should come as no surprise. During the first Trump term, federal immigration officials engaged in retaliatory immigration enforcement against individuals like Ms. Vizguerra-Ramirez who engaged in protected First Amendment activity. *See*, *e.g.,* Alina Das, *Deportation and Dissent: Protecting the Voices of the Immigrant Rights Movement,* 65 N.Y.L. Sch. L. Rev. 225, 231-237 (2020-2021) (describing examples of First Amendment retaliation); *see also* Gaby Del Valle, *ICE Keeps Arresting Prominent Immigration Activists. They Think They're Being Targeted.*, VICE NEWS (Aug. 24, 2019) (https://www.vice.com/en/article/ywady5/ice-keeps-arrestingprominent-immigration-activists-they-think-theyre-being-targeted) (last

visited April 8, 2025); John Burnett, *See the 20+ Immigration Activists Arrested Under Trump*, NPR (Mar. 16, 2018) (https://www.npr.org/2018/03/16/591879718/ see-the-20-immigration-activists-arrestedunder-trump) (last visited April 8, 2025; John Burnett, *Immigration Advocates Warn ICE is Retaliating for Activism*, NPR (Mar. 16, 2018) (https:/www.npr.org/2018/03/16/593884181/ immigration-advocates-warn-ic-is-retaliating-for-activism) (last visited April 8, 2025); Maria Sacchetti & David Weigel, *ICE Has Detained or Deported Prominent Immigration Activists*, WASH. POST (Jan. 19, 2018) ([https://www.washingtonpost.com/powerpost/ice-has-detained-or-deported-foreignerswho-are-also-immigration-activists/2018/01/19/377af23a-fc95-11e7-a46b-a3614530bd87_story.html](https://www.washingtonpost.com/powerpost/ice-has-detained-or-deported-foreignerswho-are-also-immigration-activists/2018/01/19/377af23a-fc95-11e7-a46b-a3614530bd87_story.html)) (last visited April 8, 2025).

44.     By the close of the first term of the Trump Administration, non-governmental organizations mapped more than one thousand instances of retaliation against immigrant rights advocates, including citizens and noncitizens. *See* Immigrant Rights Voices Map, https://immigrantrightsvoices.org; Nick Pinto, *Across the U.S., Trump Used ICE to Crack Down on Immigration Activists*, THE INTERCEPT (Nov. 1, 2020) ([https://theintercept.com/2020/11/01/ice-immigration-activists-map/](https://theintercept.com/2020/11/01/ice-immigration-activists-map/)) (last visited April 8, 2025). During this second Trump term, it is clearly happening again.

## STATEMENT OF LAW

### Voluntary Departure

45.     Noncitizens placed in removal proceedings have a right to apply for various forms of relief from removal before an Immigration Judge. 8 U.S.C. § 1229a(c)(4). Two relief options relevant here are cancellation of removal, under 8 U.S.C. § 1229b(b)(1), and voluntary departure under 8 U.S.C. § 1229c(b). A person

granted voluntary departure who complies with the terms of that grant will not have an order of removal. 8 U.S.C. § 1229c(b)(1). However, where a person granted voluntary departure does not leave by the stated deadline, the voluntary departure order converts to a removal order, and any subsequent departure is considered a self-removal. 8 C.F.R. § 1240.26(d) (alternate order of removal entered along with voluntary departure).

46.    Noncitizens who received an adverse decision from an Immigration Judge in removal proceedings may appeal that decision to the Board of Immigration Appeals. 8 U.S.C. § 1229a(c)(5); 8 C.F.R. § 1003.1(b)(3).

47.    Typically, the voluntary departure period begins running on the date of the Immigration Judge's order. However, when a person appeals an Immigration Judge's decision to the Board, the filing of the appeal automatically stays execution of the Immigration Judge's voluntary departure order. *Matter of A-M-*, 23 I&N Dec. 737, 744 (BIA 2005) (citing 8 C.F.R. § 1003.6(a)). Thus, while an appeal is pending, the voluntary departure period is not running.

48.    If a person departs while an appeal is pending, her departure will be deemed a withdrawal of the appeal. 8 C.F.R. § 1003.4. In such a situation, "the initial decision in the case shall be final to the same extent as though no appeal had been taken." *Id*. Accordingly, in the case of an appellant with a tolled voluntary departure order, her departure from the U.S. prior to a decision on her appeal would immediately trigger the start of her voluntary departure period. *Id*.

**Reinstatement of Removal**

49.    If a person reenters the U.S. illegally after "having departed voluntarily, *under an order of removal*, the prior order of removal is reinstated from its original date"

and the person "shall be removed under the prior order at any time after the reentry." 8

U.S.C. § 1231(a)(5) (emphasis added).

50.    In reinstatement proceedings under 8 U.S.C. § 1231(a)(5), a DHS officer

conducts an interrogation to determine whether an individual has a prior removal order,

is in fact the person identified in the prior order, and unlawfully reentered. 8 C.F.R. §

241.8(a). In making this determination, the officer "must obtain the prior order." 8 C.F.R.

§ 241.8(a)(1). At the conclusion of the interrogation, the officer signs and dates the top

portion of Form I-871, titled "Notice of Intent/Decision to Reinstate Prior Order." This

portion of the form contains the factual allegations against the individual, including that

he or she is not a U.S. citizen, the date of the prior order, date and manner of departure,

and the date of illegal reentry.

51.    DHS must inform the individual that he or she has the right to make a

written or oral statement contesting the conclusion that he or she is subject to

reinstatement. 8 C.F.R. § 241.8(b). After completing the top portion of Form I-871, the

officer must present the notice portion of Form I-871 to the individual to sign and to

indicate whether he or she wishes to make a statement contesting the determination. *Id*.

("If the [individual] wishes to make . . . a statement, the officer shall allow the [individual]

to do so and shall consider whether the [individual]'s statement warrants

reconsideration of the determination.").

52.    Only after the person has been informed of their right to challenge the

reinstatement, and any such challenge has been reviewed, does a different officer then

sign and date the bottom portion of Form I-871, labeled "Decision, Order and Officer's

Certification."

53.     If a person with a valid reinstated order expresses a fear of return to her home country, she is referred to a USCIS asylum officer to determine whether there is a reasonable fear of persecution or torture in the person's home country. 8 C.F.R. § 1241.8(e). Through this process, the person may eventually obtain relief from the reinstated removal order in the form of withholding of removal, 8 U.S.C. § 1231(b)(3), in which case the reinstated removal order is not vacated or withdrawn, only its execution is withheld. *Matter of I-S- & C-S-*, 24 I&N Dec. 432, 433-34 (BIA 2008).[2]

54.     A person has the right to counsel during the reasonable fear process. 8.C.F.R. § 208.31(c) ("The alien may be represented by counsel . . . at the interview"); *see also* 8 U.S.C. § 1362 (providing that noncitizens shall have the privilege of being represented by counsel of their choosing in any removal proceedings); *Orozco-Lopez v. Garland*, 11 F.4th 764, 777 (9th Cir. 2021) (holding that "any removal proceedings" includes those concerning eligibility for relief from removal, such as a reasonable fear screening for people with reinstated orders); USCIS Reasonable Fear Procedures Manual § III.E.5.a ("The alien may be represented at the interview by counsel").

**First Amendment Retaliation**

55.     The First Amendment to the United States Constitution provides in part that "Congress shall make no law . . . abridging the freedom of speech  . . . or the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. Amend. I.

---

[2] Of relevance to a petition for review challenging the underlying reinstatement order, that order is not final for purposes of judicial review until the reasonable fear and withholding-only proceedings are finished. *Luna-Garcia v. Holder*, 777 F.3d 1182, 11185 (10th Cir. 2015); *see also Arostegui-Maldonado v. Garland*, 75 F.4th 1132, 1139 (10th Cir. 2023) (affirming *Luna-Garcia*).

56.    Speech on matters of public concern is entitled to the highest level of protection under the First Amendment. *See, e.g., Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1034 (1991) ("[S]peech critical of the exercise of the State's power lies at the very center of the First Amendment."). Moreover, government action that targets private speech based on the viewpoint taken by the speaker is an egregious form of content discrimination and presumptively unconstitutional. *See Matal v. Tam*, 582 U.S. 218 (2017).

57.    To bring a claim of First Amendment retaliation, a plaintiff must allege facts showing: "(1) that [she] was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2020) (quotations omitted).

## CLAIMS FOR RELIEF

### COUNT ONE

### Violation of Fifth Amendment Right to Due Process

58.    The Respondents have violated Ms. Vizguerra-Ramirez's rights to constitutional due process by detaining her without statutory authority.

59.    There are only two possible sources of the Respondents' detention authority. The first is 8 U.S.C. § 1226, which authorizes the detention of noncitizens during the pendency of removal proceedings. However, Respondents have indicated to Ms. Vizguerra-Ramirez that she will not be placed in removal proceedings under 8

U.S.C. § 1229a.

60.     The second is 8 U.S.C. § 1231, which authorizes the detention of noncitizens following the issuance of an administratively final order of removal. Ms. Vizguerra-Ramirez, however, has no such order. She received a grant of voluntary departure in lieu of a removal order in 2011 and departed the U.S. while that order was tolled. The government's attempt at reinstatement in 2013 was fatally flawed by its decision to issue that putative order *prior to* meeting its regulatory duty of informing Ms. Vizguerra-Ramirez of her right to challenge the determination. Therefore, the agency's putative reinstatement order, on which its detention authority is based, does not meet the regulatory definition of a reinstatement order. 8 C.F.R. § 241.8(b).

61.     Absent detention authority under § 1226 or § 1231, the Respondents' decision to detain Ms. Vizguerra-Ramirez violates the Due Process Clause of the Fifth Amendment.

**COUNT TWO**

**Violation of 8 U.S.C. § 1231(a)(5) and Implementing Regulations**

62.     To the extent Respondents assert detention authority under 8 U.S.C. § 1231(a)(5), that argument would be unfounded considering the government's failure to abide by its due process protections, to wit, the requirement that Ms. Vizguerra-Ramirez be informed of the intended reinstatement, and of her right to challenge that determination, *prior to* the issuance of a final order. The document it is relying on to trigger its detention authority does not meet the regulatory definition of a reinstatement order. 8 C.F.R. § 241.8(b).

63.     For these reasons, Respondents' detention of Ms. Vizguerra-Ramirez violates 8 U.S.C. § 1231(a)(5) and 8 C.F.R. § 241.8(b).

## COUNT THREE

### Retaliation and Discrimination in Violation of the First Amendment

64.     Ms. Vizguerra-Ramirez's speech is protected by the First Amendment. Her past speech pertained to matters of prominent public concern—the conditions of immigration detention system and abuses of government power. She has spoken out repeatedly over the course of many years against the detention of noncitizens and the forced separation of families. Her advocacy has received significant state and national attention.

65.     The way Respondents publicly celebrated their apprehension of Ms. Vizguerra-Ramirez, and substantially compromised her ability to have a fair hearing on her claim for persecution-based protections, is likely to chill the speech of other immigrants opposed to the government's immigration policies and practices. Left undisturbed, ICE's actions in this case would have a devastating effect on vital political speech, allowing a government agency to abuse immigrants and then deport the victims of its illegal actions.

66.     There is a substantial causal connection between Ms. Vizguerra-Ramirez's protected speech and Respondents' adverse actions and threats. Respondents have been motivated to silence Ms. Vizguerra-Ramirez due to her status as the face of the sanctuary movement.

67.     Ms. Vizguerra-Ramirez is suffering severe and ongoing harm because of Respondents' actions, including separation from her family and the threat of deportation

to a country where she fears persecution or torture, without a fundamentally fair process. This includes being subjected to a series of procedural violations and irregularities in the reasonable fear process that raise serious due process concerns and strongly suggest retaliatory intent. The handling of Ms. Vizguerra-Ramirez's RFI reflects a clear interference with attorney-client access, failure to follow typical agency protocol, and a pattern of misrepresentation regarding Ms. Vizguerra-Ramirez's rights. These actions—taken while Ms. Vizguerra-Ramirez remains in ICE custody and under ongoing judicial protection—reflect a broader strategy to bypass meaningful review despite unresolved jurisdictional and constitutional claims. They constitute retaliation.

68. Respondents' actions against Ms. Vizguerra-Ramirez based on her protected speech do not serve a compelling state interest, and are not narrowly tailored to any legitimate government interest.

## PRAYER FOR RELIEF

Wherefore, Petitioner respectfully requests this Court to grant the following:

(1) Assume jurisdiction over this matter.

(2) Issue an Order to Show Cause ordering Respondents to show cause why this Petition should not be granted.

(3) Declare that Petitioner's detention violates the Due Process Clause of the Fifth Amendment, 8 U.S.C. § 1231(a)(5), and 8 C.F.R. § 241.8(b).

(4) Declare that Respondents' retaliatory actions in detaining Petitioner and compromising her rights to access to counsel violated her free speech rights under the First Amendment.

(5)    Issue a Writ of Habeas Corpus ordering Respondents to release Petitioner immediately.

(6)    Enter an injunction restraining Respondents from taking any action to deport Petitioner unless Respondents demonstrate that such action is untainted by unlawful First Amendment retaliation and discrimination.

(7)    Award Petitioner attorney's fees and costs under the Equal Access to Justice Act, and on any other basis justified under law.

(8)    Grant any further relief this Court deems just and proper.

Dated: April 8, 2025

Respectfully submitted,

/s/ Laura L. Lichter
*Counsel for Plaintiff-Petitioner*

Laura L. Lichter                                    Brian Scott Green
Lichter Immigration                            Law Office of Brian Green
1601 Vine Street                                 9609 S. University Boulevard, #630084
Denver, CO 80206                             Highlands Ranch, CO 80130
(303) 554-8400                                   (443) 799-4225
LLichter@LichterImmigration.com    BrianGreen@greenUSimmigration.com

Mark R. Barr
Lichter Immigration
1601 Vine Street
Denver, CO 80206
(303) 554-8400
MBarr@LichterImmigration.com

## VERIFICATION PURSUANT TO 28 U.S.C. § 2242

I represent Petitioner-Plaintiff, Jeanette Vizguerra-Ramirez, and I submit this verification on her behalf. I hereby verify that the factual statements made in the foregoing Amended and Verified Petition for Writ of Habeas Corpus are true and correct to the best of my knowledge.

Dated this 8th day of April 2025.

/s/ Laura L. Lichter
*Counsel for Plaintiff-Petitioner*

## INDEX OF ATTACHED EXHIBITS

| Ex. | Document |
|-----|----------|
| A | Putative Reinstatement Order (July 24, 2013). |
| B | Amended Petition Showing Additions and Deletions, pursuant to D.C.COLO.LCivR 16.2. |