# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 25-cv-00881-NYW-KAS

Jeanette Vizguerra-Ramirez,

      Petitioner-Plaintiff,

v.

Juan Baltazar,
      Warden, Aurora ICE Processing Center,
Robert Guadian,
      Field Office Director, U.S. Immigration and Customs Enforcement, U.S.
      Department of Homeland Security,
Kristi Noem,
      Secretary, U.S. Department of Homeland Security,
Pamela Bondi,
      U.S. Attorney General, U.S. Department of Justice,

        in their official capacities,

      Respondents-Defendants

---

## AMENDED AND VERIFIED PETITION FOR WRIT OF HABEAS CORPUS

---

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 4

JURISDICTION ................................................................................................... 6

VENUE ............................................................................................................... 7

PARTIES ............................................................................................................ 7

STATEMENT OF FACTS .................................................................................... 9

    Procedural History of Putative Reinstatement Order ........................................... 9

        IJ Denial of Cancellation and Grant of Voluntary Departure in 2011 .......... 9

        BIA Appeal and Tolling of Voluntary Departure Period ............................ 10

        Departure and Return While Appeal Pending ......................................... 10

        Issuance of Putative Reinstatement Order in 2013 .................................. 11

        ICE Stay of Removal in 2013 .................................................................. 12

        Detention in 2025 .................................................................................. 12

        Judicial and Administrative Challenges to Detention and Reinstatement 12

            a.    Habeas Corpus .................................................................... 12

            b.    Withholding of Removal ........................................................ 12

            c.    Petition for Review .............................................................. 13

    Ms. Vizguerra-Ramirez's History as an Outspoken Activist ................................ 15

    Evidence of Retaliatory Arrest ....................................................................... 16

    Continued Retaliation in Detention .................................................................. 18

    Broader Context of First Amendment Retaliation .............................................. 23

    Conditions of Detention ................................................................................. 25

STATEMENT OF LAW ...................................................................................... 27

    Voluntary Departure ...................................................................................... 27

    Reinstatement of Removal ............................................................................. 29

    Withholding-Only Proceedings ....................................................................... 30

    First Amendment Retaliation .......................................................................... 31

    Detention During Withholding Only Proceedings .............................................. 32

    Prolonged, Post-Removal Order Detention in Violation of Due Process ............. 32

        Recent Post-Order Detention Cases Brought in the District of Colorado . 34

            a.    Use of the Singh Factors ..................................................... 35

            b.    Bond Hearing as a Remedy ................................................ 35

CLAIMS FOR RELIEF ...................................................................................... 36

    Count 1: Violation of Fifth Amendment Right to Due Process (Unlawful Detention) ....................................................................................................................... 36

    Count 2: Violation of 8 U.S.C. § 1231(a)(5) and Implementing Regulations ....... 37

    Count 3: Retaliation and Discrimination in Violation of the First Amendment ..... 38

Count 4: Violation of Fifth Amendment Rights to Procedural Due Process (Unreasonably Prolonged Detention) ...................................................... 39

The *Singh* Factors Weigh in Petitioner's Favor ....................................... 40

    a.    Duration of Detention ........................................................ 40

    b.    Likelihood of Continued Detention ..................................... 40

    c.    Conditions of Detention...................................................... 41

    d.    Delays Caused by the Noncitizen and by the Government 44

    e.    Likelihood that Removal Proceedings Will Result in Removal ............................................................................................ 45

Appropriate Remedies: Grant of Immediate Release or Individualized Bond Hearing in which the Government Bears the Burden ........... 46

PRAYER FOR RELIEF ................................................................................... 48

INDEX OF ATTACHED EXHIBITS ................................................................ 50

## INTRODUCTION

Petitioner-Plaintiff, Jeanette Vizguerra-Ramirez (hereinafter "Petitioner") a citizen of Mexico and nationally prominent advocate for immigrant rights, was detained on Monday, March 17, 2025, without statutory authority and in apparent retaliation for her outspoken criticisms of this country's immigration enforcement policies and practices. Nonetheless, the Respondents-Defendants ("Respondents") continue to detain Ms. Vizguerra-Ramirez. The length of such detention has become unreasonable and is in violation of her Fifth Amendment due process rights.

Ms. Vizguerra-Ramirez's case is in legal limbo. She has not been placed in removal proceedings, under 8 U.S.C. § 1229a, which would permit her detention under 8 U.S.C. § 1226 pending a decision on whether she is to be ordered removed from the U.S. While Respondents-Defendants ("Respondents") assert Ms. Vizguerra-Ramirez has a prior order of removal which has been reinstated, authorizing her detention under 8 U.S.C. § 1231(a)(5), the administrative record shows the putative order to be so procedurally and substantively deficient such that it does not meet the regulatory definition of a reinstatement order and therefore cannot trigger the Respondents' claimed statutory authority to detain.

Furthermore, the decision of Respondents from the U.S. Department of Homeland Security ("DHS" or "the Department") to target Ms. Vizguerra-Ramirez for detention, substantially on account of her protected speech, strikes at the heart of the First Amendment. As the Supreme Court has held, "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *City of*

*Houston, Tex. v. Hill,* 482 U.S. 451, 462–63 (1987). As shown by the prominence of immigration issues in the recent election, immigration policy is a matter of heightened public concern, making discussions about the topic clearly covered within the scope of First Amendment protection. *See Connick v. Myers,* 461 U.S. 138, 145 (1983) ("[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection."); *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1034 (1991) ("[S]peech critical of the exercise of the State's power lies at the very center of the First Amendment."). By specifically targeting Ms. Vizguerra-Ramirez for detention due to her national prominence as an activist, a status achieved through her sharp critiques of government enforcement policies, the Department's actions—including the highly unusual moves of publicizing a photo of her shackled on social medial and publicly commenting on her individual case—violated her rights under the First and Fifth Amendments of the U.S. Constitution, the Immigration and Nationality Act, and its own federal regulations. Unfortunately, Ms. Vizguerra-Ramirez's retaliatory arrest is not an aberration, as noncitizens exercising their speech rights have been targeted throughout the country in recent months. *See*, *e.g.*, *Khalil v. Joyce, et al.*, 2:25-cv-01963 (D.N.J. 2025); *Ozturk v. Hyde, et al.*, 1:25-cv-10695 (D. Mass 2025).

Inside detention, Respondents continued their retaliatory actions, treating Ms. Vizguerra-Ramirez differently than other people in detention by substantially limiting and interfering with her access to counsel and in violation of their own procedures when processing her for a reasonable fear interview ("RFI"), a mandatory screening as to whether Ms. Vizguerra-Ramirez's removal would subject her to harm if returned to Mexico. Rather than functioning as a protective mechanism for those fearing

persecution or torture, the administrative RFI process in this case was administered in a manner that appeared to subvert its intended purpose from protective to punitive.

By detaining Ms. Vizguerra-Ramirez beyond six months, the Respondents also violate her Fifth Amendment due process rights and subject her to prolonged detention. The Supreme Court in *Zadyvdas v. Davis* made clear that after six months, post-removal detention is no longer "presumptively reasonable." There is no substantial likelihood that DHS will be able to carry out Ms. Vizguerra-Ramirez's removal in the reasonably foreseeable future due to her on-going withholding-only proceedings and the likelihood of subsequent administrative and judicial appeals.

Courts in this district are familiar with constitutional claims against prolonged, post-removal detention, frequently applying the *Singh* factors to assess whether the government is violating the petitioner's due process rights.

Accordingly, to vindicate Ms. Vizguerra-Ramirez's constitutional, statutory, and regulatory rights, this Court should grant the instant petition for a writ of habeas corpus. In doing so, this Court should declare Respondents' actions unlawful, order Ms. Vizguerra-Ramirez's release or require an individualized bond hearing where the government carries the burden of proof, and enjoin Respondents from detaining or deporting Ms. Vizguerra-Ramirez in the future unless Respondents can demonstrate an unambiguous statutory authority for such detention and clearly establish that their actions are untainted by impermissible First Amendment retaliation.

## JURISDICTION

1.    This action arises under the Constitution of the United States and the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq*.

2.      This Court has subject matter jurisdiction under 28 U.S.C. § 2241 (habeas corpus), 28 U.S.C. § 1331 (federal question), Article I, § 9, cl. 2 of the United States Constitution (Suspension Clause), the First Amendment, and the Fifth Amendment.

3.      An actual and justiciable controversy exists between the parties under 28 U.S.C. § 2201. This Court may grant declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*; the All Writs Act, 28 U.S.C. § 1651; 28 U.S.C. § 2241(a); Fed. R. Civ. P. 57, 65; as well based on its inherent authority to grant equitable relief. *See, e.g., Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971).

4.      Petitioner is in custody for purposes of habeas jurisdiction because she is detained at the Aurora ICE Processing Center in Aurora, Colorado.

## VENUE

5.      Venue is proper because Ms. Vizguerra-Ramirez is detained at the GEO Group's ICE Processing Center in Aurora, Colorado, which is within the jurisdiction of this District. 28 U.S.C. § 224(a). In addition, venue is proper in this District because a substantial part of the events giving rise to Ms. Vizguerra-Ramirez's claims occurred in this District, and she resides in this District and no real property is involved in this action. 28 U.S.C. §§ 1391(b)(2) and (e)(1). *See Braden v. 30th Judicial Circuit*, 410 U.S. 484, 493–94 (1973).

## PARTIES

6.      Petitioner, Jeanette Vizguerra-Ramirez, is a 53-year-old native and citizen of Mexico and mother of four children, three of whom are U.S. citizens. She has no current, lawful status in the U.S., despite years of seeking a path to permanent, legal status based on her residence of nearly thirty years, substantial ties to the community,

and broad public support due to her many years of social activism. She is being detained at the GEO Group's ICE Processing Center in Aurora, Colorado. She is in the custody, and under the direct control, of Respondents and their agents and/or others working in active concert or participation.

7.      Respondent Baltazar is sued in his official capacity as the Warden of the GEO Group's ICE Processing Center in Aurora. He has immediate physical custody of Ms. Vizguerra-Ramirez pursuant to the GEO Group's contract with U.S. Immigration and Customs Enforcement ("ICE") to detain noncitizens. Respondent Baltazar is a legal custodian of Ms. Vizguerra-Ramirez.

8.      Respondent Guadian is sued in his official capacity as the Field Office Director of the Denver ICE Office. ICE is a component agency of DHS. In this capacity, he is responsible for the administration of immigration laws and the execution of detention and removal determinations, including coordination with United States Citizenship and Immigration Services ("USCIS"), another component agency of DHS. Respondent Guadian is a legal custodian of Ms. Vizguerra-Ramirez and has authority to release her.

9.      Respondent Noem is sued in her official capacity as the Secretary of DHS. In this capacity, Respondent Noem is responsible for the implementation and enforcement of the immigration laws pursuant to 8 U.S.C. § 1103(a). She routinely transacts business in this District and is legally responsible for pursuing any effort to detain and remove the Petitioner, including coordination with ICE and USCIS. Respondent Noem is a legal custodian of Ms. Vizguerra-Ramirez.

10.     Respondent Bondi is sued in her official capacity as the Attorney General of the United States and the senior official of the U.S. Department of Justice ("DOJ"). In that capacity, she has the authority to adjudicate removal cases and to oversee the Executive Office for Immigration Review ("EOIR"), which administers the immigration courts and the Board of Immigration Appeals. Respondent Bondi has the authority to release Ms. Vizguerra-Ramirez pending a decision on whether she is to be removed from the United States. Respondent Bondi is a legal custodian of Ms. Vizguerra-Ramirez.

## STATEMENT OF FACTS

### Procedural History of Putative Reinstatement Order

### IJ Denial of Cancellation and Grant of Voluntary Departure in 2011

11.     Ms. Vizguerra-Ramirez is a 53-year-old citizen of Mexico. In 1997, at the age of 25, she fled to the U.S. with her husband and daughter due to the persecution her husband experienced at his job from criminal organizations. The family entered the United States without inspection.

12.     In 2009, Ms. Vizguerra-Ramirez was placed in removal proceedings. As a defense to removal, she applied for cancellation of removal, a form of relief that authorizes an Immigration Judge to "cancel" a noncitizen's deportation and grant lawful permanent residency if the applicant meets four statutory requirements, including a demonstration of exceptional and extremely unusual hardship to certain relatives with lawful status. Ms. Vizguerra-Ramirez sought relief based on the hardship that would befall her three U.S. citizen children.

13.     On November 18, 2011, an Immigration Judge in Denver denied Ms. Vizguerra-Ramirez's application for cancellation of removal, finding that she had not met

the high standard for demonstrating her removal would constitute an exceptional and extremely unusual hardship. However, the Immigration Judge granted Ms. Vizguerra-Ramirez's alternate request for voluntary departure, giving her 60 days to leave the country in lieu of a removal order.

## BIA Appeal and Tolling of Voluntary Departure Period

14.     On December 16, 2011, Ms. Vizguerra-Ramirez timely appealed the denial of her cancellation application to the Board of Immigration Appeals. Her timely appeal meant that her 60-day period of voluntary departure was tolled during the pendency of the appeal. 8 C.F.R. § 1003.6(a).

## Departure and Return While Appeal Pending

15.     In September 2012, while her appeal remained pending, Ms. Vizguerra-Ramirez learned that her mother was dying. Wanting to see her one last time, Ms. Vizguerra-Ramirez flew back to Mexico. Her departure from the United States, by regulation, triggered a subsequent, automatic withdrawal of her appeal. 8 C.F.R. § 1003.4.

16.     Having attended her mother's funeral and grieved with family in Mexico, Ms. Vizguerra-Ramirez returned to the U.S., without inspection, in April 2013. She was apprehended shortly after her entry and charged criminally for illegal entry, a misdemeanor, under 8 U.S.C. § 1325(a)(1), receiving a sentence of one year of unsupervised probation.

17.     After being released from criminal custody, Ms. Vizguerra-Ramirez was turned over to ICE custody in El Paso, Texas, where she remained until June 7, 2013. Ms. Vizguerra-Ramirez was then released under an order of supervision, which required her to report to the Denver ICE Field Office in Centennial, Colorado.

## <u>Issuance of Putative Reinstatement Order in 2013</u>

18.    On July 24, 2013, at her check-in, ICE officials detained Ms. Vizguerra-Ramirez. The next day, July 25, 2013, ICE officials presented her with a putative reinstatement order on Form I-871, which was filled out, signed and dated on both the top (notice of intent to reinstate) *and* bottom (final reinstatement order). Having been notified on July 25th that an order had already issued the day prior and without notice or opportunity to contest the determination, Ms. Vizguerra-Ramirez declined to sign the middle of the form. That order is attached and incorporated hereto as Exhibit A.

19.    The putative reinstatement order dated July 24, 2013, is the order on which Respondents seek to detain Ms. Vizguerra-Ramirez. However, it is unambiguously facially deficient and does not satisfy the minimum regulatory definition of a reinstatement order. 8 C.F.R. § 241.8(b). It clearly indicates that ICE officials issued the order on July 24th *before* informing Ms. Vizguerra-Ramirez of its existence and of her right to raise an objection prior to the order becoming final. It also clearly indicates that the officer making the decision to reinstate did not review "all available evidence" or any "statements made or submitted in rebuttal" before signing the order portion of the form. Thus, the officer could not have credibly executed the required "Certification" by signing the putative order.

20.    The procedural error was not immaterial. Had Ms. Vizguerra-Ramirez been notified of the possibility of a reinstatement order, she could have alerted officials to the fact that she did *not* have a prior removal order. Instead, she had a grant of voluntary departure that was issued in lieu of a removal order, and by leaving the U.S. while her appeal was pending, she necessarily complied with the order's departure

deadline and did not leave under an order of removal. Absent a prior removal order, there was nothing to be reinstated in 2013.

### ICE Stay of Removal in 2013

21.     Perhaps aware of the due process violation, ICE agents granted Ms. Vizguerra-Ramirez a stay of removal on August 8, 2013. Since that time, ICE repeatedly granted extensions of that stay of removal, with her most recent stay expiring in 2024. Under then-current guidance in 2024, Ms. Vizguerra-Ramirez was not an enforcement priority; an extension of stay was unnecessary and unlikely to be adjudicated.

### Detention in 2025

22.     On Monday, March 17, 2025, Ms. Vizguerra-Ramirez was arrested by ICE agents while on her lunch break from work at Target. She was placed in shackles, photographed, and told in Spanish by one of the officers, "We finally got you!" She was transported to the GEO Aurora ICE Processing Center, where she has remained in custody.

### Judicial and Administrative Challenges to Detention and Reinstatement

#### a.      Habeas Corpus

23.     Ms. Vizguerra-Ramirez has challenged the legality of her detention before this Court, with her initial habeas petition filed on March 18, 2025, focused on the absence of a legally cognizable reinstatement order. On April 8, 2025, she filed an amended petition, adding a First Amendment retaliation claim.

#### b.      Withholding of Removal

24.     In detention, Ms. Vizguerra-Ramirez expressed a fear of persecution or torture in Mexico. She has a long record of public criticism of systemic corruption and violence in Mexico, as well as the United States. Her activism has targeted abuses by

the Mexican government, law enforcement, and cartel collusion, making her a visible and outspoken political dissident. Ms. Vizguerra-Ramirez's sincerely held and consistently demonstrated political beliefs arise out of her deeply held conviction that all people deserve basic, fundamental human rights and that governments and others must respect those rights. This includes basic protections for workers, the indigenous, migrants and women. Her beliefs and activism have, and will, make her a target for retribution by the Mexican government and by cartels that the government is unable or unwilling to control.

25.    Officials from the USCIS Asylum Office, following a procedurally flawed and prejudicial initial screening, determined that Ms. Vizguerra-Ramirez did not establish a reasonable fear of persecution or torture. However, an Immigration Judge later reversed that determination, allowing Ms. Vizguerra-Ramirez to proceed with an application for withholding of removal under 8 U.S.C. § 1231(b)(3)(B) and protection under the Convention Against Torture ("CAT"), pursuant to 8 C.F.R. § 1208.16-18. The application is currently pending before an immigration judge.

### c.    Petition for Review

26.    Ms. Vizguerra-Ramirez has the right to challenge the government's putative reinstatement order before the Tenth Circuit Court of Appeals, where she would argue that it was legal error to hold that a tolled grant of voluntary departure converts to a removal order if the recipient departs the U.S. during the pendency of her agency appeal. The deadline for filing a petition for review is 30 days. 8 U.S.C. § 1252(b)(1).

27.    Ms Vizguerra-Ramirez did not file a petition for review within 30 days in 2013 because, at that time, a person with a reinstated order of removal could not seek judicial review until reasonable fear and withholding-only proceedings were finished.

*See*, *e.g.*, *Neri-Garcia v. Holder*, 696 F.3d 1003, 1008 (10th Cir. 2012) (PFR of denial of relief in reasonable fear proceedings was "timely filed" upon completion of the reasonable fear proceedings). Also in 2013, the only circuit to have directly addressed the issue held that a reinstated order of removal did not become final for purposes of § 1252(b)(1) until reasonable fear proceedings were completed. *Ortiz-Alfaro v. Holder*, 694 F.3d 955, 958 (9th Cir. 2012). In 2014, the Tenth Circuit formally agreed with the Ninth, holding that a reinstatement order was not final for purposes of judicial review until the reasonable fear and withholding-only proceedings were finished. *Luna-Garcia v. Holder*, 777 F.3d 1182, 11185 (10th Cir. 2015). The Tenth Circuit later affirmed that holding in *Arostegui-Maldonado v. Garland*, 75 F.4th 1132, 1139 (10th Cir. 2023). In Ms. Vizguerra-Ramirez's case, her reasonable-fear and withholding proceedings were not completed within 30 days of the issuance of the reinstatement order. In fact, they had not even started and would not start for over a decade. This is because ICE, despite issuing the putative reinstatement order in 2013, did not seek to immediately execute that order, instead granting Ms. Vizguerra-Ramirez a stay of removal, which it then renewed numerous times in the subsequent years.

28.    Immediately following Ms. Vizguerra-Ramirez's detention in March, and faced with the prospect of immediate removal, she filed a precautionary petition for review with the Tenth Circuit, Case No. 25-9532. She later voluntarily withdrew that petition once she received confirmation that her reasonable-fear proceedings had been initiated, relying on *Luna-Garcia* and *Arostegui-Maldonado*, and anticipating that those protection claims would need to reach finality before she could seek judicial review of the underlying reinstatement order.

29.    That reliance changed with the Supreme Court's decision in *Riley v. Bondi*, 145 S. Ct. 2190 (2025) on June 26, 2025. In *Riley*, the Supreme Court held that, for purposes of judicial review, a DHS-issued removal order, not the agency's decision at the conclusion of withholding-only proceedings, is the final removal order that triggers the 30-day filing deadline for a petition for review. In so holding, the Court overturned decisions from every court of appeals except the Second and Fourth Circuits holding that the deadline commences at the end of fear-based proceedings. This included an overruling of *Arostegui-Maldonado* in the Tenth Circuit. In addition, the Supreme Court held that the 30-day filing deadline is a non-jurisdictional claim-processing rule subject to equitable exceptions including waiver and forfeiture, and possibly equitable tolling.

30.    Within 30 days of *Riley*, Ms. Vizguerra-Ramirez filed another petition for review, Case No. 25-9559. It is currently pending, with an opening brief due on October 14, 2025.

**Ms. Vizguerra-Ramirez's History as an Outspoken Activist**

31.    The reason ICE was glad they finally "got" Ms. Vizguerra-Ramirez appears to be tied to her long history as an immigration and labor activist. After years of union organizing, she first received significant national attention in 2017, shortly after the start of the first Trump term, when she took sanctuary in Denver's First Unitarian Society, and later in the First Baptist Church. *Advocates say ICE agent pursued a personal vendetta against undocumented immigrant Jeanette Vizguerra*, Denverite (March 3, 2017) (https://denverite.com/2017/03/03/advocates-say-ice-agent-pursued-personal-vendetta-undocumented-immigrant-jeanette-vizguerra/) (last visited September 29, 2025). Community members poured into the streets to march in support of her decision to seek sanctuary. *Hundreds march from Civic Center Park to First Unitarian Church to*

*support Jeanette Vizguerra*, Denverite (February 18, 2017)

(https://denverite.com/2017/02/18/hundreds-march-civic-center-park-first-unitarian-church-support-jeanette-vizguerra/) (last visited September 29, 2025). Her sanctuary stay made Ms. Vizguerra-Ramirez "perhaps the best-known undocumented immigrant in Colorado" as she became the "new face of the sanctuary movement." *Who is Jeanette Vizguerra, the Denver immigration activist detained by ICE?*, Denverite (March 18, 2025) (https://denverite.com/2025/03/18/who-is-jeanette-vizguerra-ice-detained/) (last visited September 29, 2025). She was named one of Time Magazine's "100 most influential people" in April 2017, with actress America Ferrera writing the vignette for her entry. *Jeanette Vizguerra, undocumented Denver immigrant, honored as one of TIME's 100 most influential people*, Denverite (April 20, 2017).

(https://denverite.com/2017/04/20/denvers-jeanette-vizguerra-one-times-100-influential-people/) (last visited September 29, 2025). In the years since, Ms. Vizguerra-Ramirez "has been a regular face at protests," and "she has also been a vocal advocate in Facebook groups meant to spread the word about ICE's actions in the metro area." *Who is Jeanette Vizguerra, the Denver immigration activist detained by ICE?*, Denverite (March 18, 2025) (https://denverite.com/2025/03/18/who-is-jeanette-vizguerra-ice-detained/) (last visited September 29, 2025); see also https://www.facebook.com/jeanette.vizguerra.

**Evidence of Retaliatory Arrest**

32.    There are strong indications that ICE's enforcement actions against Ms. Vizguerra-Ramirez were driven, to a large degree, by a desire for retaliation due to her prominence as a critic of Trump immigration policies, and to send a message to other potential critics. The signs of a retaliatory motive include the following.

a.    On March 19, 2025, Denver ICE chose to publish news of Ms. Vizguerra-Ramirez's arrest on its X account (@ERODenver), with a picture of her in handcuffs and chained at the waist. The post was amplified by the main ICE X account (@ICEgov) on March 21, 2025, commenting, "In 2017, Jeanette Vizguerra-Ramirez hid in Denver churches for nearly three months to avoid arrest. Despite her being featured in national media for years, we arrested her in public March 17. A high-profile status does not exempt a person from immigration law [sic]." Among hundreds of posts about arrests and removals conducted by ICE in the last three months, the post about Ms. Vizguerra-Ramirez uniquely focuses on her activism and national prominence.

b.    On March 19, 2025, Tricia McLaughlin said on X that, "Under President Trump and Secretary Noem, we are once again a nation of laws. We will find, arrest, and deport illegal aliens regardless of if they were a featured 'Time Person of the Year.'" Tricia McLaughlin is the Assistant Secretary for Public Affairs within DHS. She oversees the Department's public outreach, including its media, digital, strategic and crisis communications efforts, and serves as the principal advisor to Secretary Noem on all external and internal communications.

c.    On March 18, 2025, John Fabbricatore responded in celebration on X in response to Ms. Vizguerra-Ramirez's arrest. He said, "She is a criminal, hates Trump, and is an open-borders, abolish-ICE advocate. Bye!!!!" Mr. Fabbricatore served several years as the Field Office Director of the Denver ICE Office. He was serving as the Assistant Field Office Director in 2013, when his

office issued the putative reinstatement order against Ms. Vizguerra-Ramirez, and in early 2017, when she first went into sanctuary.

      d.     On the same day, in response to his own post, Mr. Fabbricatore posted screenshots from Ms. Vizguerra-Ramirez's Facebook page indicating her strident opposition to ICE and to Trump.

      e.     On the same day, and in a different post on X, Mr. Fabbricatore said people should "stop with their tear-jerking for a criminal and anti/ICE [sic] activist."

      f.     On March 26, 2025, in response to news of Trump planning an executive order to end so-called sanctuary cities, Mr. Fabbricatore said on X, "Let's go!!!! End Sanctuary!" Ms. Vizguerra-Ramirez is known nationally for her involvement with the sanctuary movement.

      g.     As previously noted, at the time of Ms. Vizguerra-Ramirez's arrest, one of the agents told her, in Spanish, "We finally got you!"

### Continued Retaliation in Detention

33.     Evidence of the government's retaliatory motives are also seen in how Ms. Vizguerra-Ramirez has been treated following her arrest. USCIS, acting in concert with ICE, initiated and repeatedly pursued Ms. Vizguerra-Ramirez's reasonable fear interview (RFI) without notice to counsel, in violation of its own protocols and due process protections. In doing so, the agency repurposed the RFI into a procedural formality designed not to assess potential harm if removed, but to eliminate a perceived barrier to enforcement of a legally defective removal order and to further retaliate against Ms. Vizguerra-Ramirez for her widely known public criticisms of ICE's enforcement policies and practices.

34.     On the day of Ms. Vizguerra-Ramirez's arrest, undersigned counsel contacted ICE via email and informed them, *inter alia*, of Ms. Vizguerra-Ramirez's fear of return to Mexico. She noted that <u>if</u> the agency had a valid reinstatement order (which counsel noted was in doubt), then Ms. Vizguerra-Ramirez was entitled to and formally requested referral to the USCIS Asylum Office for an RFI. Counsel also provided ICE with an executed G-28, Notice of Entry of Appearance as counsel of record.

35.     On the afternoon of Tuesday, March 18, 2025, Ms. Vizguerra-Ramirez was taken to meet with an ICE officer who advised her that she would have an RFI with a USCIS asylum officer to assess her fear of return to Mexico. The ICE officer made the referral to the Asylum Office the same day, providing a copy of counsel's G-28, Entry of Appearance.

36.     Between March 18, 2025 until the early morning of March 22, 2025, undersigned counsel could not communicate with Ms. Vizguerra-Ramirez. In response to two men escaping the Aurora facility, ICE and GEO engaged in a facility-wide lockdown. All phone access—including legal calls—was suspended. Even after phone access was restored, Ms. Vizguerra-Ramirez's personal phone PIN remained inactive. Ms. Vizguerra-Ramirez was unable to speak with her attorney until approximately 7:15 a.m. on Saturday, March 22, 2025.

37.     Meanwhile, on Thursday, March 20, 2025, at approximately 8:30 am, a GEO guard pulled Ms. Vizguerra-Ramirez from a medical appointment and took her to speak with "Asylum." This was in violation of USCIS' own procedures that such interview could not be conducted until at least 48 hours after referral. Ms. Vizguerra-

Ramirez objected to the lack of notice and expressed her right to counsel. The interview was postponed.

38.     On Monday, March 24, 2025, Ms. Vizguerra-Ramirez was called again for an interview with an asylum officer without advance notice, again in violation of USCIS protocols. She told the asylum officer that she could not proceed because she could not communicate with counsel while the phones were down and her attorney was not present. The asylum officer placed Ms. Vizguerra-Ramirez on hold several times while consulting with a supervisor and ultimately informed her that the interview would be rescheduled.

39.     On March 25, 2025, Ms. Vizguerra-Ramirez was summoned for a third attempted interview with an asylum officer. At approximately 8:15 a.m., she was escorted to an interview room and connected by phone with an asylum officer. After Ms. Vizguerra-Ramirez protested, the interview was discontinued.

40.     On the morning of Thursday, March 27, 2025, a GEO guard informed Ms. Vizguerra-Ramirez she had to choose between a legal visit and a visit with her children. Believing that her attorney needed to speak with her, she chose the legal visit, only to learn later that she was being brought to a fourth attempted RFI, despite having been told the interview would take place no earlier than Monday, March 31, 2025.

41.     The asylum officer attempted to start the interview, but Ms. Vizguerra-Ramirez said the prior asylum officer had told her it would be scheduled for Monday, March 31, at the earliest, as well as reiterated the reasons she was not fully prepared to proceed. The asylum officer attempted to call undersigned counsel, but she was

unavailable. The RFI was again pushed back. The Asylum Office *never* provided counsel with advance notice prior to any of the four failed interview attempts.

42.     On March 29, 2025, USCIS contacted counsel via email to inform her that they would conduct the RFI on Monday, March 31, 2025, at 8:30 a.m.

43.     On March 30, 2025, undersigned counsel responded to the email, submitting a detailed letter to USCIS citing irregularities in the handling of Ms. Vizguerra-Ramirez's RFI. Counsel specifically requested that the RFI be held in abeyance pending resolution of jurisdictional issues in the pending federal litigation, or, at a minimum, that the RFI be rescheduled with sufficient notice to allow undersigned counsel to be present in person with her client. The letter cited the agency's own Reasonable Fear Procedures Manual, which authorizes such delay at counsel's request or where exceptional circumstances exist. USCIS Reasonable Fear Procedures Manual, Section III.B.3 ("The APSS processing clock may only be tolled due to: a request by the alien or the alien's representative to defer the reasonable fear interview; . . . or exceptional circumstances.").

44.     On March 31, 2025, USCIS again attempted to conduct the RFI. At approximately 8:30 a.m., Ms. Vizguerra-Ramirez was taken to the interview room and placed on the phone with an asylum officer. After nearly 45 minutes, the asylum officer called counsel. Counsel informed the officer of her prior correspondence requesting the RFI be held in abeyance.

45.     Despite counsel's objections, the asylum officer next attempted to place Ms. Vizguerra-Ramirez under oath and proceed with the RFI. Counsel continued her objections as the asylum officer attempted to steamroll through the interview upon

direction from his supervisor, admonishing counsel and advising her that she was only permitted to observe. Counsel advised her client not to proceed with the interview, and Ms. Vizguerra-Ramirez disconnected at 9:45 a.m. Counsel remained on the line, requesting to speak with a supervisor. After 15 minutes without response from a supervisor, counsel ended the call.

46.     Just minutes after counsel got off the phone, Ms. Vizguerra-Ramirez was recalled by a GEO officer who informed her—erroneously—that *both her attorney* and the asylum officer needed her to return to finish the interview. She was reconnected to USCIS at 10:06 a.m.  The asylum officer stated to Ms. Vizguerra-Ramirez that he *and her counsel had agreed* that she must proceed with the RFI, despite counsel not being present. This was not true. Ms. Vizguerra-Ramirez refused to answer questions without hearing her attorney on the line. The officer then told Ms. Vizguerra-Ramirez that her counsel had the opportunity to participate but had instead chosen to take care of another client and warned her that the RFI would be considered abandoned if Ms. Vizguerra-Ramirez failed to go forward without counsel. Feeling she was being tricked, Ms. Vizguerra-Ramirez terminated the call.

47.     Counsel submitted a formal complaint to USCIS, describing how the asylum officer attempted to proceed with the RFI under false pretenses and without proper notification or inclusion of counsel.  USCIS did not respond.

48.     On April 7, 2025, USCIS Asylum contacted undersigned counsel via email to reschedule the RFI. At 6:40 a.m. on April 8, 2025, counsel responded with her renewed request that USCIS respond to her letter. To date, however, no one from USCIS has addressed counsel's requests or complaints.

49.     On May 2, 2025, without having interviewed Ms. Vizguerra-Ramirez on her protection claim, USCIS issued a decision finding she had no reasonable fear of persecution.  On May 20, 2025, the decision was reversed after review by an immigration judge.  That claim remains pending.

**Broader Context of First Amendment Retaliation**

50.     The government's retaliation against Ms. Vizguerra-Ramirez comes in a broader context of retaliation against other noncitizens who have exercised their First Amendment rights.

51.     During Trump's current term, there have already been numerous instances of federal immigration officials targeting noncitizens based on their protected speech. *See*, *e.g.*, *Court Rules Rümeysa Öztürk's Lawsuit Should Move Forward in Vermont*, ACLU of Massachusetts (April 4, 2025) (noting that Ms. *Öztürk*, a noncitizen PhD student at Tufts, "was grabbed, arrested, and detained in Somerville, Massachusetts by plainclothes federal agents in apparent retaliation for an op-ed she co-authored in a student newspaper") (https://www.aclu.org/press-releases/court-rules-rumeysa-ozturks-lawsuit-should-move-forward-in-vermont) (last visited April 8, 2025); *Rubio Orders U.S. Diplomats to Scour Student Visa Applicants' Social Media*, New York Times (September 29, 2025) (noting "an effort to bar those suspected of criticizing the United States and Israel from entering the country") (https://www.nytimes.com/2025/04/01/us/politics/student-visas-social-media.html) (last visited September 29, 2025); *Rubio warns visas will be revoked for all foreign student 'activists' amid Tufts arrest*, Fox News (March 27, 2025) (quoting the Secretary of State that anyone found to be "creating a ruckus" will have their visa revoked) https://www.foxnews.com/world/rubio-warns-visas-revoked-all-foreign-student-activists-

amid-tufts-arrest (last visited September 29, 2025); *Immigration agents arrest Palestinian activist who helped lead Columbia University protests*, AP (March 10, 2025) (https://apnews.com/article/columbia-university-mahmoud-khalil-ice-15014bcbb921f21a9f704d5acdcae7a8) (last visited September 29, 2025); *U.S. arrests second pro-Palestinian Columbia University protester*, BBC (March 15, 2025) (https://www.bbc.com/news/articles/c3rnzp4ye5zo) (last visited September 29, 2025); *Judge blocks deportation of Georgetown fellow detained by immigration authorities*, ABC News (March 20, 2025) (https://abcnews.go.com/US/georgetown-fellow-detained-alleged-hamas-ties-targeted-wifes/story?id=119983535) (last visited September 29, 2025); *Judge blocks Trump administration from deporting 21-year-old Columbia protester and green card holder*, CBS News (March 25, 2025) (https://www.cbsnews.com/news/yunseo-chung-columbia-student-south-korea-ice-deportation/) (last visited September 29, 2025).

52.    The recent actions should come as no surprise. During the first Trump term, federal immigration officials engaged in retaliatory immigration enforcement against individuals like Ms. Vizguerra-Ramirez who engaged in protected First Amendment activity. *See*, *e.g.,* Alina Das, *Deportation and Dissent: Protecting the Voices of the Immigrant Rights Movement,* 65 N.Y.L. Sch. L. Rev. 225, 231-237 (2020-2021) (describing examples of First Amendment retaliation); *see also* Gaby Del Valle, *ICE Keeps Arresting Prominent Immigration Activists. They Think They're Being Targeted.*, VICE NEWS (Aug. 24, 2019) (https://www.vice.com/en/article/ice-keeps-arresting-prominent-immigration-activists-they-think-theyre-being-targeted/) (last visited September 29, 2025); John Burnett, *See the 20+ Immigration Activists Arrested Under*

*Trump*, NPR (Mar. 16, 2018) (https://www.npr.org/2018/03/16/591879718/ see-the-20-immigration-activists-arrestedunder-trump) (last visited September 29, 2025); John Burnett, *Immigration Advocates Warn ICE is Retaliating for Activism*, NPR (Mar. 16, 2018) (https:/www.npr.org/2018/03/16/593884181/ immigration-advocates-warn-ic-is-retaliating-for-activism) (last visited September 29, 2025); Maria Sacchetti & David Weigel, *ICE Has Detained or Deported Prominent Immigration Activists*, WASH. POST (Jan. 19, 2018) (https://www.washingtonpost.com/powerpost/ice-has-detained-or-deported-foreigners-who-are-also-immigration-activists/2018/01/19/377af23a-fc95-11e7-a46b-a3614530bd87_story.html) (last visited September 29, 2025).

53.     By the close of the first term of the Trump Administration, non-governmental organizations mapped more than one thousand instances of retaliation against immigrant rights advocates, including citizens and noncitizens. *See* Immigrant Rights Voices Map, https://immigrantrightsvoices.org; Nick Pinto, *Across the U.S., Trump Used ICE to Crack Down on Immigration Activists*, THE INTERCEPT (Nov. 1, 2020) (https://theintercept.com/2020/11/01/ice-immigration-activists-map/) (last visited September 29, 2025). During this second Trump term, it is clearly happening again.

## Conditions of Detention

54.     The Aurora Contract Detention Facility, where Ms. Vizguerra-Ramirez is currently detained, is well-known for its abuse and neglect. *See* Press Release, ACLU, ACLU Report Highlights Death, Abuse, and Neglect at Aurora ICE Detention Facility (Sept. 18, 2019), https://www.aclu.org/press-releases/aclu-report-highlights-death-abuse-and-neglect-aurora-ice-detention-facility (last visited September 29, 2025). Three people in detention have died in this facility. *See* Report, ACLU, Cashing in on Cruelty: Stories of Death, Abuse and Neglect at the GEO Immigration Detention Facility in

Aurora (Sept. 17, 2019), https://www.aclu-co.org/publications/cashing-cruelty-stories-death-abuse-and-neglect-geo-immigration-detention-facility/ (last visited September 29, 2025); *see* Press Release, ACLU, ACLU FOIA Litigation Reveals New Information About Plans to Expand ICE Detention in Colorado (July 9, 2025), https://www.aclu-co.org/press-releases/foia-reveals-ice-plans-expand/ (last visited September 29, 2025).

55.     The first person died in this facility in 2012 after a heart attack due to medical staff incompetence with EKGs and heart medication. Press Release, ACLU (Sept. 18, 2019). The second person in detention died in 2017, after the facility discontinued his medically prescribed methadone, and failed to respond adequately as he died from the dangerous effects of opioid withdrawal. *See id.* The third person in detention died in 2022 due to an undiagnosed and untreated blood clot in his leg. Press Release, ACLU (July 9, 2025). An ACLU report from 2019 revealed numerous instances of medical incompetence, dental neglect, inadequate nutrition and mental healthcare, in addition to a lack of accommodations for detainees with disabilities, limited access to legal resources, and substandard care that contributed to the suffering and death of the person in detention in 2017. Press Release, ACLU (Sept. 18, 2019).

56.     According to her social worker, Ms. Vizguerra-Ramirez expresses continuous distress, escalating despair, and declining physical and mental health in detention. Exh. 2, Declaration of Jenny Delgado, LCSW ¶ 25. Since July 2025, the social worker visits her in the detention center on a weekly basis, providing mental health services to her and community services to her family. Her social worker determined that Ms. Vizguerra-Ramirez's and her family's well-being will likely continue to worsen if she is not released. *Id.* at 26.

57.    Ms. Vizguerra-Ramirez experiences negative social interactions in detention because of her career as an advocate for immigrant rights. *Id*. at 20. Guards ask her questions such as "'who do you think you are?" and "do you think you have access to special treatment because of who you are?" She also experiences retaliation, evidenced by the removal of phone and video communications in her dorm. *Id*. at 21. Ms. Vizguerra-Ramirez and her fellow dormmates routinely suffer from this collective punishment which has contributed to tension in the dorm. *Id*.

58.    The social worker also provides insight into the extent of the strain on Ms. Vizguerra-Ramirez's family resulting from her detention and the despair of a mother separated from her children. *Id*. at 16. Ms. Vizguerra-Ramirez is desperately concerned about her younger daughter coping with the absence of her mother. Her daughter experiences school absenteeism and episodes of bullying from other students. *Id*. Ms. Vizguerra-Ramirez also worries that she will not be able to see her middle daughter before her military deployment. *Id*. Ms. Vizguerra-Ramirez experiences increased symptoms of depression and anxiety due to the separation from her family. *Id*. at 12.

59.    The social worker determines that the true source of Ms. Vizguerra-Ramirez's distress is "her confinement and separation from loved ones and her inability to more effectively meet their growing needs ..." and that her prominence as an advocate has caused her to experience "additional stressors and mistreatment while in detention." *Id*. at 26.

## STATEMENT OF LAW

### Voluntary Departure

60.    Noncitizens placed in removal proceedings have a right to apply for various forms of relief from removal before an Immigration Judge. 8 U.S.C. §

1229a(c)(4). Two relief options relevant here are cancellation of removal, under 8 U.S.C. § 1229b(b)(1), and voluntary departure under 8 U.S.C. § 1229c(b). A person granted voluntary departure who complies with the terms of that grant will not have an order of removal. 8 U.S.C. § 1229c(b)(1). However, where a person granted voluntary departure does not leave by the stated deadline, the voluntary departure order converts to a removal order, and any subsequent departure is considered a self-removal. 8 C.F.R. § 1240.26(d) (alternate order of removal entered along with voluntary departure).

61.    Noncitizens who received an adverse decision from an Immigration Judge in removal proceedings may appeal that decision to the Board of Immigration Appeals. 8 U.S.C. § 1229a(c)(5); 8 C.F.R. § 1003.1(b)(3).

62.    Typically, the voluntary departure period begins running on the date of the Immigration Judge's order. However, when a person appeals an Immigration Judge's decision to the Board, the filing of the appeal automatically stays execution of the Immigration Judge's voluntary departure order. *Matter of A-M-*, 23 I&N Dec. 737, 744 (BIA 2005) (citing 8 C.F.R. § 1003.6(a)). Thus, while an appeal is pending, the voluntary departure period is not running.

63.    If a person departs while an appeal is pending, her departure will be deemed a withdrawal of the appeal. 8 C.F.R. § 1003.4. In such a situation, "the initial decision in the case shall be final to the same extent as though no appeal had been taken." *Id*. Accordingly, in the case of an appellant with a tolled voluntary departure order, her departure from the U.S. prior to a decision on her appeal would immediately trigger the start of her voluntary departure period. *Id*.

**Reinstatement of Removal**

64.     If a person reenters the U.S. illegally after "having departed voluntarily, *under an order of removal*, the prior order of removal is reinstated from its original date" and the person "shall be removed under the prior order at any time after the reentry." 8 U.S.C. § 1231(a)(5) (emphasis added).

65.     In reinstatement proceedings under 8 U.S.C. § 1231(a)(5), a DHS officer conducts an interrogation to determine whether an individual has a prior removal order, is in fact the person identified in the prior order, and unlawfully reentered. 8 C.F.R. § 241.8(a). In making this determination, the officer "must obtain the prior order." 8 C.F.R. § 241.8(a)(1). At the conclusion of the interrogation, the officer signs and dates the top portion of Form I-871, titled "Notice of Intent/Decision to Reinstate Prior Order." This portion of the form contains the factual allegations against the individual, including that he or she is not a U.S. citizen, the date of the prior order, date and manner of departure, and the date of illegal reentry.

66.     DHS must inform the individual that he or she has the right to make a written or oral statement contesting the conclusion that he or she is subject to reinstatement. 8 C.F.R. § 241.8(b). After completing the top portion of Form I-871, the officer must present the notice portion of Form I-871 to the individual to sign and to indicate whether he or she wishes to make a statement contesting the determination. *Id*. ("If the [individual] wishes to make . . . a statement, the officer shall allow the [individual] to do so and shall consider whether the [individual]'s statement warrants reconsideration of the determination.").

67.     Only after the person has been informed of their right to challenge the reinstatement, and any such challenge has been reviewed, does a different officer then

sign and date the bottom portion of Form I-871, labeled "Decision, Order and Officer's Certification."

## Withholding-Only Proceedings

68.     Prior to the execution of a reinstated order, if a person expresses a fear of return to her home country, she is referred to a USCIS asylum officer to determine whether there is a reasonable fear of persecution or torture in the person's home country. 8 C.F.R. §§ 1241.8(e), 1208.31(a).

69.     A person has the right to counsel during the reasonable fear process. 8.C.F.R. § 208.31(c) ("The alien may be represented by counsel . . . at the interview"); *see also* 8 U.S.C. § 1362 (providing that noncitizens shall have the privilege of being represented by counsel of their choosing in any removal proceedings); *Orozco-Lopez v. Garland*, 11 F.4th 764, 777 (9th Cir. 2021) (holding that "any removal proceedings" includes those concerning eligibility for relief from removal, such as a reasonable fear screening for people with reinstated orders); USCIS Reasonable Fear Procedures Manual § III.E.5.a ("The alien may be represented at the interview by counsel").

70.     If an asylum officer determines that the person has a reasonable fear of persecution or torture, the officer shall refer the matter to an Immigration Judge for full consideration of applications for withholding of removal under 8 U.S.C. § 1231(b)(3)(B) and protection under the CAT. 8 C.F.R. §§ 208.16-18. 8 C.F.R. § 1208.31(e). If an asylum officer determines that the person does not have a reasonable fear of persecution or torture, the person may seek de novo review by an Immigration Judge. 8 C.F.R. § 1208.31(f). If an Immigration Judge reverses the negative fear determination, the person will be placed in withholding-only proceedings to prosecute her protection

claims, with no deference given to the asylum officer's initial, negative determination. 8 C.F.R. § 1208.31(g)(2).

71.     Withholding and CAT claims are based on a fear of persecution due to membership in a protected class, or a fear of torture, respectively. 8 U.S.C. § 1231(b)(3); 8 C.F.R. §§ 1208.16-18.

72.     The United States' commitment to the principle of non-refoulment, a commitment to refrain from sending individuals to a country where they will likely suffer persecution and/or torture, underlies withholding-only proceedings. This principle applies whether the court is considering sending the individual to their country of origin, or to a "third country." 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. §§ 1208.16(b)-(c).

73.     For a person granted withholding or CAT protection, the underlying reinstated removal order is not vacated or withdrawn, only its execution is withheld. *Matter of I-S- & C-S-*, 24 I&N Dec. 432, 433-34 (BIA 2008).

**First Amendment Retaliation**

74.     The First Amendment to the United States Constitution provides in part that "Congress shall make no law . . . abridging the freedom of speech  . . . or the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. Amend. I.

75.     Speech on matters of public concern is entitled to the highest level of protection under the First Amendment. *See, e.g., Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1034 (1991) ("[S]peech critical of the exercise of the State's power lies at the very center of the First Amendment."). Moreover, government action that targets private speech based on the viewpoint taken by the speaker is an egregious form of content

discrimination and presumptively unconstitutional. *See Matal v. Tam*, 582 U.S. 218 (2017).

76.     To bring a claim of First Amendment retaliation, a plaintiff must allege facts showing: "(1) that [she] was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2020) (quotations omitted).

## Detention During Withholding Only Proceedings

77.     The post-removal detention statute, 8 U.S.C. § 1231(a)(2), authorizes detention of noncitizens during their fear-based, withholding-only proceedings.

78.     When a final removal order is issued, a 90-day removal period commences, during which an individual is subject to mandatory detention. 8 U.S.C. §§ 1231(a)(1)(A), (2)(A). However, following that 90-day removal period, individuals "*may* be detained." *Id*. § (a)(6) (emphasis added).

## Prolonged, Post-Removal Order Detention in Violation of Due Process

79.     Nonetheless, indefinite detention beyond the removal period raises "serious constitutional concerns." *Zadvydas v. Davis*, 533 U.S. 678, 682 (2001). In *Zadvydas*, the Supreme Court addressed the statutory ambiguity inherent in the word "may" in 8 U.S.C. § 1231§ (a)(6) and held that "read in light of the Constitution's demands," § (a)(6) "does not permit indefinite detention" for noncitizens in post-removal detention. *Id*. at 689. In fact, the Court decided that six months constituted a "presumptively reasonable" period in post-removal detention. *Id*. at 701. Following that

period, if an individual provides "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future," the government shall carry the burden of justifying continued detention. *Id*.

80.    The Supreme Court then clarified in *Johnson v. Arteaga-Martinez* that: (1) individuals detained under § 1231 are not, as of right, provided a bond hearing after six months detention, and (2) the *Zadvydas* court applied the canon of constitutional avoidance and merely interpreted § 1231 not to permit indefinite detention. 596 U.S. 573, 576, 579 (2022). The *Arteaga-Martinez* Court followed suit and "implicitly recognized" a distinction between constitutional claims regarding prolonged detention and "the statutory prohibition against indefinite detention embodied in *Zadvydas*." *Arostegui-Maldonado v. Baltazar*, No. 25-cv-2205-WJM-STV, 2025 WL 2280357, at *6 (D. Colo. Aug. 8, 2025); *Juarez v. Choate*, No. 1:24-cv-00419-CNS, 2024 WL 1012912, at * 6 (D. Colo. July 19, 2024); *see also Arteaga-Martinez*, 596 U.S. at 583. The *Arteaga-Martinez* Court thus chose not to place any restrictions around as-applied, constitutional claims against prolonged, post-removal detention.

81.    The *Arteaga-Martinez* Court acted carefully, choosing not to disrupt decades of jurisprudence addressing and correcting governmental violations of constitutional rights belonging to individuals facing prolonged, if not indefinite, civil detention. *Demore v. Kim*, 538 U.S. 510, 523 (2003) (citing *Reno v. Flores*, 507 U.S. 292, 306 (1993) ("'It is well established that the Fifth Amendment entitles [noncitizens] to due process of law in deportation proceedings.'")); *Zadvydas*, 533 U.S. at 699 ("to avoid a serious constitutional threat, we conclude that, once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute");

*Jackson v. Indiana*, 406 U.S. 715, 738 (1972) ("due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed"); *Diop v. ICE/Homeland Sec.*, 656 F.3d 221, 234 (3d Cir. 2011) (stating that after the maximum of five months, "the constitutional case for continued detention without inquiry into its necessity becomes more and more suspect as detention continues"); *Chavez-Alvarez v. Warden York County Prison*, 783 F.3d 469, 474-75 (3d Cir. 2015) (declaring that due process requires recognition that, at a certain point, the burden to a noncitizen's "liberty outweighs a mere presumption" that they will flee and/or are dangerous); *German Santos v. Warden*, 965 F.3d 203, 210-11 (3d Cir. 2020); *Juarez*, 2024 WL 1012912, at *5-6 ("noncitizens detained under § 1231(a)(6) past the *Zadvydas* six-month presumptively constitutional period may bring an as-applied due process challenge to his or her detention under the statute"); *Ramirez v. Bondi*, No. 25-cv-1002-RMR, 2025 WL 1294919, at *5 (D. Colo. May 5, 2025) ("when a noncitizen's detention becomes unreasonably prolonged in relation to [risk of danger and preventing flight], his or her continued detention may violate the Fifth Amendment").

## Recent Post-Order Detention Cases Brought in the District of Colorado

82.     The District Court of Colorado, in the past fourteen months, has decided three as-applied, constitutional due process claims filed by individuals in post-removal order, mandatory detention. *Arostegui-Maldonado*, 2025 WL 2280357; *Ramirez*, 2025 WL 1294919; and *Juarez*, 2024 WL 1012912. In each of those cases, the court granted the petitioner an individualized bond hearing and placed the burden on the government to justify further detention.

### a.    Use of the Singh Factors

83.    The "vast majority of judges" in this district apply the *Singh* factors when deciding whether a noncitizen's detention without a bond hearing, whether they are in pre- or post-removal proceedings, has become "unduly prolonged as to become unreasonable or unjustified," in violation of their constitutional rights. *Arostegui-Maldonado,* 2025 WL 2280357, at *6; *Juarez*, 2024 WL 1012912, at *6-8 (collecting cases). The factors include: (1) the total length of detention to date; (2) the likely duration of future detention; (3) the conditions of detention; (4) delays in the removal proceedings caused by the detainee; (5) delays in the removal proceedings caused by the government; and (6) the likelihood that the removal proceedings will result in a final order of removal.

84.    While the *Singh* factors were originally applied in this district to assess a constitutional claim of prolonged detention by an individual detained under 8 U.S.C. § 1226(c), recent jurisprudence indicates that there is "little substantial distinction between the liberty interest of noncitizens detained pursuant to § 1226(c) and § 1231(a)(6)." *Juarez*, 2024 WL 1012912, at *6. This is "because '[r]egardless of the stage of the proceedings, the same important interest is at stake—freedom from prolonged detention.'" *Id.* (quoting *Guerrero-Sanchez v. Warden York County Prison*, 905 F. 3d 208, 222 (3d Cir. 2018).

### b.    Bond Hearing as a Remedy

85.    This district, alongside others, consistently holds that the appropriate remedy for prolonged detention of a noncitizen is an individualized bond hearing in front of an Immigration Judge in which the government bears the burden of proving by clear and convincing evidence that the noncitizen is a flight risk or a danger to the community.

The government is better equipped with freedom and extensive resources to carry the
burden of proof to justify continued detention.

86.     Well-established precedent places the burden on the government to justify
an individual's deprivation of liberty in civil detention. *Arostegui-Maldonado*, 2025 WL
2280357, at *11 (citing *United States v. Salerno*, 481 U.S. 739,751 (1987)) ("the
Supreme Court has long held that the clear and convincing evidence standard applies
to civil detention where an individual's liberty interest is at stake"); *Addington v. Texas*,
441 U.S. 418, 427 (1979) ("We conclude that the individual's interest in the outcome of
a civil commitment proceeding is of such weight and gravity that due process requires
the state to justify confinement . . . ."). This district repeatedly, although not exclusively,
applies this principle to civil immigration detention, by deliberately placing the burden to
justify continued detention on the government in bond hearings. *Juarez*, 2024 WL
1012912, at * 8 ("entitlement to a bond hearing in this case emanates from the Due
Process Clause . . . and in that light, to the extent that the Court has already determined
that a bond hearing is warranted, the Court is persuaded that placing the burden of
proof on the government comports with due process requirements"); *Singh*, 2019 WL
3943960, at *7; *Viruel Arias*, No. 1:22-cv-02238-CNS, 2022 WL 4467245, at *4 (D. Colo.
Sept. 6, 2022); *but see Martinez,* 760 F. Supp. 3d 1188, 1199 (D. Colo. 2024); *de
Zarate v. Choate*, No. 23-CV-00571-PAB, 2023 WL 2574370, at *4 (D. Colo. Mar. 20,
2023).

## CLAIMS FOR RELIEF

### Count 1: Violation of Fifth Amendment Right to Due Process (Unlawful Detention)

87.     The Respondents have violated Ms. Vizguerra-Ramirez's rights to
constitutional due process by detaining her without statutory authority.

88.    There are only two possible sources of the Respondents' detention authority. The first is 8 U.S.C. § 1226, which authorizes the detention of noncitizens during the pendency of removal proceedings. However, Respondents have indicated to Ms. Vizguerra-Ramirez that she will not be placed in removal proceedings under 8 U.S.C. § 1229a.

89.    The second is 8 U.S.C. § 1231, which authorizes the detention of noncitizens following the issuance of an administratively final order of removal. Ms. Vizguerra-Ramirez, however, has no such order. She received a grant of voluntary departure in lieu of a removal order in 2011 and departed the U.S. while that order was tolled. The government's attempt at reinstatement in 2013 was fatally flawed by its decision to issue that putative order *prior to* meeting its regulatory duty of informing Ms. Vizguerra-Ramirez of her right to challenge the determination. Therefore, the agency's putative reinstatement order, on which its detention authority is based, does not meet the regulatory definition of a reinstatement order. 8 C.F.R. § 241.8(b).

90.    Absent detention authority under § 1226 or § 1231, the Respondents' decision to detain Ms. Vizguerra-Ramirez violates the Due Process Clause of the Fifth Amendment.

**Count 2: Violation of 8 U.S.C. § 1231(a)(5) and Implementing Regulations**

91.    To the extent Respondents assert detention authority under 8 U.S.C. § 1231(a)(5), that argument would be unfounded considering the government's failure to abide by its due process protections, to wit, the requirement that Ms. Vizguerra-Ramirez be informed of the intended reinstatement, and of her right to challenge that determination, *prior to* the issuance of a final order. The document it is relying on to

trigger its detention authority does not meet the regulatory definition of a reinstatement order. 8 C.F.R. § 241.8(b).

92.     For these reasons, Respondents' detention of Ms. Vizguerra-Ramirez violates 8 U.S.C. § 1231(a)(5) and 8 C.F.R. § 241.8(b).

**Count 3: Retaliation and Discrimination in Violation of the First Amendment**

93.     Ms. Vizguerra-Ramirez's speech is protected by the First Amendment. Her past speech pertained to matters of prominent public concern—the conditions of immigration detention system and abuses of government power. She has spoken out repeatedly over the course of many years against the detention of noncitizens and the forced separation of families. Her advocacy has received significant state and national attention.

94.     The way Respondents publicly celebrated their apprehension of Ms. Vizguerra-Ramirez and substantially compromised the initial review of her claim for persecution-based protections, is likely to chill the speech of other immigrants opposed to the government's immigration policies and practices. Left undisturbed, ICE's actions in this case would have a devastating effect on vital political speech, allowing a government agency to run roughshod over immigrants' due process rights and then deport the victims of its illegal actions.

95.     There is a substantial causal connection between Ms. Vizguerra-Ramirez's protected speech and Respondents' adverse actions and threats. Respondents have been motivated to silence Ms. Vizguerra-Ramirez due to her status as the face of the sanctuary movement.

96.     Ms. Vizguerra-Ramirez is suffering severe and ongoing harm because of Respondents' actions, including separation from her family and the threat of deportation

to a country where she fears persecution or torture, without a fundamentally fair process. This includes being subjected to a series of procedural violations and irregularities in the reasonable fear process that raise serious due process concerns and strongly suggest retaliatory intent. The handling of Ms. Vizguerra-Ramirez's RFI reflects a clear interference with attorney-client access, failure to follow typical agency protocol, and a pattern of misrepresentation regarding Ms. Vizguerra-Ramirez's rights. These actions—taken while Ms. Vizguerra-Ramirez remains in ICE custody and under ongoing judicial protection—reflect a broader strategy to bypass meaningful review despite unresolved jurisdictional and constitutional claims. They constitute retaliation.

97.    Respondents' actions against Ms. Vizguerra-Ramirez based on her protected speech do not serve a compelling state interest and are not narrowly tailored to any legitimate government interest.

### Count 4: Violation of Fifth Amendment Rights to Procedural Due Process (Unreasonably Prolonged Detention)

98.    Ms. Vizguerra-Ramirez's prolonged detention under 8 U.S.C. § 1231(a) violates her Fifth Amendment due process rights guaranteed to her by the United States Constitution. Ms. Vizguerra-Ramirez does not concede her challenge to the validity of the reinstated removal order authorizing her detention. Nonetheless, the government has: (1) insisted on the validity of said reinstatement order; (2) subjected Ms. Vizguerra-Ramirez to all the trappings of withholding-only proceedings under 8 U.S.C. § 1231; and (3) detained Ms. Vizguerra-Ramirez for an unconstitutionally prolonged period pursuant to the putative removal order. By virtue of such treatment, Respondents are violating Ms. Vizguerra Ramirez's due process rights.

99.     Ms. Vizguerra-Ramirez's as-applied, constitutional due process claim
against her prolonged, post-removal detention under 8 U.S.C. § 1231 stands squarely
upon precedent. *Zadvydas*, 533 U.S. at 701; *Arteaga-Martinez,* 596 U.S. at 583;
*Jennings v. Rodriguez*, 583 U.S. 281, 288-89 (2018) (declining to disturb *Zadvydas*).
Ms. Vizguerra-Ramirez's claim also parallels the claims made in *Arostegui-Maldonado*
and *Juarez*, recently decided in the noncitizen's favor in this district. 2025 WL 2280357,
at *6; 2024 WL 1012912, at *5.

100.    Due process requires that Ms. Vizguerra Ramirez be released from
detention, or in the alternative, that she receives a bond hearing at which the
government bears the burden to justify further detention by clear and convincing
evidence.

### The *Singh* Factors Weigh in Petitioner's Favor

101.    This Court's application of the *Singh* factors will show that Ms. Vizguerra-
Ramirez's detention is now unconstitutionally prolonged.

### a.     Duration of Detention

102.    The first and "most important" *Singh* factor weighs in favor of Ms.
Vizguerra-Ramirez because she has spent over six consecutive months in the Aurora
Contract Detention Facility since the government targeted and arrested her – thus, her
detention exceeds the six-month period of "reasonable" detention.

### b.     Likelihood of Continued Detention

103.    The second factor, the likely duration of Ms. Vizguerra-Ramirez's future
detention, also weighs in her favor. Ms. Vizguerra-Ramirez is currently in withholding-
only proceedings before an immigration judge. Regardless of the outcome, an appeal is
all but certain. Without judicial relief, Ms. Vizguerra-Ramirez's detention is very likely to

continue during the pendency of an administrative appeal, and then during the pendency of a petition for review from the Tenth Circuit. *Villaescusa-Rios*, No. 20-cv-03187-CMA, 2021 WL 269766, at *3 (D. Colo. Jan. 27, 2021) ("Courts examine the anticipated duration of all removal proceedings—including administrative and judicial appeals—when estimating how long detention will last"). Her detention will terminate eventually, but "'that point is likely to be many months or even years from now.'" *Arostegui-Maldonado*, 2025 WL 2280357, at *7 (quoting *Villaescusa-Rios*, 2021 WL 269766, at *3). Because either party may appeal an immigration court's decision, this factor weighs in favor of Ms. Vizguerra-Ramirez. *Viruel Arias*, 2022 WL 4467245, at *2.

104.    Undersigned counsel obtained recent EOIR data pursuant to a Freedom of Information Act (FOIA) request indicating that the average length of a BIA appeal, between both detained and non-detained appellees and appellants, is currently 786.27 days. A petition for review from the Tenth Circuit recently took one year. *Arostegui-Maldonado*, 2025 WL 2280357, at *2. That same FOIA data indicates that the average length of a proceeding on remand to the BIA from a circuit court is 616.02 days.

### c.    Conditions of Detention

105.    The third *Singh* factor, conditions of Ms. Vizguerra-Ramirez's confinement, weighs in her favor; indeed, this factor regularly weighs in favor of the petitioner, given that facilities for civil immigration detention and penal institutions for criminal detention are not meaningfully different from one another. *German-Santos*, 596 .3d at 211; *see also Velasco-Lopez v. Decker*, 978 F.3d. 842, 851 (2d. Cir. 2020) (finding that a noncitizen detained for immigration proceedings where they cannot "maintain employment or see . . . family or friends or others outside visiting hours [and] the use of a cell phone [is] prohibited, and [there is] no access to the internet or email and limited

access to the telephone" are conditions "indistinguishable from those imposed on criminal defendants sent to prison following convictions for violent felonies and other serious crimes"); *Chavez-Alvarez,* 783 F.3d at 478.

106. Where the conditions of detention resemble a penal institution, this factor weighs in favor of finding that detention is unreasonable. *Singh*, 2019 WL 3943960 at *6; Villaescusa-*Rios*, 2021 WL 269766, at *4, ("[t]he more that the conditions under which the [person] is held resemble penal confinement, the stronger his argument that he is entitled to a bond hearing"). Further, the extensive history of abusive conditions at the Aurora Contract Detention Facility exacerbates the conditions of Ms. Vizguerra-Ramirez's deprivation of liberty. *Daley v. Choate*, No, 22-CV-03043-RM, 2023 WL 2336052, at *4 (D. Colo. Jan. 6, 2023). As the length of her detention increases, this factor weighs increasingly in her favor. *Chavez-Alvarez*, 783 F.3d at 478.

107. Courts in this district have found that conditions in civil immigration detention are not meaningfully different from criminal incarceration. *Arostegui-Maldonado*, 2025 WL 2280357, at *7 ("The Court has little trouble concluding . . . that the conditions at the Aurora Facility strongly resemble penal confinement . . . they are abhorrent. That is, they more than resemble penal confinement"); *Martinez v. Ceja*, 760 F. Supp. 3d 1188, 1195 (D. Colo. 2024) ("Mr. Martinez's allegations regarding his confinement at the Aurora Detention Facility, which respondents do not contest, demonstrate that he is being held in conditions resembling penal confinement."); *de Zarate*, 2023 WL 2574370, at *4 ("[C]ourts have concluded that [the Aurora facility] is enough like a corrections facility for this factor to favor" individuals subject to immigration detention) (citing *Daley*, 2023 WL 2336052, at *4). For nearly the last

decade, immigrants detained at the Aurora facility have sounded the alarm about oppressive and unsafe conditions, including substandard medical and mental health care, medical neglect, failures to comply with agency standards, reports of excessive use of force, retaliation against First Amendment protected speech, and claims related to wage violations and forced labor. In this context, three people detained at Aurora have died since 2012, including Melvin Ariel Calero Mendoza in 2022. This Court already has held that the location of incarceration weighs in a noncitizen's favor because it is akin to a penal institution. *Sheikh v. Choate*, No. 1:22-cv-01627-RMR, 2022 WL 17075894, at *8-9, (D. Colo. July 19, 2024); *Singh*, 2021 WL 22090712, at *3-4; *Villaescusa-Rios*, 2021 WL 269766, at *4; Cf. *de Jesus de Jesus v. Wolf*, No. 20-cv-03637 (RBJ), 2021 WL 603056, at *3 (D. Colo. Feb. 16, 2021).

108.    In addition to the pervasive abuse and neglect that all individuals detained at the Aurora Contract Detention Facility experience, Ms. Vizguerra-Ramirez experiences unique conditions in detention because of her work as an educator and advocate for immigrant rights. Ms. Vizguerra-Ramirez remains under extraordinary scrutiny by the guards and the target of antagonistic comments.

109.    Furthermore, when Ms. Vizguerra-Ramirez's community comes together on Monday evenings to mourn and bear witness to her detention outside of the Aurora Contract Detention Facility, GEO treats the weekly peaceful vigils as a security threat, ceasing all but essential movement, barring access to the facility by legal and social visitation, alike, and shutting down access to telephone lines in the dorms. Consequently, the other women in Ms. Vizguerra-Ramirez's dorm react with frustration

towards her because of the way that they too suffer from such a collective punishment on Monday nights.

110.    Finally, Ms. Vizguerra-Ramirez's mental health suffers tremendously from her condition in detention as a mother separated from her children. Her detention has been extraordinarily difficult on her youngest daughter who is only fourteen. In turn, Ms. Vizguerra-Ramirez worries constantly about her daughter's health and safety. She also worries that she will not have the chance to hug her other daughter before she is deployed in the military in November. Ms. Vizguerra-Ramirez experiences increased symptoms of depression including fatigue, hopelessness, and despair because of her prolonged detention.

111.    As the length of her detention increases, this factor weighs increasingly in her favor.

### d.    Delays Caused by the Noncitizen and by the Government

112.    For the fourth and fifth *Singh* factors, courts consider the cause of any "bad faith" delays in removal proceedings. *German Santos*, 965 F.3d at 211 internal quotations omitted). These factors weigh in Ms. Vizguerra-Ramirez's favor as she has done nothing to delay her proceedings, but the government continues to delay Ms. Vizguerra-Ramirez's proceedings while she is detained.

113.    In March 2025, the government failed to notify Ms. Vizguerra-Ramirez's counsel on four separate instances before attempting to complete a reasonable fear interview (RFI) with her. On the fourth and fifth attempts, the asylum officers used false pretenses to pressure Ms. Vizguerra-Ramirez. Each time she refused, exercising her right to request her counsel be present for the interview.

114.    Despite their inappropriate attempts to complete the RFI, and the superficial appearance of haste, the government's actions delayed the overall proceedings. Instead of contacting Ms. Vizguerra-Ramirez's counsel to schedule the RFI, the asylum office spent a week, from March 20th to March 27th, attempting to pressure Ms. Vizguerra-Ramirez to proceed without counsel. The government's misconduct at the beginning of her case should be held against them.

115.    Ms. Vizguerra-Ramirez should not be penalized for any delay in her removal proceedings because she has not acted in bad faith or through "dilatory tactics." *Viruel Arias*, 2022 WL 4467245, at *3.  Further, any appeals or petitions for review filed by Ms. Vizguerra-Ramirez shall not be held against her. *German Santos*, 965 F.3d at 212 ("Absent carelessness or bad faith, we will not scrutinize the merits of immigration proceedings and blame whichever party has the weaker hand."). This district recognized the importance of protecting one's right to exhaust their legal pathways in *Martinez* and *de Zarate*, declaring that they would not hold the petitioner's efforts to seek relief through the available legal channels against them. *Martinez*, 760 F. Supp. 3d at 1195; *de* Zarate, 2023 WL 2574370, at *4. Since the RFI's completion, Ms. Vizguerra-Ramirez's case has continued at a regular pace without undue delay by Ms. Vizguerra-Ramirez.

116.    Thus, this favor weighs in favor of Ms. Vizguerra-Ramirez.

### e.    *Likelihood that Removal Proceedings Will Result in Removal*

117.    The final *Singh* factor weighs in Ms. Vizguerra-Ramirez's favor, as her removal proceedings are unlikely to result in removal. Ms. Vizguerra-Ramirez is prosecuting two meritorious claims, before two different tribunals (all while detained), with success in either court preventing her removal.

118.    The first is a purely legal claim pending before the Tenth Circuit which asks the following question: does a tolled grant of voluntary departure convert to a removal order if the recipient departs the U.S. during the pendency of her agency appeal? As this Court has already recognized, there is no known case that has yet answered that question. *See* Dk. No. 11, pg. 4. Ms. Vizguerra-Ramirez will argue that the answer is unambiguously "no," as a contrary reading would violate the plain terms of the withdrawal regulation, 8 C.F.R. § 1003.4, the reinstatement statute, 8 U.S.C. § 1231(a)(5), and the finality statute, 8 U.S.C. § 1101(a)(47)(B).

119.    The second is a withholding and CAT claim currently pending before an immigration judge. This claim has already passed a threshold determination of possible success, with an immigration judge necessarily finding a meritorious claim by placing Ms. Vizguerra-Ramirez in withholding-only proceedings rather than ordering her summarily removed. 8 C.F.R. § 1208.31(g)(2).

120.    In sum, the balance of as-applied factors weighs in favor of finding Ms. Vizguerra-Ramirez's prolonged detention without a bond hearing unreasonable and unconstitutional.

### Appropriate Remedies: Grant of Immediate Release or Individualized Bond Hearing in which the Government Bears the Burden

121.    Granting Ms. Vizguerra-Ramirez immediate release is the most appropriate and equitable remedy due to her prolonged detention in violation of her Fifth Amendment constitutional right to procedural due process.

122.    In the alternative, and at a minimum, due process requires Ms. Vizguerra-Ramirez be granted a bond hearing. At such bond hearing, the government must be required to justify Ms. Vizguerra-Ramirez's ongoing detention by clear and convincing

evidence. *See Arostegui-Maldonado*, 2025 WL 2280357, at *16; *Ramirez*, 2025 WL 1294919, at *8 (D. Colo. May 5, 2025) (ordering a bond hearing where detention pursuant to 8 U.S.C. § 1231(a) violated due process).

123.    Ms. Viguerra-Ramirez should not be detained. The Respondents cannot prove that Ms. Vizguerra-Ramirez poses a flight risk or a danger to her community. Indeed, Ms. Vizguerra-Ramirez is an exceptional presence in her community. She fearlessly stands alongside fellow immigrants as they navigate slews of obstacles. Her commitment to justice, her commitment to her community, and her commitment to her four U.S. citizen children living in Denver, overwhelmingly demonstrate that Ms. Vizguerra-Ramirez is firmly rooted in Colorado. Every Monday evening, her community grieves, protests, and begs for her release outside of Aurora Contract Detention Facility. Brandon Gehrke Quintanilla, *Protestors block GEO detention facility in Aurora, OO, demanding "Free Jeanette now!"* Fight Back News, (2025), https://fightbacknews.org/articles/protesters-block-geo-detention-facility-in-aurora-co-demanding-free-jeanette (last visited Sept. 29, 2025). Instead of a flight risk, Ms. Vizguerra-Ramirez is a pillar of her community, cemented and firm. Instead of a danger, Ms. Vizguerra-Ramirez fervently protects those around her. Ms. Vizguerra-Ramirez's life work may have gotten her detained, but it champions her release.

124.    An equitable remedy in immigration court will be most likely delivered if an immigration judge is required to meaningfully consider alternatives to imprisonment such as community-based alternatives to detention including conditional release, parole, as well as Ms. Vizguerra-Ramirez's ability to pay a bond.

**PRAYER FOR RELIEF**

Wherefore, Petitioner respectfully requests this Court to grant the following:

(1)   Assume jurisdiction over this matter.

(2)   Issue an Order to Show Cause ordering Respondents to show cause why this Petition should not be granted.

(3)   Declare that Petitioner's detention violates the Due Process Clause of the Fifth Amendment, 8 U.S.C. § 1231(a)(5), and 8 C.F.R. § 241.8(b).

(4)   Declare that Respondents' retaliatory actions in detaining Petitioner and compromising her rights to access to counsel violated her free speech rights under the First Amendment.

(5)   Issue a Writ of Habeas Corpus ordering Respondents to release Petitioner immediately.

(6)   Enter an injunction restraining Respondents from taking any action to deport Petitioner unless Respondents demonstrate that such action is untainted by unlawful First Amendment retaliation and discrimination.

(7)   Require the Respondents to provide, within seven days of this Court's order, a constitutionally adequate, individualized bond hearing before an impartial adjudicator in which DHS bears the burden of establishing by clear and convincing evidence that continued detention is justified.

(8)   Award Petitioner attorney's fees and costs under the Equal Access to Justice Act, and on any other basis justified under law.

(9)   Grant any further relief this Court deems just and proper.

Dated: September 29, 2025

Respectfully submitted,

/s/ Laura L. Lichter

*Counsel for Plaintiff-Petitioner*

Laura L. Lichter
Lichter Immigration
1601 Vine Street
Denver, CO 80206
(303) 554-8400
LLichter@LichterImmigration.com

Mark R. Barr
Lichter Immigration
1601 Vine Street
Denver, CO 80206
(303) 554-8400
MBarr@LichterImmigration.com

Shira Herald
Rocky Mountain Immigrant Advocacy
Network
7301 N. Federal Blvd., Suite 300
Westminster, CO 80030
Telephone: (303) 433-2812
Shereld@rmian.org

Shannon Long
Student Law Office
University of Denver Sturm College of
Law
2255 East Evans Avenue Suite 335
Shannon.Long@du.edu

Brian Scott Green
Law Office of Brian Green
9609 S. University Boulevard, #630084
Highlands Ranch, CO 80130
(443) 799-4225
BrianGreen@greenUSimmigration.com

Laura Lunn
Rocky Mountain Immigrant Advocacy
Network
7301 N. Federal Blvd., Suite 300
Westminster, CO 80030
Telephone: (303) 433-2812
Llunn@rmian.org

Elizabeth Jordan
Student Law Office
University of Denver Sturm College of
Law
2255 East Evans Avenue Suite 335
Elizabeth.jordan@du.edu

**VERIFICATION PURSUANT TO 28 U.S.C. § 2242**

I represent Petitioner-Plaintiff, Jeanette Vizguerra-Ramirez, and I submit this verification on her behalf. I hereby verify that the factual statements made in the foregoing Amended and Verified Petition for Writ of Habeas Corpus are true and correct to the best of my knowledge.

Dated: September 29, 2025.


/s/ Laura L. Lichter

*Counsel for Plaintiff-Petitioner*


**INDEX OF ATTACHED EXHIBITS**

| Ex. | Document |
|---|---|
| A | Putative Reinstatement Order (July 24, 2013). |
| B | Declaration of Jenny Delgado, LCSW. |
| C | Amended Petition Showing Additions and Deletions, pursuant to D.C.COLO.LCivR 16.2. |

# Exhibit A

Putative Reinstatement Order
(July 24, 2013)

07/26/2013 12:27 FAX 303 361 ⟨ ⟩4          DHS ICE FDNDRO                    ☑002

U.S. Department of Homeland Security          **Notice of Intent/Decision to Reinstate Prior Order**

                                              File No. A089 826 036
                                              Event No: DEN1307000520
                              FIN #: 1086576171   Date: July 24, 2013

Name: Jeanetta Vizguerra-Ramirez

In accordance with section 241(a)(5) of the Immigration and Nationality Act (Act) and 8 CFR 241.8, you are hereby notified that the Secretary of Homeland Security intends to reinstate the order of _____ Removal _____ entered against you. This intent
                                              (Deportation / exclusion / removal)
is based on the following determinations:

1. You are an alien subject to a prior order of deportation / exclusion / removal entered on   November 18, 2011   at
                                                                                              (Date)
Denver, CO.  .
        (Location)

2. You have been identified as an alien who:

   ☐ was removed on _____ pursuant to an order of deportation / exclusion / removal.
                        (Date)
   ☒ departed voluntarily on   September 8, 2012   pursuant to an order of deportation / exclusion / removal on or
                                    (Date)
       after the date on which such order took effect (i.e., who self-deported).

3. You illegally reentered the United States on or about   April 20, 2013   at or near PRESIDIO, TEXAS
                                                                (Date)                        (Location)

In accordance with Section 241(a)(5) of the Act, you are removable as an alien who has illegally reentered the United States after
having been previously removed or departed voluntarily while under an order of exclusion, deportation or removal and are therefore
subject to removal by reinstatement of the prior order. You may contest this determination by making a written or oral statement to
an immigration officer. You do not have a right to a hearing before an immigration judge.

*The facts that formed the basis of this determination, and the existence of a right to make a written or oral statement contesting this
determination, were communicated to the alien in the*   Spanish   *language.*

        B 3476  EICHERS                                              (Signature of officer)
   (Printed or typed name of official)

                                                             DEPORTATION OFFICER
                                                                  (Title of officer)

---

### Acknowledgment and Response

I ☐ do  ☐ do not  wish to make a statement contesting this determination.      7/25/2013  1125Hrs

_____                                    Alien refused to sign
        (Date)                                                  (Signature of Alien)

---

### Decision, Order, and Officer's Certification

Having reviewed all available evidence, the administrative file and any statements made or submitted in rebuttal, I have determined
that the above-named alien is subject to removal through reinstatement of the prior order in accordance with section 241(a)(5) of
the Act.

July 24, 2013          CENTENNIAL, CO.
   (Date)                 (Location)                        (Signature of authorized/deciding official)

R 2395 STRONG                                                        SDDO
   (Printed or typed name of official)                              (Title)

                                                             Form I-871 (Rev. 08/01/07)

# Exhibit
# B

Declaration of Jenny Delgado, LCSW



7301 Federal Blvd., Ste. 300
Westminster, CO 80030

(303) 433-2812
(303) 433-2823 FAX
www.rmian.org

### DECLARATION OF JENNY DELGADO, LCSW

I, Jenny Delgado, pursuant to 28 U.S.C. § 1746, and based on my personal knowledge and information made known to me from official records reasonably relied upon in the course of my employment, hereby declare as follows related to the above-captioned matter:

1. I am a Licensed Clinical Social Worker in the Social Services Program (SSP) at the Rocky Mountain Immigrant Advocacy Network (RMIAN) in Colorado. The Social Service Program at RMIAN provides wrap-around support to individuals with mental health and medical needs, histories of significant trauma, and social-emotional needs in collaboration with RMIAN legal representation. I received a Master of Social Work (MSW) from the University of Denver in 2019 and am licensed in the state of Colorado (CSW.09930984), receiving almost three years of supervision from a Licensed Clinical Social Worker to support my practice. I have worked with various nonprofit organizations providing mental health services including individual therapy, family therapy, and supportive services such as case management for the last five years, specifically focusing on work with refugee and immigrant populations. Organizations I have worked with include the International Rescue Committee, Bethany Christian Services, and Colorado Youth for a Change. I have received training in the following modalities: Mental Health First Aid, Dialectical Behavioral Therapy, Trauma-Focused Cognitive Behavioral Therapy, Experiential Therapy, and Strengths-Based Therapy, and I keep a Person-Centered and Culturally Sensitive lens when working with individuals.

2. The Social Services Program was originally consulted to provide support to Ms. Vizguerra-Ramirez's family after concerns arose for the mental health and well-being of Ms. Vizguerra-Ramirez's youngest daughter. When I first met with Ms. Vizguerra-Ramirez on July 15, 2025, to discuss her daughter's well-being, it became apparent that Ms. Vizguerra-Ramirez was struggling significantly and needed her own individualized mental health support. It also became apparent that although she was detained and had



7301 Federal Blvd., Ste. 300
Westminster, CO 80030

(303) 433-2812
(303) 433-2823 FAX
www.rmian.org

limited access to her children, she continued to do all that she could to stay connected and check in on their well-being. To best support Ms. Vizguerra-Ramirez and her family, it was determined that directly supporting Ms. Vizguerra-Ramirez would have the biggest impact on her family's well-being as she continued to be the leader of her family.

3. I have worked with Jeanette Vizguerra-Ramirez as a social worker on approximately a weekly basis since July 2025 to provide mental health support to her and resource connections for her family as needed. Each meeting has lasted an average of 70 minutes. For the duration of my professional relationship with her, she has been detained at the Aurora Contract Detention Facility in Aurora, Colorado. My work is not intended to be a substitute for psychological or psychiatric treatment, especially as there are various limitations to providing therapeutic interventions and support within a detention facility.

4. Ms. Vizguerra-Ramirez has found the meetings to be helpful as she has been managing the challenges she encounters physically, mentally, emotionally, socially and within the confines of detention. During our meetings, I have observed various concerning expressions of her distress and declines at subsequent meetings. I have prepared the following report based on my observations and conversations with the client, approached from a clinical lens.

5. In addition to these visits, my knowledge of familial mental health concerns and needs is informed by my review of the Psychological Affidavit and report from Dr. Gwen Vogel Mitchell for Ms. Vizguerra-Ramirez 's youngest daughter and Luna Baez Vizguerra's Declaration.

## Physical health

6. During my meetings with Ms. Vizguerra-Ramirez, I have encountered various concerning comments that she has made regarding her physical health, and I have also observed declines. She disclosed to me that upon entering the detention center, the only



7301 Federal Blvd., Ste. 300
Westminster, CO 80030

(303) 433-2812
(303) 433-2823 FAX
www.rmian.org

health concerns she had were chronic gastritis and prediabetes. Since entering the detention center, she has experienced an onset of medical concerns. These include respiratory concerns. She believes the air conditioner in the pods are the culprit of these widespread concerns, and she notices more symptoms when it is functioning at very cold temperatures. In the six months of her detention, she has not seen it being cleaned once. She frequently carries a tissue in her shirt and often takes it out during our meetings to wipe her nose. She has reported to me that many other women in her pod have begun to exhibit similar respiratory concerns, making it appear that the concerns are more widespread as well. When the air conditioner in the facility has not been functioning in areas of the facility, which has happened several times during the summer that I have known Ms. Vizguerra-Ramirez, the temperatures have been very warm and uncomfortable for her and myself. On various afternoons that I visited Ms. Vizguerra-Ramirez over the summer, the outdoor temperatures were well over 90 degrees, causing stifling temperatures inside areas of the facility where the air conditioner was not working. I often even heard guards throughout the facility bemoan when they had to enter the very hot areas.

7. Ms. Vizguerra-Ramirez has spoken further about how her health concerns have worsened since being detained. She has chronic gastritis and reported that the medication she used to take to address this had "stopped working" during her time in detention. In response to this, she reported that the doctors at the facility were testing her for H. Pylori bacteria. She previously contracted this bacteria at a previous detention facility she was held in. She reported more recently that she also now has high cholesterol levels, and her kidney function levels are also elevated. She reported that the doctors are continuing to do exams to determine what is happening with her body. Ms. Vizguerra-Ramirez has spoken about how the processed food and preservatives that she is provided at the facility are a possible



7301 Federal Blvd., Ste. 300
Westminster, CO 80030

(303) 433-2812
(303) 433-2823 FAX
www.rmian.org

cause of further deterioration of her body, as is the ongoing stress she is experiencing from being detained.

8. She has reported general pain throughout her body, gesturing to her entire body to try to explain the sensation to me. Her overall posture and demeanor seem to suggest extreme fatigue and discomfort. She also spoke to me about gaining weight while detained and appeared to have a distended stomach during many of our meetings. Ms. Vizguerra-Ramirez has told me that her preference for her own health treatment is to access natural remedies and not to take the assortment of medications that she was being newly prescribed to treat her various concerns. Her preference is such that she reported that even in her discomfort she would try to stop taking all medications for a week to see which were addressing her symptoms. Ms. Vizguerra-Ramirez's health needs do not appear to be appropriately addressed within the confines of detention and the traditional medical model, and she is unable to access the natural remedies that would be culturally appropriate for her while detained either.

9. Of concern as well has been the extreme fatigue, observable and reported, that Ms. Vizguerra-Ramirez has displayed. She has reported at various meetings a significant increase in her daytime sleeping to cope with the stressors she is experiencing, including generalized physical pain and mental distress. She has told me that she sleeps "most of the day". Ms. Vizguerra-Ramirez, who is used to high levels of activity and engagement in the community, is engaging in increased sleeping behavior that is uncharacteristic of her previously high levels of activity and engagement with her surroundings. She has frequently told me how responsive she was to questions community members asked, day or night, and her pride in being a reliable source of support to fellow members of the community. More recently, she has reported that when others in her pod approach her for help or a question, she has declined to help due to her extreme tiredness and fatigue, not



7301 Federal Blvd., Ste. 300
Westminster, CO 80030

(303) 433-2812
(303) 433-2823 FAX
www.rmian.org

appearing to be induced by physical exertion, but by mental, emotional, and physical stress on her body.

10. As a woman in her 50s, Ms. Vizguerra-Ramirez may have additional health concerns that are not being appropriately addressed while she is detained, and which she may not have disclosed to me. The symptoms and concerns reported above include what she has verbally expressed to me and that I have observed in conversations with her but are not necessarily representative of all the physical challenges she may face.

**Mental and emotional health**

11. During my initial meeting with Ms. Vizguerra-Ramirez, she cried several times when describing her distress. As described by Ms. Vizguerra-Ramirez herself and a RMIAN staff member who had known her prior to her detention, her tearfulness and vulnerability are not her typical demeanor.  This made it even more notable that she would express herself this way to a stranger upon first meeting. She told me that she often cries in the shower as the only private place she has. She does not share with her family the extent to which she is struggling because she feels that they need to see her strong so that they will not lose hope. During the weekly meetings that we have spoken, the vast majority have involved her tearfulness when she speaks about her stress, frustration, and desperation.

12. Being separated from her family and unable to support them has caused a development of and an increase in Ms. Vizguerra-Ramirez symptoms of anxiety and depression. Ms. Vizguerra-Ramirez's anxiety is expressed as frequent headaches, and she has pointed to her chest to describe where she notices the sensation as well. She has also reported that she began to pick at scabs on her face out of feeling anxious, an observable manifestation of her increasing anxiety. She reports that her mind is constantly racing- worrying about her children, herchildren's father, her community, her work as a public advocate, her finances, her legal case, and her country's changes. Her anxiety was such that she



7301 Federal Blvd., Ste. 300
Westminster, CO 80030

(303) 433-2812
(303) 433-2823 FAX
www.rmian.org

requested to speak to a staff psychologist at the Aurora Contract Detention Facility to request to be prescribed anxiety medication. Given her preference for natural remedies, her choice to actively seek out medication for anxiety indicates high levels of distress. When asked about coping skills for relaxation, she is not easily able to name any and appears to be continuing to struggle to find equilibrium.

13. Ms. Vizguerra-Ramirez has also been experiencing an increase in symptoms of depression, symptoms both reported and observed. She has experienced a drastic increase in her normal sleeping patterns and a drastic decrease in her energy levels. I have noted patterns that seem to indicate her increased isolation from others, including through excessive daytime sleeping, not sharing with others in her pod about how she is doing, and her report of not engaging in some activities that other women in her pod do to try to cope. I have noticed an increase in irritability during our meetings, which is also a common symptom of depression. At times this has been expressed with a defensive posture of crossed arms or quickly countering a consideration that I may offer her. At other times, it has been expressed through an increase in discourse where she more vehemently expresses her frustration with her ongoing struggles, including fighting for years to try to find peace in this country, challenges with communication with others outside of detention, conditions inside of detention, the need for advocacy and the protection of human rights, and political concerns. Ms. Vizguerra-Ramirez's frustration often ends in tears when I ask her gently and more directly about how these concerns affect her and her family. Her deep anger and frustration mask deeper levels of hurt that she is experiencing. She has often reported to me that talking about how she is doing is helpful. I also believe that the support I am offering as her social worker is not sufficient to ameliorate the harm she is experiencing and the significant increase in her mental and emotional suffering.



7301 Federal Blvd., Ste. 300
Westminster, CO 80030

(303) 433-2812
(303) 433-2823 FAX
www.rmian.org

14. Not only has Ms. Vizguerra-Ramirez exhibited changes in her mood, but I have also observed declines in her cognition and memory during the time I have met with her. At times when I have asked her a question, her speech and thoughts have meandered to subjects that may or may not be related and seem to reflect what she is thinking about in the moment but not necessarily follow the flow of conversation. I have also more recently observed forgetfulness in her. She and I spoke over the phone the day after two members of her legal team visited her. We reviewed how it had been and she asked me to pass on a message she had forgotten. The next week, she spoke at length about how good it had been to receive the visit and asked me to again pass on the message. I assured her that I had. At the following week's visit, about two weeks after the initial visit from the two attorneys, Ms. Vizguerra-Ramirez told me that she had received a visit from the same attorneys and reviewed with me the same material that we had discussed. I had been told by a RMIAN staff member that Ms. Vizguerra-Ramirez's mental sharpness seemed to be struggling since her detainment, and I have noted these concerns in an observable and concerning way.

15. The topic that most concerns and causes distress to Ms. Vizguerra-Ramirez is the well-being of her family and their futures. After her detention, her family lost the additional income that she brought in, and they are no longer able to afford rent for their home despite the ongoing hard work of her children's father. Even while detained, Ms. Vizguerra-Ramirez continues to do her best to solve problems and seek out housing resources, requesting that I share resources I am aware of with her as well. As a result of the lost income, Ms. Vizguerra-Ramirez's son left college to begin working and support his family. When telling me that her son had left school due to her detention, Ms. Vizguerra-Ramirez expressed much distress and tearfulness, talking about how young he is and that he should be able to finish his studies and not have to worry about providing for the family at his age. She should be the one providing for her family, she has told me,



7301 Federal Blvd., Ste. 300
Westminster, CO 80030

(303) 433-2812
(303) 433-2823 FAX
www.rmian.org

and she has felt increasing desperation at being unable to do so and the burden it places on him. He is also serving, in part, as his younger sister's caregiver. He wakes up early and drops her off at school each day before work.

16. Ms. Vizguerra Ramirez's daughter is struggling in school and experiencing bullying, which is deterring her from wanting to attend classes. She has been experiencing the challenges of entering high school without the backing of her biggest supporter and advocate, her mother. Ms. Vizguerra-Ramirez arranged for a team of volunteers to pick up her daughter from school, which she is incredibly grateful for, but expresses grief around: "That should be me". Ms. Vizguerra-Ramirez, who continues to maintain constant contact with her youngest child, does all she can to encourage her daughter from afar, but this has not been sufficient to protect her from the irreparable harm that can come from having a protective attachment figure removed from her life at a formative age. Even Ms. Vizguerra-Ramirez's adult children are suffering and needing her presence. Her middle daughter, Luna, will be deploying to join the U.S. military in November. When Ms. Vizguerra-Ramirez has spoken about this, she expresses much grief and pain that she may not be able to be with her daughter before her deployment. She has concerns about her daughter's well-being and Luna also greatly needs her mom before she begins her service to the country. At times Ms. Vizguerra-Ramirez's children tell her that they are just too tired to go to the vigils supporting their mom; the exhaustion they feel around her separation from them and the prolongation of her confinement is overwhelming.

17. Ms. Vizguerra-Ramirez's detention has also had an impact on her children's father. As the primary source of income for the family, he has needed to constantly work to make ends meet for the family. When Ms. Vizguerra-Ramirez spoke to him about my being available to meet with him and the rest of the family to provide support, he expressed interest but said it would be almost impossible to schedule a reliable time due to working



7301 Federal Blvd., Ste. 300
Westminster, CO 80030

(303) 433-2812
(303) 433-2823 FAX
www.rmian.org

long hours for six days a week. Later in our meetings, Ms. Vizguerra-Ramirez reported that her children's fatherhad a new onset and increase in concerning physical and mental health symptoms that required immediate attention. Due to fear of immigration enforcement, he did not seek needed treatment for his medical and mental health needs. In the past, Ms. Vizguerra-Ramirez helped catalyze his seeking of services when needed and to assuage fears he had surrounding this, but now being detained, she could not help him go. "What will happen to my children if something happens to their father?" she asked me.

18. Ms. Vizguerra-Ramirez's fear and desperation for her family have increased since being detained and throughout my work with her. She has begun planning for worst case scenarios that she ruminates on. She wonders about her family's future; after a lifetime in the United States, raising her children and supporting her family, what would happen to her family if she were to be deported? She has considered that it would be likely that they would be separated, with Ms. Vizguerra-Ramirez going with her two youngest children while her oldest two children continue their lives in the United States. She has fears surrounding her family's safety in Mexico as she would continue to advocate for human rights wherever she was. It pains Ms. Vizguerra-Ramirez to consider the possibility of the division of her family as she tries to mentally prepare for all possibilities.

19. When Ms. Vizguerra-Ramirez has an opportunity to see her family through scheduled visitation times from behind a glass wall and through a telephone, she has reported to me that her family waits for hours in the early morning to see her, and she often does not receive the full hour with her family that the visitation is supposed to allow for. She has been told that staffing shortages have contributed to the longer waiting times and the shortening of the visits, and these items are outside Ms. Vizguerra-Ramirez's control. Especially since her family is so greatly important to her, the shortening of these visits angers and upsets Ms. Vizguerra-Ramirez, who is vocal about what she sees as wrong.



7301 Federal Blvd., Ste. 300
Westminster, CO 80030

(303) 433-2812
(303) 433-2823 FAX
www.rmian.org

She does not easily accept the conditions within detention that are unjust or unfair and speaks out against these. This makes her a target for retaliation from guards who view her as "problematic".

**Impacts of advocacy**

20. As an outspoken advocate of human rights, Ms. Vizguerra-Ramirez's identity does not change even when detained. While in meetings with me, she speaks at length about her passions, her beliefs, her desire to do more to support her community, and the injustices she sees in the world. In particular, she has spoken to me about the injustices and harassment she has experienced while detained. Guards have questioned her identity and outspoken nature, saying, "Who do you think you are?" When she has advocated for her rights, guards have questioned her, saying, "Do you think you deserve special treatment because of who you are?" On another occasion, when she spoke up about something she believed was not right, a guard became very upset with her. When a new guard entered, she noticed the two whispering to each other and sensed it was about her. This suspicion felt confirmed when she noticed the extra reactivity of the new guard toward her. When she got up to use the bathroom, for example, the new guard yelled at her, saying, "Where do you think you're going?" Ms. Vizguerra-Ramirez is known to the guards, most of whom show a reaction of at least recognition when I request to meet with her. I have also received expressions of questioning such as: "She has already had a legal visit today; why should she have another?" She has noted the way that guards have labeled her as "problematic" for being more outspoken about her concerns, and she has reported to me that she feels that she is treated differently. Her advocacy and fame create a target on Ms. Vizguerra-Ramirez's back, especially when she speaks out or when she is trying to access her rights.



7301 Federal Blvd., Ste. 300
Westminster, CO 80030

(303) 433-2812
(303) 433-2823 FAX
www.rmian.org

21. Most notably, Ms. Vizguerra-Ramirez feels she is being retaliated against in the facility because of her role as an advocate. When she has engaged in advocacy, several resources have been removed from her, and by consequence, also those in her pod. For example, she observed that during several Monday night vigils in support of her, her pod's phones and tablets for video call access were shut off. Comparatively, she looked across the hall at a different pod and saw that they maintained their access to tablet video calls at least and could still communicate with loved ones. Ms. Vizguerra-Ramirez submitted an ICE Resident Grievance Form to report on the difference in treatment and access to communication resources, particularly on Monday nights. Added to the form were the signatures of at least ten other women in her pod who had experienced this, further corroborating her claim. The reply to the grievance denied that this had occurred and rejected her report despite the evidence stating the contrary. Ms. Vizguerra-Ramirez has often advocated with guards in the facility, asking why these services are being shut down on Mondays. One guard once disclosed to her "It is because of the protests." Most other times, she has been told that it was due to people being deported or transferred from the facility. She told me that the view from her window allows her to see the buses that transport individuals, and often there is no movement occurring to support this claim when phones are shut off. Having lines of communication shut off, particularly in Ms. Vizguerra-Ramirez's pod because of her advocacy, causes tension between her and her pod mates who are also affected by the shut-off. She has reported to me that she feels that loss of access to phones and tablets for video calls is another measure to try to control her, violate her rights, and limit her access to communicating with the outside world as an advocate. It is also desperation-inducing for her fellow detained individuals. When the lines are reinstated, people run to the phone lines to have contact again with their loved ones; it is a desperate environment and the shutting off and on of communication lines increases the desperation of those around her. With Ms. Vizguerra-Ramirez being viewed



7301 Federal Blvd., Ste. 300
Westminster, CO 80030

(303) 433-2812
(303) 433-2823 FAX
www.rmian.org

as the cause of the additional restrictions within her pod, tension against her from fellow detained individuals increases as well.

22. While detained, Ms. Vizguerra-Ramirez has reported being mistreated by others in her pod. Others have mockingly asked her "Are you the savior of us?" In our first weeks meeting together, our meeting ran into the "stop movement" time, during which no detained individuals can be moved while they are counted. This meant that after I left, Ms. Vizguerra-Ramirez would need to sit alone in the legal visitation room for an hour before being able to return to her pod, and I apologized that she would need to do this. Ms. Vizguerra-Ramirez told me with relief that she preferred to sit there alone for an hour with nothing to do or look at than to return to her pod because of the tensions she was experiencing there with women who were mistreating her. She reported that she was thankful to have some peace in an empty room rather than return to the pod again and be amid the tension. While in the pod, Ms. Vizguerra-Ramirez has experienced harassment and tension to the point that she would prefer self-isolation to being among peers. She has also had personal items she bought stolen from under her bed.

23. In the new reality Ms. Vizguerra-Ramirez is living in, speaking out about harm she or others are experiencing can have repercussions against her or those around her. She described another instance to me of the silencing of her voice during an unjust situation she witnessed. A detained woman had a severe headache and was not receiving needed medication even after submitting a request through the appropriate channels. When another woman saw her pain, she shared a Tylenol pill with her, neither of them knowing that this was not permitted. The guard on duty was informed of the incident by a third detained woman, who Ms. Vizguerra-Ramirez has observed receives preferential treatment from the guard. The guard began to berate the two women who had made the mistake. Ms. Vizguerra-Ramirez respectfully told the guard that if rules were going to be enforced, she thought it would be best that people be oriented to what the rules were to



7301 Federal Blvd., Ste. 300
Westminster, CO 80030

(303) 433-2812
(303) 433-2823 FAX
www.rmian.org

avoid being punished for inadvertently breaking them. She recalled that there was no orientation to this rule. The guard reacted to Ms. Vizguerra-Ramirez's intervention and spoke harshly against her, telling her that the issue did not concern her and that she should not speak further. Ms. Vizguerra-Ramirez told her that if this incident committed without knowledge of wrongdoing was going to be punished, an incident of sexual harassment that had been committed against another detained person, which the guard was aware of, should also be reported and punished. The act of sexual harassment had been completed by the woman who had reported the medication sharing to the guard. Ms. Vizguerra-Ramirez also told me that there were suspicions of a romantic relationship between the guard and this person. In response, the guard told Ms. Vizguerra-Ramirez that if she did not report the sexual harassment incident and the guard's lack of reporting, the other two women would not be punished for sharing medication. If she did report, the two women who had shared medication would be punished. In a bind that would affect the lives of two other women and without power to do differently, Ms. Vizguerra-Ramirez decided to tell those women to speak to the guard and try to resolve the situation themselves.

24. Ms. Vizguerra-Ramirez is upset by systemic issues that she sees and is not afraid to confront power and bring these to people's attention. These have included the challenges she encounters to accessing her legal team. There is only one room reliably available for legal visits in the section of the facility where she is housed. Waiting to see her can sometimes take over an hour or can be impossible in other instances. I have met with attorneys who have told me that they have been waiting for over two hours to see their clients at times. When more rooms began to be utilized for legal visits, I was told by guards that the rooms could often not be accessed because there were not enough guards to oversee them. On one occasion, after waiting an hour to see Ms. Vizguerra-Ramirez and being told that I would need to come back in the evening if I wanted to complete the



7301 Federal Blvd., Ste. 300
Westminster, CO 80030

(303) 433-2812
(303) 433-2823 FAX
www.rmian.org

visit, I agreed to see her in a personal visitation room across a glass and a hard receiver telephone. The sound quality over the phone was very poor, making comprehension challenging. Taking notes and appropriately providing support was also unsupported in this environment. On another occasion, Ms. Vizguerra-Ramirez noticed that a room she was placed in with the legal team also had a camera in it, which is not permitted for legal visits. When I or other attorneys call the main phone line of the detention facility, it is not uncommon to wait over half an hour to get connected to the client we are trying to speak with. When Ms. Vizguerra-Ramirez makes calls out of the facility to her legal team, she must hope that they answer because the facility does not permit her to leave a voice mail. This makes it more challenging for Ms. Vizguerra-Ramirez to get in contact with her legal team since they cannot tell who called. These frustrations and barriers to access make it harder for Ms. Vizguerra-Ramirez to receive timely support for the struggles she is facing.

## **Summary**

25. The built-up pressure of Ms. Vizguerra-Ramirez's high profile while detained has caused undue stress and pressure in Ms. Vizguerra-Ramirez's life and the life of her family. She is not only a mother, grandmother, and community member, but also a public figure. Her ongoing detainment under adverse conditions continues to affect her physical and mental health drastically, as well as the well-being of her family. Her advocacy for her basic rights and that of others while detained are causing retaliation against her and creating more tension for her within the walls of the facility. Her voice appears to be purposefully silenced during weekly vigils and she is also encountering the cumulative effects of being silenced and having her rights violated ongoingly. During the weekly vigils held by the community to honor, support, and stand against Ms. Vizguerra-Ramirez's ongoing detainment, she speaks to the crowd whenever possible. During these conversations, she



7301 Federal Blvd., Ste. 300
Westminster, CO 80030

(303) 433-2812
(303) 433-2823 FAX
www.rmian.org

has told me that she often offers words of encouragement or exhortation, rarely talking in detail about her own desperation and distress while detained. Even with those with whom she feels most safe and comfortable- her family and supportive community members- she does not seem to express freely the extent to which she is suffering while detained and separated from them. I have witnessed only a part of what she is experiencing through our meetings and have shared this in my report, though I imagine much from her mistreatment may be missing.

26. My time spent with Ms. Vizguerra-Ramirez is an effort to support her in managing the symptoms of physical and mental health deterioration while detained in adversarial conditions. My interventions have mostly been an ineffective salve for the true cause of her increasing distress- her confinement and separation from loved ones and her inability to more effectively meet their growing needs: physical, emotional, financial, attachment, and care, especially for her youngest children. Throughout ongoing meetings, I have also become aware of the ways that her role as public figure and outspoken advocate have created additional stressors and mistreatment of her while she is in the facility. I anticipate that without release from the facility and reconnection to her family and community, Ms. Vizguerra-Ramirez and her family's well-being will continue to plummet.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is all true and correct to the best of my knowledge and belief.

*Jenny Delgado*

Jenny Delgado, LCSW                                    Date: September 24, 2025
Social Worker
Rocky Mountain Immigrant Advocacy Network
7301 Federal Blvd Ste 300
Westminster, CO 80030

# Exhibit C

Amended Petition Showing Additions and Deletions
Pursuant to D.C.COLO.LCivR 16.2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 25-cv-00881-NYW-KAS

Jeanette Vizguerra-Ramirez,

      Petitioner-Plaintiff,

v.

~~Dawn Ceja~~Juan Baltazar,
      Warden, Aurora ICE Processing Center,
Robert Guadian,
      Field Office Director, U.S. Immigration and Customs Enforcement, U.S.
      Department of Homeland Security,
Kristi Noem,
      Secretary, U.S. Department of Homeland Security,
Pamela Bondi,
      U.S. Attorney General, U.S. Department of Justice,

        in their official capacities,

      Respondents-Defendants

---

## AMENDED AND VERIFIED PETITION FOR WRIT OF HABEAS CORPUS

---

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 4

JURISDICTION ................................................................................................... 6

VENUE ............................................................................................................... 7

PARTIES ............................................................................................................ 7

STATEMENT OF FACTS ................................................................................... 9

    Procedural History of Putative Reinstatement Order ............................. 9

        IJ Denial of Cancellation and Grant of Voluntary Departure in 2011 .......... 9

        BIA Appeal and Tolling of Voluntary Departure Period ............................ 10

        Departure and Return While Appeal Pending .......................................... 10

        Issuance of Putative Reinstatement Order in 2013 ................................. 11

        ICE Stay of Removal in 2013 .................................................................. 12

        Detention in 2025 .................................................................................... 12

        Judicial and Administrative Challenges to Detention and Reinstatement 12

            a.    Habeas Corpus ................................................................. 12

            b.    Withholding of Removal ..................................................... 12

            c.    Petition for Review ............................................................ 13

    Ms. Vizguerra-Ramirez's History as an Outspoken Activist ................................. 15

    Evidence of Retaliatory Arrest ................................................................ 16

    Continued Retaliation in Detention ......................................................... 18

    Broader Context of First Amendment Retaliation ................................... 23

    Conditions of Detention ....................................................................... 2625

STATEMENT OF LAW ................................................................................... 2827

    Voluntary Departure ........................................................................... 2827

    Reinstatement of Removal ...................................................................... 29

    Withholding-Only Proceedings ............................................................... 30

    First Amendment Retaliation ............................................................... 3231

    Detention During Withholding Only Proceedings ................................. 3332

    Prolonged, Post-Removal Order Detention in Violation of Due Process ......... 3332

        Recent Post-Order Detention Cases Brought in the District of Colorado

        ...................................................................................................... 3534

            a.    Use of the Singh Factors ............................................... 3635

            b.    Bond Hearing as a Remedy ........................................... 3635

CLAIMS FOR RELIEF .................................................................................. 3736

    Count 1: Violation of Fifth Amendment Right to Due Process (Unlawful Detention)

    ...................................................................................................... 3736

    Count 2: Violation of 8 U.S.C. § 1231(a)(5) and Implementing Regulations ... 3837

    Count 3: Retaliation and Discrimination in Violation of the First Amendment . 3938

Count 4: Violation of Fifth Amendment Rights to Procedural Due Process
(Unreasonably Prolonged Detention) .................................................... 40~~39~~

The *Singh* Factors Weigh in Petitioner's Favor ................................... 41~~40~~

    a.    Duration of Detention ..................................................... 41~~40~~

    b.    Likelihood of Continued Detention ................................ 42~~40~~

    c.    Conditions of Detention.................................................. 42~~41~~

    d.    Delays Caused by the Noncitizen and by the Government
.......................................................................................... 45~~44~~

    e.    Likelihood that Removal Proceedings Will Result in Removal
.......................................................................................... 47~~45~~

Appropriate Remedies: Grant of Immediate Release or Individualized
Bond Hearing in which the Government Bears the Burden ....... 48~~46~~

PRAYER FOR RELIEF .............................................................................. 50~~48~~

INDEX OF ATTACHED EXHIBITS ............................................................. 52~~50~~

**INTRODUCTION**

Petitioner-Plaintiff, Jeanette Vizguerra-Ramirez (hereinafter "Petitioner") a citizen of Mexico and nationally prominent advocate for immigrant rights, was detained on Monday, March 17, 2025, without statutory authority and in apparent retaliation for her outspoken criticisms of this country's immigration enforcement policies and practices. Nonetheless, the Respondents-Defendants ("Respondents") continue to detain Ms. Vizguerra-Ramirez. The length of such detention has become unreasonable and is in violation of her Fifth Amendment due process rights.

Ms. Vizguerra-Ramirez's case is in legal limbo. She has not been placed in removal proceedings, under 8 U.S.C. § 1229a, which would permit her detention under 8 U.S.C. § 1226 pending a decision on whether she is to be ordered removed from the U.S. While Respondents-Defendants ("Respondents") ~~believe~~assert Ms. Vizguerra-Ramirez has a prior order of removal which has been reinstated, authorizing her detention under 8 U.S.C. § 1231(a)(5), the administrative record shows the putative order to be so procedurally and substantively deficient such that it does not meet the regulatory definition of a reinstatement order and therefore cannot trigger the Respondents' claimed statutory authority to detain.

Furthermore, the decision of Respondents from the U.S. Department of Homeland Security ("DHS" or "the Department") to target Ms. Vizguerra-Ramirez for detention, substantially on account of her protected speech, strikes at the heart of the First Amendment. As the Supreme Court has held, "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *City of*

*Houston, Tex. v. Hill,* 482 U.S. 451, 462–63 (1987). As shown by the prominence of immigration issues in the recent election, immigration policy is a matter of heightened public concern, making discussions about the topic clearly covered within the scope of First Amendment protection. *See Connick v. Myers,* 461 U.S. 138, 145 (1983) ("[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection."); *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1034 (1991) ("[S]peech critical of the exercise of the ~~State's~~State's power lies at the very center of the First Amendment."). By specifically targeting Ms. Vizguerra-Ramirez for detention due to her national prominence as an activist, a status achieved through her sharp critiques of government enforcement policies, the Department's actions—including the highly unusual moves of publicizing a photo of her shackled on social medial and publicly commenting on her individual case—violated her rights under the First and Fifth Amendments of the U.S. Constitution, the Immigration and Nationality Act, and its own federal regulations. Unfortunately, Ms. Vizguerra-Ramirez's retaliatory arrest is not an aberration, as noncitizens exercising their speech rights have been targeted throughout the country in recent ~~weeks~~months. *See*, *e.g.*, *Khalil v. Joyce, et al.*, 2:25-cv-01963 (D.N.J. 2025); *Ozturk v. Hyde, et al.*, 1:25-cv-10695 (D. Mass 2025).

Inside detention, Respondents continued their retaliatory actions, treating Ms. Vizguerra-Ramirez differently than other people in detention by substantially limiting and interfering with her access to counsel and in violation of their own procedures when processing her for a reasonable fear interview ("RFI"), a mandatory screening as to whether Ms. Vizguerra-Ramirez's removal would subject her to harm if returned to

Mexico. Rather than functioning as a protective mechanism for those fearing persecution or torture, the administrative RFI process in this case has beenwas administered in a manner that appearsappeared to subvert its intended purpose from protective to punitive.

By detaining Ms. Vizguerra-Ramirez beyond six months, the Respondents also violate her Fifth Amendment due process rights and subject her to prolonged detention. The Supreme Court in *Zadyvdas v. Davis* made clear that after six months, post-removal detention is no longer "presumptively reasonable." There is no substantial likelihood that DHS will be able to carry out Ms. Vizguerra-Ramirez's removal in the reasonably foreseeable future due to her on-going withholding-only proceedings and the likelihood of subsequent administrative and judicial appeals.

Courts in this district are familiar with constitutional claims against prolonged, post-removal detention, frequently applying the *Singh* factors to assess whether the government is violating the petitioner's due process rights.

Accordingly, to vindicate Ms. Vizguerra-Ramirez's constitutional, statutory, and regulatory rights, this Court should grant the instant petition for a writ of habeas corpus,. In doing so, this Court should declare Respondents' actions unlawful, order Ms. Vizguerra-Ramirez's release or require an individualized bond hearing where the government carries the burden of proof, and enjoin Respondents from detaining or deporting Ms. Vizguerra-Ramirez in the future unless Respondents can demonstrate an unambiguous statutory authority for such detention and clearly establish that their actions are untainted by impermissible First Amendment retaliation.

**JURISDICTION**

1.      This action arises under the Constitution of the United States and the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq*.

2.      This Court has subject matter jurisdiction under 28 U.S.C. § 2241 (habeas corpus), 28 U.S.C. § 1331 (federal question), Article I, § 9, cl. 2 of the United States Constitution (Suspension Clause), the First Amendment, and the Fifth Amendment.

3.      An actual and justiciable controversy exists between the parties under 28 U.S.C. § 2201. This Court may grant declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*; the All Writs Act, 28 U.S.C. § 1651; 28 U.S.C. § 2241(a); Fed. R. Civ. P. 57, 65; as well based on its inherent authority to grant equitable relief. *See, e.g., Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971).

4.      Petitioner is in custody for purposes of habeas jurisdiction because she is detained at the Aurora ICE Processing Center in Aurora, Colorado.

## VENUE

5.      Venue is proper because Ms. Vizguerra-Ramirez is detained at the GEO Group's ICE Processing Center in Aurora, Colorado, which is within the jurisdiction of this District. 28 U.S.C. § 224(a). In addition, venue is proper in this District because a substantial part of the events giving rise to Ms. Vizguerra-Ramirez's claims occurred in this District, and she resides in this District and no real property is involved in this action. 28 U.S.C. §§ 1391(b)(2) and (e)(1). *See Braden v. 30th Judicial Circuit*, 410 U.S. 484, 493–94 (1973).

## PARTIES

6.      Petitioner, Jeanette Vizguerra-Ramirez, is a 53-year-old native and citizen of Mexico and mother of four children, three of whom are U.S. citizens. She has no

current, lawful status in the U.S., despite years of seeking a path to permanent, legal status based on her residence of nearly thirty years, substantial ties to the community, and broad public support due to her many years of social activism. She is being detained at the GEO Group's ICE Processing Center in Aurora, Colorado. She is in the custody, and under the direct control, of Respondents and their agents and/or others working in active concert or participation.

7.    Respondent ~~Ceja~~Baltazar is sued in ~~her~~his official capacity as the Warden of the GEO Group's ICE Processing Center in Aurora. ~~She~~He has immediate physical custody of Ms. Vizguerra-Ramirez pursuant to the GEO Group's contract with U.S. Immigration and Customs Enforcement ("ICE") to detain noncitizens. Respondent ~~Ceja~~Baltazar is a legal custodian of Ms. Vizguerra-Ramirez.

8.    Respondent Guadian is sued in his official capacity as the Field Office Director of the Denver ICE Office. ICE is a component agency of DHS. In this capacity, he is responsible for the administration of immigration laws and the execution of detention and removal determinations, including coordination with United States Citizenship and Immigration Services ("USCIS"), another component agency of DHS. Respondent Guadian is a legal custodian of Ms. Vizguerra-Ramirez and has authority to release her.

9.    Respondent Noem is sued in her official capacity as the Secretary of DHS. In this capacity, Respondent Noem is responsible for the implementation and enforcement of the immigration laws pursuant to 8 U.S.C. § 1103(a). She routinely transacts business in this District and is legally responsible for pursuing any effort to

detain and remove the Petitioner, including coordination with ICE and USCIS. Respondent Noem is a legal custodian of Ms. Vizguerra-Ramirez.

10.    Respondent Bondi is sued in her official capacity as the Attorney General of the United States and the senior official of the U.S. Department of Justice ("DOJ"). In that capacity, she has the authority to adjudicate removal cases and to oversee the Executive Office for Immigration Review ("EOIR"), which administers the immigration courts and the Board of Immigration Appeals. Respondent Bondi has the authority to release Ms. Vizguerra-Ramirez pending a decision on whether she is to be removed from the United States. Respondent Bondi is a legal custodian of Ms. Vizguerra-Ramirez.

## STATEMENT OF FACTS

### Procedural History of Putative Reinstatement Order

### IJ Denial of Cancellation and Grant of Voluntary Departure in 2011

11.    Ms. Vizguerra-Ramirez is a 53-year-old citizen of Mexico. In 1997, at the age of 25, she fled to the U.S. with her husband and daughter due to the persecution her husband experienced at his job from criminal organizations. The family entered the United States without inspection.

12.    In 2009, Ms. Vizguerra-Ramirez was placed in removal proceedings. As a defense to removal, she applied for cancellation of removal, a form of relief that authorizes an Immigration Judge to "cancel" a noncitizen's deportation and grant lawful permanent residency if the applicant meets four statutory requirements, including a demonstration of exceptional and extremely unusual hardship to certain relatives with lawful status. Ms. Vizguerra-Ramirez sought relief based on the hardship that would befall her three U.S. citizen children.

13.     On November 18, 2011, an Immigration Judge in Denver denied Ms. Vizguerra-Ramirez's application for cancellation of removal, finding that she had not met the high standard for demonstrating her removal would constitute an exceptional and extremely unusual hardship. However, the Immigration Judge granted Ms. Vizguerra-Ramirez's alternate request for voluntary departure, giving her 60 days to leave the country in lieu of a removal order.

### BIA Appeal and Tolling of Voluntary Departure Period

14.     On December 16, 2011, Ms. Vizguerra-Ramirez timely appealed the denial of her cancellation application to the Board of Immigration Appeals. Her timely appeal meant that her 60-day period of voluntary departure was tolled during the pendency of the appeal. 8 C.F.R. § 1003.6(a).

### Departure and Return While Appeal Pending

15.     In September 2012, while her appeal remained pending, Ms. Vizguerra-Ramirez learned that her mother was dying. Wanting to see her one last time, Ms. Vizguerra-Ramirez risked flyingflew back to Mexico. Her departure from the countryUnited States, by regulation, triggered a subsequent, automatic withdrawal of her appeal. 8 C.F.R. § 1003.4.

16.     Having attended her mother's funeral and grieved with family in Mexico, Ms. Vizguerra-Ramirez then returned to the U.S., without inspection, in April 2013. She was apprehended shortly after her entry and charged criminally for illegal entry, a misdemeanor, under 8 U.S.C. § 1325(a)(1), receiving a sentence of one year of unsupervised probation.

17.     After being released from criminal custody, Ms. Vizguerra-Ramirez was turned over to ICE custody in El Paso, Texas, where she remained until June 7, 2013.

Ms. Vizguerra-Ramirez was then released under an order of ~~ICE~~ supervision, which required her to report to the Denver ICE Field Office in Centennial, Colorado.

**Issuance of Putative Reinstatement Order in 2013**

18.     On July 24, 2013, at her check-in, ICE officials detained Ms. Vizguerra-Ramirez. The next day, July 25, 2013, ICE officials presented her with a putative reinstatement order on Form I-871, which was filled out, signed and dated on both the top (notice of intent to reinstate) *and* bottom (final reinstatement order). Having been notified on July 25th that an order had already issued the day prior and without notice or opportunity to contest the determination, Ms. Vizguerra-Ramirez declined to sign the middle of the form. That order is attached and incorporated hereto as Exhibit A.

19.     The putative reinstatement order dated July 24, 2013, is the order on which Respondents seek to detain Ms. Vizguerra-Ramirez. However, it is unambiguously facially deficient and does not satisfy the minimum regulatory definition of a reinstatement order. 8 C.F.R. § 241.8(b). It clearly indicates that ICE officials issued the order on July 24th *before* ~~letting~~informing Ms. Vizguerra-Ramirez ~~know~~ of its existence and of her right to raise an objection prior to the order becoming final. It also clearly indicates that the officer making the decision to reinstate did not review "all available evidence" or any "statements made or submitted in rebuttal" before signing the order portion of the form. Thus, the officer could not have credibly executed the required "Certification" by signing the putative order.

20.     The procedural error was not immaterial. Had Ms. Vizguerra-Ramirez been notified of the possibility of a reinstatement order, she could have alerted officials to the fact that she did *not* have a prior removal order. Instead, she had a grant of voluntary departure that was issued in lieu of a removal order, and by leaving the U.S.

while her appeal was pending, she necessarily complied with the order's departure deadline and did not leave under an order of removal. Absent a prior removal order, there was nothing to be reinstated in 2013.

### ICE Stay of Removal in 2013

21.     Perhaps aware of the due process violation, ICE agents granted Ms. Vizguerra-Ramirez a stay of removal on August 8, 2013. Since that time, ICE repeatedly granted extensions of that stay of removal, with her most recent stay expiring in 2024. Under then-current guidance in 2024, Ms. Vizguerra-Ramirez was not an enforcement priority; an extension of stay was unnecessary and unlikely to be adjudicated.

### Detention in 2025

22.     On Monday, March 17, 2025, Ms. Vizguerra-Ramirez was arrested by ICE agents while on her lunch break from work at Target. She was placed in shackles, photographed, and told in Spanish by one of the officers, "We finally got you!" She was transported to the GEO Aurora ICE Processing Center, where she has remained in custody since.

### Judicial and Administrative Challenges to Detention and Reinstatement

#### a.     Habeas Corpus

23.     Ms. Vizguerra-Ramirez has challenged the legality of her detention before this Court, with her initial habeas petition filed on March 18, 2025, focused on the absence of a legally cognizable reinstatement order. On April 8, 2025, she filed an amended petition, adding a First Amendment retaliation claim.

#### b.     Withholding of Removal

24.     In detention, Ms. Vizguerra-Ramirez expressed a fear of persecution or torture in Mexico. She has a long record of public criticism of systemic corruption and

violence in Mexico, as well as the United States. Her activism has targeted abuses by the Mexican government, law enforcement, and cartel collusion, making her a visible and outspoken political dissident. Ms. Vizguerra-Ramirez's sincerely held and consistently demonstrated political beliefs arise out of her deeply held conviction that all people deserve basic, fundamental human rights and that governments and others must respect those rights. This includes basic protections for workers, the indigenous, migrants and women. Her beliefs and activism have, and will, make her a target for retribution by the Mexican government and by cartels that the government is unable or unwilling to control.

26. Officials from the USCIS Asylum Office, following a procedurally flawed and prejudicial initial screening, determined that Ms. Vizguerra-Ramirez did not establish a reasonable fear of persecution or torture. However, an Immigration Judge later reversed that determination, allowing Ms. Vizguerra-Ramirez to proceed with an application for withholding of removal under 8 U.S.C. § 1231(b)(3)(B) and protection under the Convention Against Torture ("CAT"), pursuant to 8 C.F.R. § 1208.16-18. The application is currently pending before an immigration judge.

### *c.    Petition for Review*

26. Ms. Vizguerra-Ramirez has the right to challenge the government's putative reinstatement order before the Tenth Circuit Court of Appeals, where she would argue that it was legal error to hold that a tolled grant of voluntary departure converts to a removal order if the recipient departs the U.S. during the pendency of her agency appeal. The deadline for filing a petition for review is 30 days. 8 U.S.C. § 1252(b)(1).

27. Ms Vizguerra-Ramirez did not file a petition for review within 30 days in 2013 because, at that time, a person with a reinstated order of removal could not seek

judicial review until reasonable fear and withholding-only proceedings were finished. *See*, *e.g.*, *Neri-Garcia v. Holder*, 696 F.3d 1003, 1008 (10th Cir. 2012) (PFR of denial of relief in reasonable fear proceedings was "timely filed" upon completion of the reasonable fear proceedings). Also in 2013, the only circuit to have directly addressed the issue held that a reinstated order of removal did not become final for purposes of § 1252(b)(1) until reasonable fear proceedings were completed. *Ortiz-Alfaro v. Holder*, 694 F.3d 955, 958 (9th Cir. 2012). In 2014, the Tenth Circuit formally agreed with the Ninth, holding that a reinstatement order was not final for purposes of judicial review until the reasonable fear and withholding-only proceedings were finished. *Luna-Garcia v. Holder*, 777 F.3d 1182, 11185 (10th Cir. 2015). The Tenth Circuit later affirmed that holding in *Arostegui-Maldonado v. Garland*, 75 F.4th 1132, 1139 (10th Cir. 2023). In Ms. Vizguerra-Ramirez's case, her reasonable-fear and withholding proceedings were not completed within 30 days of the issuance of the reinstatement order. In fact, they had not even started and would not start for over a decade. This is because ICE, despite issuing the putative reinstatement order in 2013, did not seek to immediately execute that order, instead granting Ms. Vizguerra-Ramirez a stay of removal, which it then renewed numerous times in the subsequent years.

28.    Immediately following Ms. Vizguerra-Ramirez's detention in March, and faced with the prospect of immediate removal, she filed a precautionary petition for review with the Tenth Circuit, Case No. 25-9532. She later voluntarily withdrew that petition once she received confirmation that her reasonable-fear proceedings had been initiated, relying on *Luna-Garcia* and *Arostegui-Maldonado*, and anticipating that those

protection claims would need to reach finality before she could seek judicial review of the underlying reinstatement order.

29.     That reliance changed with the Supreme Court's decision in *Riley v. Bondi*, 145 S. Ct. 2190 (2025) on June 26, 2025. In *Riley*, the Supreme Court held that, for purposes of judicial review, a DHS-issued removal order, not the agency's decision at the conclusion of withholding-only proceedings, is the final removal order that triggers the 30-day filing deadline for a petition for review. In so holding, the Court overturned decisions from every court of appeals except the Second and Fourth Circuits holding that the deadline commences at the end of fear-based proceedings. This included an overruling of *Arostegui-Maldonado* in the Tenth Circuit. In addition, the Supreme Court held that the 30-day filing deadline is a non-jurisdictional claim-processing rule subject to equitable exceptions including waiver and forfeiture, and possibly equitable tolling.

30.     Within 30 days of *Riley*, Ms. Vizguerra-Ramirez filed another petition for review, Case No. 25-9559. It is currently pending, with an opening brief due on October 14, 2025.

**Ms. Vizguerra-Ramirez's History as an Outspoken Activist**

2331.  The reason ICE was glad they finally "got" Ms. Vizguerra-Ramirez appears to be tied to her long history as an immigration and labor activist. After years of union organizing, she first received significant national attention in 2017, shortly after the start of the first Trump term, when she took sanctuary in Denver's First Unitarian Society, and later in the First Baptist Church. *Advocates say ICE agent pursued a personal vendetta against undocumented immigrant Jeanette Vizguerra*, Denverite (March 3, 2017) (https://denverite.com/2017/03/03/advocates-say-ice-agent-pursued-personal-vendetta-undocumented-immigrant-jeanette-vizguerra/) (last visited April 8September

29, 2025). Community members poured into the streets to march in support of her decision to seek sanctuary. *Hundreds march from Civic Center Park to First Unitarian Church to support Jeanette Vizguerra*, Denverite (February 18, 2017) (https://denverite.com/2017/02/18/hundreds-march-civic-center-park-first-unitarian-church-support-jeanette-vizguerra/) (last visited ~~April 8~~September 29, 2025). Her sanctuary stay made Ms. Vizguerra-Ramirez "perhaps the best-known undocumented immigrant in Colorado" as she became the "new face of the sanctuary movement." *Who is Jeanette Vizguerra, the Denver immigration activist detained by ICE?*, Denverite (March 18, 2025) (https://denverite.com/2025/03/18/who-is-jeanette-vizguerra-ice-detained/) (last visited ~~April 8~~September 29, 2025). She was named one of Time Magazine's "100 most influential people" in April 2017, with actress America Ferrera writing the vignette for her entry. *Jeanette Vizguerra, undocumented Denver immigrant, honored as one of TIME's 100 most influential people*, Denverite (April 20, 2017). (https://denverite.com/2017/04/20/denvers-jeanette-vizguerra-one-times-100-influential-people/) (last visited ~~April 8~~September 29, 2025). In the years since, Ms. Vizguerra-Ramirez "has been a regular face at protests," and "she has also been a vocal advocate in Facebook groups meant to spread the word about ICE's actions in the metro area." *Who is Jeanette Vizguerra, the Denver immigration activist detained by ICE?*, Denverite (March 18, 2025) (https://denverite.com/2025/03/18/who-is-jeanette-vizguerra-ice-detained/) (last visited ~~April 8~~September 29, 2025); see also https://www.facebook.com/jeanette.vizguerra.

### Evidence of Retaliatory Arrest

~~24~~32.  There are strong indications that ICE's enforcement actions against Ms. Vizguerra-Ramirez were driven, to a large degree, by a desire for retaliation due to her

prominence as a critic of Trump immigration policies, and to send a message to other potential critics. The signs of a retaliatory motive include the following.[4]

    a.    On March 19, 2025, Denver ICE chose to publish news of Ms. Vizguerra-Ramirez's arrest on its X account (@ERODenver), with a picture of her in handcuffs and chained at the waist. The post was amplified by the main ICE X account (@ICEgov) on March 21, 2025, commenting, "In 2017, Jeanette Vizguerra-Ramirez hid in Denver churches for nearly three months to avoid arrest. Despite her being featured in national media for years, we arrested her in public March 17. A high-profile status does not exempt a person from immigration law [sic]." Among hundreds of posts about arrests and removals conducted by ICE in the last three months, the post about Ms. Vizguerra-Ramirez uniquely focuses on her activism and national prominence.

    b.    On March 19, 2025, Tricia McLaughlin said on X that, "Under President Trump and Secretary Noem, we are once again a nation of laws. We will find, arrest, and deport illegal aliens regardless of if they were a featured 'Time Person of the Year.'" Tricia McLaughlin is the Assistant Secretary for Public Affairs within DHS. She oversees the Department's public outreach, including its media, digital, strategic and crisis communications efforts, and serves as the principal advisor to Secretary Noem on all external and internal communications.

---

[4] ~~Petitioner will shortly file a discovery motion, as she has good cause to believe additional evidence in support of the retaliation claim are within Respondents' possession and/or control.~~

c.    On March 18, 2025, John Fabbricatore responded in celebration on X in response to Ms. Vizguerra-Ramirez's arrest. He said, "She is a criminal, hates Trump, and is an open-borders, abolish-ICE advocate. Bye!!!!" Mr. Fabbricatore served several years as the Field Office Director of the Denver ICE Office. He was serving as the Assistant Field Office Director in 2013, when his office issued the putative reinstatement order against Ms. Vizguerra-Ramirez, and in early 2017, when she first went into sanctuary.

d.    On the same day, in response to his own post, Mr. Fabbricatore posted screenshots from Ms. Vizguerra-Ramirez's Facebook page indicating her strident opposition to ICE and to Trump.

e.    On the same day, and in a different post on X, Mr. Fabbricatore said people should "stop with their tear-jerking for a criminal and anti/ICE [sic] activist."

f.    On March 26, 2025, in response to news of Trump planning an executive order to end so-called sanctuary cities, Mr. Fabbricatore said on X, "Let's go!!!! End Sanctuary!" Ms. Vizguerra-Ramirez is known nationally for her involvement with the sanctuary movement.

g.    As previously noted, at the time of Ms. Vizguerra-Ramirez's arrest, one of the agents told her, in Spanish, "We finally got you!"

**Continued Retaliation in Detention**

2533.  Evidence of the government's retaliatory motives are also seen in how Ms. Vizguerra-Ramirez has been treated following her arrest. USCIS, acting in concert with ICE, initiated and has repeatedly pursued Ms. Vizguerra-Ramirez's reasonable fear interview (RFI) without notice to counsel, in violation of its own protocols and due

process protections. ~~Not to mention, DHS mysteriously initiated this process almost twelve years *after* the putative order of reinstatement went into effect. In doing so, the agency has~~In doing so, the agency repurposed the RFI into a procedural formality designed not to assess potential harm if removed, but to eliminate a perceived barrier to enforcement of a legally defective removal order and to further retaliate against Ms. Vizguerra-Ramirez for her widely known public criticisms of ICE's enforcement policies and practices. ~~Those actions are detailed below.~~

~~26~~34.  On the day of Ms. Vizguerra-Ramirez's arrest, undersigned counsel contacted ICE via email and informed them, *inter alia*, of Ms. Vizguerra-Ramirez's fear of return to Mexico. She noted that <u>if</u> the agency had a valid reinstatement order (which counsel noted was in doubt), then Ms. Vizguerra-Ramirez was entitled to and formally requested referral to the USCIS Asylum Office for an RFI. Counsel also provided ICE with an executed G-28, Notice of Entry of Appearance as counsel of record.

~~27~~35.  On the afternoon of Tuesday, March 18, 2025, Ms. Vizguerra-Ramirez was taken to meet with an ICE officer who advised her that she would have an RFI with a USCIS asylum officer to assess her fear of return to Mexico. The ICE officer made the referral to the Asylum Office the same day, providing a copy of counsel's G-28, Entry of Appearance.

~~28~~36.  Between March 18, 2025 until the early morning of March 22, 2025, undersigned counsel could not communicate with Ms. Vizguerra-Ramirez. In response to two men escaping the Aurora facility, ICE and GEO engaged in a facility-wide lockdown. All phone access—including legal calls—was suspended. Even after phone access was restored, Ms. Vizguerra-Ramirez's personal phone PIN remained inactive.

Ms. Vizguerra-Ramirez was unable to speak with her attorney until approximately 7:15 a.m. on Saturday, March 22, 2025.

~~29~~37.  Meanwhile, on Thursday, March 20, 2025, at approximately 8:30 am, a GEO guard pulled Ms. Vizguerra-Ramirez from a medical appointment and took her to speak with "Asylum." ~~She~~This was in violation of USCIS' own procedures that such interview could not be conducted until at least 48 hours after referral. Ms. Vizguerra-Ramirez objected to the lack of notice and expressed her right to counsel. The interview was postponed.

~~30~~38.  On Monday, March 24, 2025, Ms. Vizguerra-Ramirez was called again for an interview with an asylum officer without advance notice~~.~~, again in violation of USCIS protocols. She told the asylum officer that she ~~was~~could not ~~ready~~proceed because she could not communicate with counsel while the phones were down and her attorney was not present. The asylum officer placed Ms. Vizguerra-Ramirez on hold several times while consulting with a supervisor and ultimately informed her that the interview would be rescheduled.

~~31~~39.  On March 25, 2025, Ms. Vizguerra-Ramirez was summoned ~~by [ICE? GEO?]~~ for a third attempted interview with an asylum officer. At approximately 8:15 a.m., she was escorted to an interview room and connected by phone with an asylum officer. After Ms. Vizguerra-Ramirez protested, the interview was discontinued.

~~32~~40.  On the morning of Thursday, March 27, 2025, a GEO guard informed Ms. Vizguerra-Ramirez she had to choose between a legal visit and a visit with her children. Believing that her attorney needed to speak with her, she chose the legal visit, only to

learn later that she was being brought to a fourth attempted RFI, despite having been told the interview would take place no earlier than Monday, March 31, 2025.

3341.  The asylum officer attempted to start the interview, but Ms. Vizguerra-Ramirez said the prior asylum officer had told her it would be scheduled for Monday, March 31, at the earliest, as well as reiterated the reasons she was not fully prepared to proceed. The asylum officer attempted to call undersigned counsel, but she was unavailable. The RFI was again pushed back. The Asylum Office *never* provided counsel with advance notice prior to any of the four failed interview attempts.

3442.  On March 29, 2025, USCIS contacted counsel via email to inform her that they would conduct the RFI on Monday, March 31, 2025, at 8:30 a.m.

3543.  On March 30, 2025, undersigned counsel responded to the email, submitting a detailed letter to USCIS citing irregularities in the handling of Ms. Vizguerra-Ramirez's RFI. Counsel specifically requested that the RFI be held in abeyance pending resolution of jurisdictional issues in the pending federal litigation, or, at a minimum, that the RFI be rescheduled with sufficient notice to allow undersigned counsel to be present in person with her client. The letter cited the agency's own Reasonable Fear Procedures Manual, which authorizes such delay at counsel's request or where exceptional circumstances exist. USCIS Reasonable Fear Procedures Manual, Section III.B.3 ("The APSS processing clock may only be tolled due to: a request by the alien or the alien's representative to defer the reasonable fear interview; . . . or exceptional circumstances.").

3644.  On March 31, 2025, USCIS again attempted to conduct the RFI. At approximately 8:30 a.m., Ms. Vizguerra-Ramirez was taken to the interview room and

placed on the phone with an asylum officer. After nearly 45 minutes, the asylum officer

called counsel. Counsel informed the officer of her prior correspondence requesting the

RFI be held in abeyance.

37~~45~~.  Despite counsel's objections, the asylum officer next attempted to place

Ms. Vizguerra-Ramirez under oath and proceed with the RFI. Counsel continued her

objections as the asylum officer attempted to steamroll through the interview upon

direction from his supervisor, admonishing counsel and advising her that she was only

permitted to observe. Counsel advised her client not to proceed with the interview, and

~~she~~Ms. Vizguerra-Ramirez disconnected at 9:45 a.m. Counsel ~~requested~~remained on

the line, requesting to speak with a supervisor. After 15 minutes without

~~resolution~~response from a supervisor, counsel ended the call.

~~38.~~    46.    Just minutes after counsel got off the phone, Ms. Vizguerra-

Ramirez was recalled by a GEO officer who informed her—erroneously—that *both her*

*attorney* and the asylum officer needed her to return to finish the interview. She was

reconnected to USCIS at 10:06 a.m.  The asylum officer stated to Ms. Vizguerra-

Ramirez that he *and her counsel had agreed* that she must proceed with the RFI,

despite counsel not being present. This was not true. Ms. Vizguerra-Ramirez refused to

answer questions without hearing her attorney on the line. The officer then told Ms.

Vizguerra-Ramirez that her counsel had the opportunity to participate but had instead

chosen to take care of another client, and warned her that the RFI would be considered

abandoned if Ms. Vizguerra-Ramirez failed to go forward without counsel. Feeling she

was being tricked, Ms. Vizguerra-Ramirez terminated the call.

3947.  Counsel submitted a formal complaint to USCIS, describing how the asylum officer attempted to proceed with the RFI under false pretenses and without proper notification or inclusion of counsel.  USCIS did not respond.

4048.  On April 7, 2025, USCIS Asylum contacted undersigned counsel via email to reschedule the RFI. At 6:40 a.m. on April 8, 2025, counsel responded with her renewed request that USCIS respond to her letter. To date, however, no one from USCIS has addressed counsel's requests or complaints.

49.     On May 2, 2025, without having interviewed Ms. Vizguerra-Ramirez on her protection claim, USCIS issued a decision finding she had no reasonable fear of persecution.  On May 20, 2025, the decision was reversed after review by an immigration judge.  That claim remains pending.

**Broader Context of First Amendment Retaliation**

4150.  The government's retaliation against Ms. Vizguerra-Ramirez comes in a broader context of retaliation against other noncitizens who have exercised their First Amendment rights.

4251.  During Trump's current term, there have already been numerous instances of federal immigration officials targeting noncitizens based on their protected speech. *See*, *e.g.*, *Court Rules Rümeysa Öztürk's Lawsuit Should Move Forward in Vermont*, ACLU of Massachusetts (April 4, 2025) (noting that Ms. Öztürk, a noncitizen PhD student at Tufts, "was grabbed, arrested, and detained in Somerville, Massachusetts by plainclothes federal agents in apparent retaliation for an op-ed she co-authored in a student newspaper") (https://www.aclu.org/press-releases/court-rules-rumeysa-ozturks-lawsuit-should-move-forward-in-vermont) (last visited April 8, 2025); *Rubio Orders U.S. Diplomats to Scour Student Visa Applicants' Social Media*, New York

Times (April 1September 29, 2025) (noting "an effort to bar those suspected of criticizing the United States and Israel from entering the country") (https://www.nytimes.com/2025/04/01/us/politics/student-visas-social-media.html) (last visited April 8September 29, 2025); *Rubio warns visas will be revoked for all foreign student 'activists' amid Tufts arrest*, Fox News (March 27, 2025) (quoting the Secretary of State that anyone found to be "creating a ruckus" will have their visa revoked) () (last visited April 8https://www.foxnews.com/world/rubio-warns-visas-revoked-all-foreign-student-activists-amid-tufts-arrest (last visited September 29, 2025); *Immigration agents arrest Palestinian activist who helped lead Columbia University protests*, AP (March 10, 2025) (https://apnews.com/article/columbia-university-mahmoud-khalil-ice-15014bcbb921f21a9f704d5acdcae7a8) (last visited April 8September 29, 2025); *U.S. arrests second pro-Palestinian Columbia University protester*, BBC (March 15, 2025) (https://www.bbc.com/news/articles/c3rnzp4ye5zo) (last visited April 8September 29, 2025); *Judge blocks deportation of Georgetown fellow detained by immigration authorities*, ABC News (March 20, 2025) (https://abcnews.go.com/US/georgetown-fellow-detained-alleged-hamas-ties-targeted-wifes/story?id=119983535) (last visited April 8September 29, 2025); *Judge blocks Trump administration from deporting 21-year-old Columbia protester and green card holder*, CBS News (March 25, 2025) (https://www.cbsnews.com/news/yunseo-chung-columbia-student-south-korea-ice-deportation/) (last visited April 8September 29, 2025).

4352.  The recent actions should come as no surprise. During the first Trump term, federal immigration officials engaged in retaliatory immigration enforcement against individuals like Ms. Vizguerra-Ramirez who engaged in protected First

Amendment activity. *See*, *e.g.,* Alina Das, *Deportation and Dissent: Protecting the Voices of the Immigrant Rights Movement,* 65 N.Y.L. Sch. L. Rev. 225, 231-237 (2020-2021) (describing examples of First Amendment retaliation); *see also* Gaby Del Valle, *ICE Keeps Arresting Prominent Immigration Activists. They Think They're Being Targeted.*, VICE NEWS (Aug. 24, 2019) ~~()~~(https://www.vice.com/en/article/ice-keeps-arresting-prominent-immigration-activists-they-think-theyre-being-targeted/) (last visited ~~April 8~~September 29, 2025); John Burnett, *See the 20+ Immigration Activists Arrested Under Trump*, NPR (Mar. 16, 2018) (https://www.npr.org/2018/03/16/591879718/ see-the-20-immigration-activists-arrestedunder-trump) (last visited ~~April 8~~September 29, 2025); John Burnett, *Immigration Advocates Warn ICE is Retaliating for Activism*, NPR (Mar. 16, 2018) (https:/www.npr.org/2018/03/16/593884181/ immigration-advocates-warn-ic-is-retaliating-for-activism) (last visited ~~April 8~~September 29, 2025); Maria Sacchetti & David Weigel, *ICE Has Detained or Deported Prominent Immigration Activists*, WASH. POST (Jan. 19, 2018) ~~() (last visited April 8~~(https://www.washingtonpost.com/powerpost/ice-has-detained-or-deported-foreigners-who-are-also-immigration-activists/2018/01/19/377af23a-fc95-11e7-a46b-a3614530bd87_story.html) (last visited September 29, 2025).

~~44~~53.  By the close of the first term of the Trump Administration, non-governmental organizations mapped more than one thousand instances of retaliation against immigrant rights advocates, including citizens and noncitizens. *See* Immigrant Rights Voices Map, https://immigrantrightsvoices.org; Nick Pinto, *Across the U.S., Trump Used ICE to Crack Down on Immigration Activists*, THE INTERCEPT (Nov. 1, 2020)

(https://theintercept.com/2020/11/01/ice-immigration-activists-map/) (last visited ~~April 8~~September 29, 2025). During this second Trump term, it is clearly happening again.

**Conditions of Detention**

54.     The Aurora Contract Detention Facility, where Ms. Vizguerra-Ramirez is currently detained, is well-known for its abuse and neglect. *See* Press Release, ACLU, ACLU Report Highlights Death, Abuse, and Neglect at Aurora ICE Detention Facility (Sept. 18, 2019), https://www.aclu.org/press-releases/aclu-report-highlights-death-abuse-and-neglect-aurora-ice-detention-facility (last visited September 29, 2025). Three people in detention have died in this facility. *See* Report, ACLU, Cashing in on Cruelty: Stories of Death, Abuse and Neglect at the GEO Immigration Detention Facility in Aurora (Sept. 17, 2019), https://www.aclu-co.org/publications/cashing-cruelty-stories-death-abuse-and-neglect-geo-immigration-detention-facility/ (last visited September 29, 2025); *see* Press Release, ACLU, ACLU FOIA Litigation Reveals New Information About Plans to Expand ICE Detention in Colorado (July 9, 2025), https://www.aclu-co.org/press-releases/foia-reveals-ice-plans-expand/ (last visited September 29, 2025).

55.     The first person died in this facility in 2012 after a heart attack due to medical staff incompetence with EKGs and heart medication. Press Release, ACLU (Sept. 18, 2019). The second person in detention died in 2017, after the facility discontinued his medically prescribed methadone, and failed to respond adequately as he died from the dangerous effects of opioid withdrawal. *See id*. The third person in detention died in 2022 due to an undiagnosed and untreated blood clot in his leg. Press Release, ACLU (July 9, 2025). An ACLU report from 2019 revealed numerous instances of medical incompetence, dental neglect, inadequate nutrition and mental healthcare, in addition to a lack of accommodations for detainees with disabilities, limited access to

legal resources, and substandard care that contributed to the suffering and death of the person in detention in 2017. Press Release, ACLU (Sept. 18, 2019).

56.     According to her social worker, Ms. Vizguerra-Ramirez expresses continuous distress, escalating despair, and declining physical and mental health in detention. Exh. 2, Declaration of Jenny Delgado, LCSW ¶ 25. Since July 2025, the social worker visits her in the detention center on a weekly basis, providing mental health services to her and community services to her family. Her social worker determined that Ms. Vizguerra-Ramirez's and her family's well-being will likely continue to worsen if she is not released. *Id*. at 26.

57.     Ms. Vizguerra-Ramirez experiences negative social interactions in detention because of her career as an advocate for immigrant rights. *Id*. at 20. Guards ask her questions such as "'who do you think you are?" and "do you think you have access to special treatment because of who you are?" She also experiences retaliation, evidenced by the removal of phone and video communications in her dorm. *Id*. at 21. Ms. Vizguerra-Ramirez and her fellow dormmates routinely suffer from this collective punishment which has contributed to tension in the dorm. *Id*.

58.     The social worker also provides insight into the extent of the strain on Ms. Vizguerra-Ramirez's family resulting from her detention and the despair of a mother separated from her children. *Id*. at 16. Ms. Vizguerra-Ramirez is desperately concerned about her younger daughter coping with the absence of her mother. Her daughter experiences school absenteeism and episodes of bullying from other students. *Id*. Ms. Vizguerra-Ramirez also worries that she will not be able to see her middle daughter

before her military deployment. *Id*. Ms. Vizguerra-Ramirez experiences increased symptoms of depression and anxiety due to the separation from her family. *Id*. at 12.

59.    The social worker determines that the true source of Ms. Vizguerra-Ramirez's distress is "her confinement and separation from loved ones and her inability to more effectively meet their growing needs ..." and that her prominence as an advocate has caused her to experience "additional stressors and mistreatment while in detention." *Id*. at 26.

## STATEMENT OF LAW

### Voluntary Departure

45~~60~~.  Noncitizens placed in removal proceedings have a right to apply for various forms of relief from removal before an Immigration Judge. 8 U.S.C. § 1229a(c)(4). Two relief options relevant here are cancellation of removal, under 8 U.S.C. § 1229b(b)(1), and voluntary departure under 8 U.S.C. § 1229c(b). A person granted voluntary departure who complies with the terms of that grant will not have an order of removal. 8 U.S.C. § 1229c(b)(1). However, where a person granted voluntary departure does not leave by the stated deadline, the voluntary departure order converts to a removal order, and any subsequent departure is considered a self-removal. 8 C.F.R. § 1240.26(d) (alternate order of removal entered along with voluntary departure).

46~~61~~.  Noncitizens who received an adverse decision from an Immigration Judge in removal proceedings may appeal that decision to the Board of Immigration Appeals. 8 U.S.C. § 1229a(c)(5); 8 C.F.R. § 1003.1(b)(3).

47~~62~~.  Typically, the voluntary departure period begins running on the date of the Immigration Judge's order. However, when a person appeals an Immigration Judge's decision to the Board, the filing of the appeal automatically stays execution of the

Immigration Judge's voluntary departure order. *Matter of A-M-*, 23 I&N Dec. 737, 744 (BIA 2005) (citing 8 C.F.R. § 1003.6(a)). Thus, while an appeal is pending, the voluntary departure period is not running.

~~48~~63.  If a person departs while an appeal is pending, her departure will be deemed a withdrawal of the appeal. 8 C.F.R. § 1003.4. In such a situation, "the initial decision in the case shall be final to the same extent as though no appeal had been taken." *Id*. Accordingly, in the case of an appellant with a tolled voluntary departure order, her departure from the U.S. prior to a decision on her appeal would immediately trigger the start of her voluntary departure period. *Id*.

### Reinstatement of Removal

~~49~~64.  If a person reenters the U.S. illegally after "having departed voluntarily, *under an order of removal*, the prior order of removal is reinstated from its original date" and the person "shall be removed under the prior order at any time after the reentry." 8 U.S.C. § 1231(a)(5) (emphasis added).

~~50~~65.  In reinstatement proceedings under 8 U.S.C. § 1231(a)(5), a DHS officer conducts an interrogation to determine whether an individual has a prior removal order, is in fact the person identified in the prior order, and unlawfully reentered. 8 C.F.R. § 241.8(a). In making this determination, the officer "must obtain the prior order." 8 C.F.R. § 241.8(a)(1). At the conclusion of the interrogation, the officer signs and dates the top portion of Form I-871, titled "Notice of Intent/Decision to Reinstate Prior Order." This portion of the form contains the factual allegations against the individual, including that he or she is not a U.S. citizen, the date of the prior order, date and manner of departure, and the date of illegal reentry.

5166.  DHS must inform the individual that he or she has the right to make a written or oral statement contesting the conclusion that he or she is subject to reinstatement. 8 C.F.R. § 241.8(b). After completing the top portion of Form I-871, the officer must present the notice portion of Form I-871 to the individual to sign and to indicate whether he or she wishes to make a statement contesting the determination. *Id*. ("If the [individual] wishes to make . . . a statement, the officer shall allow the [individual] to do so and shall consider whether the [individual]'s statement warrants reconsideration of the determination.").

5267.  Only after the person has been informed of their right to challenge the reinstatement, and any such challenge has been reviewed, does a different officer then sign and date the bottom portion of Form I-871, labeled "Decision, Order and Officer's Certification."

**53.    If a person with a valid Withholding-Only Proceedings**

68.    Prior to the execution of a reinstated order, if a person expresses a fear of return to her home country, she is referred to a USCIS asylum officer to determine whether there is a reasonable fear of persecution or torture in the person's home country. 8 C.F.R. § 1241.8(e). Through this process, the person may eventually obtain relief from the reinstated removal order in the form of withholding of removal, 8 U.S.C. § 1231(b)(3), in which case the reinstated removal order is not vacated or withdrawn, only

its execution is withheld. *Matter of I-S- & C-S-*, 24 I&N Dec. 432, 433-34 (BIA 2008).²8

C.F.R. §§ 1241.8(e), 1208.31(a).

5469.  A person has the right to counsel during the reasonable fear process.

8.C.F.R. § 208.31(c) ("The alien may be represented by counsel . . . at the interview");

*see also* 8 U.S.C. § 1362 (providing that noncitizens shall have the privilege of being

represented by counsel of their choosing in any removal proceedings); *Orozco-Lopez v.*

*Garland*, 11 F.4th 764, 777 (9th Cir. 2021) (holding that "any removal proceedings"

includes those concerning eligibility for relief from removal, such as a reasonable fear

screening for people with reinstated orders); USCIS Reasonable Fear Procedures

Manual § III.E.5.a ("The alien may be represented at the interview by counsel").

70.     If an asylum officer determines that the person has a reasonable fear of

persecution or torture, the officer shall refer the matter to an Immigration Judge for full

consideration of applications for withholding of removal under 8 U.S.C. § 1231(b)(3)(B)

and protection under the CAT. 8 C.F.R. §§ 208.16-18. 8 C.F.R. § 1208.31(e). If an

asylum officer determines that the person does not have a reasonable fear of

persecution or torture, the person may seek de novo review by an Immigration Judge. 8

C.F.R. § 1208.31(f). If an Immigration Judge reverses the negative fear determination,

---

² Of relevance to a petition for review challenging the underlying reinstatement order,

that order is not final for purposes of judicial review until the reasonable fear and

withholding-only proceedings are finished. *Luna-Garcia v. Holder*, 777 F.3d 1182,

11185 (10th Cir. 2015); *see also Arostegui-Maldonado v. Garland*, 75 F.4th 1132, 1139

(10th Cir. 2023) (affirming *Luna-Garcia*).

the person will be placed in withholding-only proceedings to prosecute her protection claims, with no deference given to the asylum officer's initial, negative determination. 8 C.F.R. § 1208.31(g)(2).

71.    Withholding and CAT claims are based on a fear of persecution due to membership in a protected class, or a fear of torture, respectively. 8 U.S.C. § 1231(b)(3); 8 C.F.R. §§ 1208.16-18.

72.    The United States' commitment to the principle of non-refoulment, a commitment to refrain from sending individuals to a country where they will likely suffer persecution and/or torture, underlies withholding-only proceedings. This principle applies whether the court is considering sending the individual to their country of origin, or to a "third country." 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. §§ 1208.16(b)-(c).

73.    For a person granted withholding or CAT protection, the underlying reinstated removal order is not vacated or withdrawn, only its execution is withheld. *Matter of I-S- & C-S-*, 24 I&N Dec. 432, 433-34 (BIA 2008).

### First Amendment Retaliation

~~55~~74.  The First Amendment to the United States Constitution provides in part that "Congress shall make no law . . . abridging the freedom of speech  . . . or the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. Amend. I.

~~56~~75.  Speech on matters of public concern is entitled to the highest level of protection under the First Amendment. *See, e.g., Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1034 (1991) ("[S]peech critical of the exercise of the State's power lies at the very center of the First Amendment."). Moreover, government action that targets private speech based on the viewpoint taken by the speaker is an egregious form of content

discrimination and presumptively unconstitutional. *See Matal v. Tam*, 582 U.S. 218

(2017).

57~~76~~.  To bring a claim of First Amendment retaliation, a plaintiff must allege

facts showing: "(1) that [she] was engaged in constitutionally protected activity; (2) that

the defendant's actions caused the plaintiff to suffer an injury that would chill a person of

ordinary firmness from continuing to engage in that activity; and (3) that the defendant's

adverse action was substantially motivated as a response to the plaintiff's exercise of

constitutionally protected conduct." *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir.

2020) (quotations omitted).

### Detention During Withholding Only Proceedings

77.    The post-removal detention statute, 8 U.S.C. § 1231(a)(2), authorizes

detention of noncitizens during their fear-based, withholding-only proceedings.

78.    When a final removal order is issued, a 90-day removal period

commences, during which an individual is subject to mandatory detention. 8 U.S.C. §§

1231(a)(1)(A), (2)(A). However, following that 90-day removal period, individuals "*may*

be detained." *Id*. § (a)(6) (emphasis added).

### Prolonged, Post-Removal Order Detention in Violation of Due Process

79.    Nonetheless, indefinite detention beyond the removal period raises

"serious constitutional concerns." *Zadvydas v. Davis*, 533 U.S. 678, 682 (2001). In

*Zadvydas*, the Supreme Court addressed the statutory ambiguity inherent in the word

"may" in 8 U.S.C. § 1231§ (a)(6) and held that "read in light of the Constitution's

demands," § (a)(6) "does not permit indefinite detention" for noncitizens in post-removal

detention. *Id*. at 689. In fact, the Court decided that six months constituted a

"presumptively reasonable" period in post-removal detention. *Id*. at 701. Following that

period, if an individual provides "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future," the government shall carry the burden of justifying continued detention. *Id.*

80.     The Supreme Court then clarified in *Johnson v. Arteaga-Martinez* that: (1) individuals detained under § 1231 are not, as of right, provided a bond hearing after six months detention, and (2) the *Zadvydas* court applied the canon of constitutional avoidance and merely interpreted § 1231 not to permit indefinite detention. 596 U.S. 573, 576, 579 (2022). The *Arteaga-Martinez* Court followed suit and "implicitly recognized" a distinction between constitutional claims regarding prolonged detention and "the statutory prohibition against indefinite detention embodied in *Zadvydas*." *Arostegui-Maldonado v. Baltazar*, No. 25-cv-2205-WJM-STV, 2025 WL 2280357, at *6 (D. Colo. Aug. 8, 2025); *Juarez v. Choate*, No. 1:24-cv-00419-CNS, 2024 WL 1012912, at * 6 (D. Colo. July 19, 2024); *see also Arteaga-Martinez*, 596 U.S. at 583. The *Arteaga-Martinez* Court thus chose not to place any restrictions around as-applied, constitutional claims against prolonged, post-removal detention.

81.     The *Arteaga-Martinez* Court acted carefully, choosing not to disrupt decades of jurisprudence addressing and correcting governmental violations of constitutional rights belonging to individuals facing prolonged, if not indefinite, civil detention. *Demore v. Kim*, 538 U.S. 510, 523 (2003) (citing *Reno v. Flores*, 507 U.S. 292, 306 (1993) ("'It is well established that the Fifth Amendment entitles [noncitizens] to due process of law in deportation proceedings.'")); *Zadvydas*, 533 U.S. at 699 ("to avoid a serious constitutional threat, we conclude that, once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute");

*Jackson v. Indiana*, 406 U.S. 715, 738 (1972) ("due process requires that the nature
and duration of commitment bear some reasonable relation to the purpose for which the
individual is committed"); *Diop v. ICE/Homeland Sec.*, 656 F.3d 221, 234 (3d Cir. 2011)
(stating that after the maximum of five months, "the constitutional case for continued
detention without inquiry into its necessity becomes more and more suspect as
detention continues"); *Chavez-Alvarez v. Warden York County Prison*, 783 F.3d 469,
474-75 (3d Cir. 2015) (declaring that due process requires recognition that, at a certain
point, the burden to a noncitizen's "liberty outweighs a mere presumption" that they will
flee and/or are dangerous); *German Santos v. Warden*, 965 F.3d 203, 210-11 (3d Cir.
2020); *Juarez*, 2024 WL 1012912, at *5-6 ("noncitizens detained under § 1231(a)(6)
past the *Zadvydas* six-month presumptively constitutional period may bring an as-
applied due process challenge to his or her detention under the statute"); *Ramirez v.
Bondi*, No. 25-cv-1002-RMR, 2025 WL 1294919, at *5 (D. Colo. May 5, 2025) ("when a
noncitizen's detention becomes unreasonably prolonged in relation to [risk of danger
and preventing flight], his or her continued detention may violate the Fifth Amendment").

### Recent Post-Order Detention Cases Brought in the District of Colorado

82.    The District Court of Colorado, in the past fourteen months, has decided
three as-applied, constitutional due process claims filed by individuals in post-removal
order, mandatory detention. *Arostegui-Maldonado*, 2025 WL 2280357; *Ramirez*, 2025
WL 1294919; and *Juarez*, 2024 WL 1012912. In each of those cases, the court granted
the petitioner an individualized bond hearing and placed the burden on the government
to justify further detention.

### *a.* **Use of the Singh** *Factors*

83.     The "vast majority of judges" in this district apply the *Singh* factors when deciding whether a noncitizen's detention without a bond hearing, whether they are in pre- or post-removal proceedings, has become "unduly prolonged as to become unreasonable or unjustified," in violation of their constitutional rights. *Arostegui-Maldonado,* 2025 WL 2280357, at *6; *Juarez*, 2024 WL 1012912, at *6-8 (collecting cases). The factors include: (1) the total length of detention to date; (2) the likely duration of future detention; (3) the conditions of detention; (4) delays in the removal proceedings caused by the detainee; (5) delays in the removal proceedings caused by the government; and (6) the likelihood that the removal proceedings will result in a final order of removal.

84.     While the *Singh* factors were originally applied in this district to assess a constitutional claim of prolonged detention by an individual detained under 8 U.S.C. § 1226(c), recent jurisprudence indicates that there is "little substantial distinction between the liberty interest of noncitizens detained pursuant to § 1226(c) and § 1231(a)(6)." *Juarez*, 2024 WL 1012912, at *6. This is "because '[r]egardless of the stage of the proceedings, the same important interest is at stake—freedom from prolonged detention.'" *Id.* (quoting *Guerrero-Sanchez v. Warden York County Prison*, 905 F. 3d 208, 222 (3d Cir. 2018).

### *b.* **Bond Hearing as a Remedy**

85.     This district, alongside others, consistently holds that the appropriate remedy for prolonged detention of a noncitizen is an individualized bond hearing in front of an Immigration Judge in which the government bears the burden of proving by clear and convincing evidence that the noncitizen is a flight risk or a danger to the community.

The government is better equipped with freedom and extensive resources to carry the
burden of proof to justify continued detention.

86.     Well-established precedent places the burden on the government to justify
an individual's deprivation of liberty in civil detention. *Arostegui-Maldonado*, 2025 WL
2280357, at *11 (citing *United States v. Salerno*, 481 U.S. 739,751 (1987)) ("the
Supreme Court has long held that the clear and convincing evidence standard applies
to civil detention where an individual's liberty interest is at stake"); *Addington v. Texas*,
441 U.S. 418, 427 (1979) ("We conclude that the individual's interest in the outcome of
a civil commitment proceeding is of such weight and gravity that due process requires
the state to justify confinement . . . ."). This district repeatedly, although not exclusively,
applies this principle to civil immigration detention, by deliberately placing the burden to
justify continued detention on the government in bond hearings. *Juarez*, 2024 WL
1012912, at * 8 ("entitlement to a bond hearing in this case emanates from the Due
Process Clause . . . and in that light, to the extent that the Court has already determined
that a bond hearing is warranted, the Court is persuaded that placing the burden of
proof on the government comports with due process requirements"); *Singh*, 2019 WL
3943960, at *7; *Viruel Arias*, No. 1:22-cv-02238-CNS, 2022 WL 4467245, at *4 (D. Colo.
Sept. 6, 2022); *but see Martinez,* 760 F. Supp. 3d 1188, 1199 (D. Colo. 2024); *de
Zarate v. Choate*, No. 23-CV-00571-PAB, 2023 WL 2574370, at *4 (D. Colo. Mar. 20,
2023).

**CLAIMS FOR RELIEF**

Count ~~ONE~~

**1: Violation of Fifth Amendment Right to Due Process (Unlawful Detention)**

~~58~~87.  The Respondents have violated Ms. Vizguerra-Ramirez's rights to

constitutional due process by detaining her without statutory authority.

~~59~~88.  There are only two possible sources of the Respondents' detention

authority. The first is 8 U.S.C. § 1226, which authorizes the detention of noncitizens

during the pendency of removal proceedings. However, Respondents have indicated to

Ms. Vizguerra-Ramirez that she will not be placed in removal proceedings under 8

U.S.C. § 1229a.

~~60~~89.  The second is 8 U.S.C. § 1231, which authorizes the detention of

noncitizens following the issuance of an administratively final order of removal. Ms.

Vizguerra-Ramirez, however, has no such order. She received a grant of voluntary

departure in lieu of a removal order in 2011 and departed the U.S. while that order was

tolled. The government's attempt at reinstatement in 2013 was fatally flawed by its

decision to issue that putative order *prior to* meeting its regulatory duty of informing Ms.

Vizguerra-Ramirez of her right to challenge the determination. Therefore, the agency's

putative reinstatement order, on which its detention authority is based, does not meet

the regulatory definition of a reinstatement order. 8 C.F.R. § 241.8(b).

~~61~~90.  Absent detention authority under § 1226 or § 1231, the Respondents'

decision to detain Ms. Vizguerra-Ramirez violates the Due Process Clause of the Fifth

Amendment.

Count <del>TWO</del>

**2: Violation of 8 U.S.C. § 1231(a)(5) and Implementing Regulations**

~~62~~91.  To the extent Respondents assert detention authority under 8 U.S.C. §

1231(a)(5), that argument would be unfounded considering the government's failure to

abide by its due process protections, to wit, the requirement that Ms. Vizguerra-Ramirez

be informed of the intended reinstatement, and of her right to challenge that

determination, *prior to* the issuance of a final order. The document it is relying on to

trigger its detention authority does not meet the regulatory definition of a reinstatement

order. 8 C.F.R. § 241.8(b).

~~63~~92.  For these reasons, Respondents' detention of Ms. Vizguerra-Ramirez

violates 8 U.S.C. § 1231(a)(5) and 8 C.F.R. § 241.8(b).

Count <s>THREE</s>

### 3: Retaliation and Discrimination in Violation of the First Amendment

~~64~~93.  Ms. Vizguerra-Ramirez's speech is protected by the First Amendment. Her

past speech pertained to matters of prominent public concern—the conditions of

immigration detention system and abuses of government power. She has spoken out

repeatedly over the course of many years against the detention of noncitizens and the

forced separation of families. Her advocacy has received significant state and national

attention.

~~65~~94.  The way Respondents publicly celebrated their apprehension of Ms.

Vizguerra-Ramirez~~,~~ and substantially compromised ~~her ability to have a fair hearing

on~~the initial review of her claim for persecution-based protections, is likely to chill the

speech of other immigrants opposed to the government's immigration policies and

practices. Left undisturbed, ICE's actions in this case would have a devastating effect

on vital political speech, allowing a government agency to ~~abuse immigrants~~run

roughshod over immigrants' due process rights and then deport the victims of its illegal

actions.

6695. There is a substantial causal connection between Ms. Vizguerra-Ramirez's protected speech and Respondents' adverse actions and threats. Respondents have been motivated to silence Ms. Vizguerra-Ramirez due to her status as the face of the sanctuary movement.

6796. Ms. Vizguerra-Ramirez is suffering severe and ongoing harm because of Respondents' actions, including separation from her family and the threat of deportation to a country where she fears persecution or torture, without a fundamentally fair process. This includes being subjected to a series of procedural violations and irregularities in the reasonable fear process that raise serious due process concerns and strongly suggest retaliatory intent. The handling of Ms. Vizguerra-Ramirez's RFI reflects a clear interference with attorney-client access, failure to follow typical agency protocol, and a pattern of misrepresentation regarding Ms. Vizguerra-Ramirez's rights. These actions—taken while Ms. Vizguerra-Ramirez remains in ICE custody and under ongoing judicial protection—reflect a broader strategy to bypass meaningful review despite unresolved jurisdictional and constitutional claims. They constitute retaliation.

6897. Respondents' actions against Ms. Vizguerra-Ramirez based on her protected speech do not serve a compelling state interest, and are not narrowly tailored to any legitimate government interest.

### Count 4: Violation of Fifth Amendment Rights to Procedural Due Process (Unreasonably Prolonged Detention)

98. Ms. Vizguerra-Ramirez's prolonged detention under 8 U.S.C. § 1231(a) violates her Fifth Amendment due process rights guaranteed to her by the United States Constitution. Ms. Vizguerra-Ramirez does not concede her challenge to the validity of the reinstated removal order authorizing her detention. Nonetheless, the government

has: (1) insisted on the validity of said reinstatement order; (2) subjected Ms. Vizguerra-Ramirez to all the trappings of withholding-only proceedings under 8 U.S.C. § 1231; and (3) detained Ms. Vizguerra-Ramirez for an unconstitutionally prolonged period pursuant to the putative removal order. By virtue of such treatment, Respondents are violating Ms. Vizguerra Ramirez's due process rights.

99.    Ms. Vizguerra-Ramirez's as-applied, constitutional due process claim against her prolonged, post-removal detention under 8 U.S.C. § 1231 stands squarely upon precedent. *Zadvydas*, 533 U.S. at 701; *Arteaga-Martinez,* 596 U.S. at 583; *Jennings v. Rodriguez*, 583 U.S. 281, 288-89 (2018) (declining to disturb *Zadvydas*). Ms. Vizguerra-Ramirez's claim also parallels the claims made in *Arostegui-Maldonado* and *Juarez*, recently decided in the noncitizen's favor in this district. 2025 WL 2280357, at *6; 2024 WL 1012912, at *5.

100.    Due process requires that Ms. Vizguerra Ramirez be released from detention, or in the alternative, that she receives a bond hearing at which the government bears the burden to justify further detention by clear and convincing evidence.

### The *Singh* Factors Weigh in Petitioner's Favor

101.    This Court's application of the *Singh* factors will show that Ms. Vizguerra-Ramirez's detention is now unconstitutionally prolonged.

#### a.    Duration of Detention

102.    The first and "most important" *Singh* factor weighs in favor of Ms. Vizguerra-Ramirez because she has spent over six consecutive months in the Aurora Contract Detention Facility since the government targeted and arrested her – thus, her detention exceeds the six-month period of "reasonable" detention.

### b.    Likelihood of Continued Detention

103.    The second factor, the likely duration of Ms. Vizguerra-Ramirez's future detention, also weighs in her favor. Ms. Vizguerra-Ramirez is currently in withholding-only proceedings before an immigration judge. Regardless of the outcome, an appeal is all but certain. Without judicial relief, Ms. Vizguerra-Ramirez's detention is very likely to continue during the pendency of an administrative appeal, and then during the pendency of a petition for review from the Tenth Circuit. *Villaescusa-Rios*, No. 20-cv-03187-CMA, 2021 WL 269766, at *3 (D. Colo. Jan. 27, 2021) ("Courts examine the anticipated duration of all removal proceedings—including administrative and judicial appeals—when estimating how long detention will last"). Her detention will terminate eventually, but "'that point is likely to be many months or even years from now.'" *Arostegui-Maldonado*, 2025 WL 2280357, at *7 (quoting *Villaescusa-Rios*, 2021 WL 269766, at *3). Because either party may appeal an immigration court's decision, this factor weighs in favor of Ms. Vizguerra-Ramirez. *Viruel Arias*, 2022 WL 4467245, at *2.

104.    Undersigned counsel obtained recent EOIR data pursuant to a Freedom of Information Act (FOIA) request indicating that the average length of a BIA appeal, between both detained and non-detained appellees and appellants, is currently 786.27 days. A petition for review from the Tenth Circuit recently took one year. *Arostegui-Maldonado*, 2025 WL 2280357, at *2. That same FOIA data indicates that the average length of a proceeding on remand to the BIA from a circuit court is 616.02 days.

### c.    Conditions of Detention

105.    The third *Singh* factor, conditions of Ms. Vizguerra-Ramirez's confinement, weighs in her favor; indeed, this factor regularly weighs in favor of the petitioner, given that facilities for civil immigration detention and penal institutions for criminal detention

are not meaningfully different from one another. *German-Santos*, 596 .3d at 211; *see also Velasco-Lopez v. Decker*, 978 F.3d. 842, 851 (2d. Cir. 2020) (finding that a noncitizen detained for immigration proceedings where they cannot "maintain employment or see . . . family or friends or others outside visiting hours [and] the use of a cell phone [is] prohibited, and [there is] no access to the internet or email and limited access to the telephone" are conditions "indistinguishable from those imposed on criminal defendants sent to prison following convictions for violent felonies and other serious crimes"); *Chavez-Alvarez,* 783 F.3d at 478.

106.    Where the conditions of detention resemble a penal institution, this factor weighs in favor of finding that detention is unreasonable. *Singh*, 2019 WL 3943960 at *6; Villaescusa-*Rios*, 2021 WL 269766, at *4, ("[t]he more that the conditions under which the [person] is held resemble penal confinement, the stronger his argument that he is entitled to a bond hearing"). Further, the extensive history of abusive conditions at the Aurora Contract Detention Facility exacerbates the conditions of Ms. Vizguerra-Ramirez's deprivation of liberty. *Daley v. Choate*, No, 22-CV-03043-RM, 2023 WL 2336052, at *4 (D. Colo. Jan. 6, 2023). As the length of her detention increases, this factor weighs increasingly in her favor. *Chavez-Alvarez*, 783 F.3d at 478.

107.    Courts in this district have found that conditions in civil immigration detention are not meaningfully different from criminal incarceration. *Arostegui-Maldonado*, 2025 WL 2280357, at *7 ("The Court has little trouble concluding . . . that the conditions at the Aurora Facility strongly resemble penal confinement . . . they are abhorrent. That is, they more than resemble penal confinement"); *Martinez v. Ceja*, 760 F. Supp. 3d 1188, 1195 (D. Colo. 2024) ("Mr. Martinez's allegations regarding his

confinement at the Aurora Detention Facility, which respondents do not contest, demonstrate that he is being held in conditions resembling penal confinement."); *de Zarate*, 2023 WL 2574370, at *4 ("[C]ourts have concluded that [the Aurora facility] is enough like a corrections facility for this factor to favor" individuals subject to immigration detention) (citing *Daley*, 2023 WL 2336052, at *4). For nearly the last decade, immigrants detained at the Aurora facility have sounded the alarm about oppressive and unsafe conditions, including substandard medical and mental health care, medical neglect, failures to comply with agency standards, reports of excessive use of force, retaliation against First Amendment protected speech, and claims related to wage violations and forced labor. In this context, three people detained at Aurora have died since 2012, including Melvin Ariel Calero Mendoza in 2022. This Court already has held that the location of incarceration weighs in a noncitizen's favor because it is akin to a penal institution. *Sheikh v. Choate*, No. 1:22-cv-01627-RMR, 2022 WL 17075894, at *8-9, (D. Colo. July 19, 2024); *Singh*, 2021 WL 22090712, at *3-4; *Villaescusa-Rios*, 2021 WL 269766, at *4; Cf. *de Jesus de Jesus v. Wolf*, No. 20-cv-03637 (RBJ), 2021 WL 603056, at *3 (D. Colo. Feb. 16, 2021).

108.    In addition to the pervasive abuse and neglect that all individuals detained at the Aurora Contract Detention Facility experience, Ms. Vizguerra-Ramirez experiences unique conditions in detention because of her work as an educator and advocate for immigrant rights. Ms. Vizguerra-Ramirez remains under extraordinary scrutiny by the guards and the target of antagonistic comments.

109.    Furthermore, when Ms. Vizguerra-Ramirez's community comes together on Monday evenings to mourn and bear witness to her detention outside of the Aurora

Contract Detention Facility, GEO treats the weekly peaceful vigils as a security threat, ceasing all but essential movement, barring access to the facility by legal and social visitation, alike, and shutting down access to telephone lines in the dorms. Consequently, the other women in Ms. Vizguerra-Ramirez's dorm react with frustration towards her because of the way that they too suffer from such a collective punishment on Monday nights.

110.    Finally, Ms. Vizguerra-Ramirez's mental health suffers tremendously from her condition in detention as a mother separated from her children. Her detention has been extraordinarily difficult on her youngest daughter who is only fourteen. In turn, Ms. Vizguerra-Ramirez worries constantly about her daughter's health and safety. She also worries that she will not have the chance to hug her other daughter before she is deployed in the military in November. Ms. Vizguerra-Ramirez experiences increased symptoms of depression including fatigue, hopelessness, and despair because of her prolonged detention.

111.    As the length of her detention increases, this factor weighs increasingly in her favor.

### d.    Delays Caused by the Noncitizen and by the Government

112.    For the fourth and fifth *Singh* factors, courts consider the cause of any "bad faith" delays in removal proceedings. *German Santos*, 965 F.3d at 211 internal quotations omitted). These factors weigh in Ms. Vizguerra-Ramirez's favor as she has done nothing to delay her proceedings, but the government continues to delay Ms. Vizguerra-Ramirez's proceedings while she is detained.

113.    In March 2025, the government failed to notify Ms. Vizguerra-Ramirez's counsel on four separate instances before attempting to complete a reasonable fear

interview (RFI) with her. On the fourth and fifth attempts, the asylum officers used false

pretenses to pressure Ms. Vizguerra-Ramirez. Each time she refused, exercising her

right to request her counsel be present for the interview.

114.    Despite their inappropriate attempts to complete the RFI, and the

superficial appearance of haste, the government's actions delayed the overall

proceedings. Instead of contacting Ms. Vizguerra-Ramirez's counsel to schedule the

RFI, the asylum office spent a week, from March 20th to March 27th, attempting to

pressure Ms. Vizguerra-Ramirez to proceed without counsel. The government's

misconduct at the beginning of her case should be held against them.

115.    Ms. Vizguerra-Ramirez should not be penalized for any delay in her

removal proceedings because she has not acted in bad faith or through "dilatory

tactics." *Viruel Arias*, 2022 WL 4467245, at *3.  Further, any appeals or petitions for

review filed by Ms. Vizguerra-Ramirez shall not be held against her. *German Santos*,

965 F.3d at 212 ("Absent carelessness or bad faith, we will not scrutinize the merits of

immigration proceedings and blame whichever party has the weaker hand."). This

district recognized the importance of protecting one's right to exhaust their legal

pathways in *Martinez* and *de Zarate*, declaring that they would not hold the petitioner's

efforts to seek relief through the available legal channels against them. *Martinez*, 760 F.

Supp. 3d at 1195; *de* Zarate, 2023 WL 2574370, at *4. Since the RFI's completion, Ms.

Vizguerra-Ramirez's case has continued at a regular pace without undue delay by Ms.

Vizguerra-Ramirez.

116.    Thus, this favor weighs in favor of Ms. Vizguerra-Ramirez.

### e.    Likelihood that Removal Proceedings Will Result in Removal

117.    The final *Singh* factor weighs in Ms. Vizguerra-Ramirez's favor, as her removal proceedings are unlikely to result in removal. Ms. Vizguerra-Ramirez is prosecuting two meritorious claims, before two different tribunals (all while detained), with success in either court preventing her removal.

118.    The first is a purely legal claim pending before the Tenth Circuit which asks the following question: does a tolled grant of voluntary departure convert to a removal order if the recipient departs the U.S. during the pendency of her agency appeal? As this Court has already recognized, there is no known case that has yet answered that question. *See* Dk. No. 11, pg. 4. Ms. Vizguerra-Ramirez will argue that the answer is unambiguously "no," as a contrary reading would violate the plain terms of the withdrawal regulation, 8 C.F.R. § 1003.4, the reinstatement statute, 8 U.S.C. § 1231(a)(5), and the finality statute, 8 U.S.C. § 1101(a)(47)(B).

119.    The second is a withholding and CAT claim currently pending before an immigration judge. This claim has already passed a threshold determination of possible success, with an immigration judge necessarily finding a meritorious claim by placing Ms. Vizguerra-Ramirez in withholding-only proceedings rather than ordering her summarily removed. 8 C.F.R. § 1208.31(g)(2).

120.    In sum, the balance of as-applied factors weighs in favor of finding Ms. Vizguerra-Ramirez's prolonged detention without a bond hearing unreasonable and unconstitutional.

**Appropriate Remedies: Grant of Immediate Release or Individualized Bond
Hearing in which the Government Bears the Burden**

121.    Granting Ms. Vizguerra-Ramirez immediate release is the most
appropriate and equitable remedy due to her prolonged detention in violation of her Fifth
Amendment constitutional right to procedural due process.

122.    In the alternative, and at a minimum, due process requires Ms. Vizguerra-
Ramirez be granted a bond hearing. At such bond hearing, the government must be
required to justify Ms. Vizguerra-Ramirez's ongoing detention by clear and convincing
evidence. *See Arostegui-Maldonado*, 2025 WL 2280357, at *16; *Ramirez*, 2025 WL
1294919, at *8 (D. Colo. May 5, 2025) (ordering a bond hearing where detention
pursuant to 8 U.S.C. § 1231(a) violated due process).

123.    Ms. Viguerra-Ramirez should not be detained. The Respondents cannot
prove that Ms. Vizguerra-Ramirez poses a flight risk or a danger to her community.
Indeed, Ms. Vizguerra-Ramirez is an exceptional presence in her community. She
fearlessly stands alongside fellow immigrants as they navigate slews of obstacles. Her
commitment to justice, her commitment to her community, and her commitment to her
four U.S. citizen children living in Denver, overwhelmingly demonstrate that Ms.
Vizguerra-Ramirez is firmly rooted in Colorado. Every Monday evening, her community
grieves, protests, and begs for her release outside of Aurora Contract Detention Facility.
Brandon Gehrke Quintanilla, *Protestors block GEO detention facility in Aurora, OO,
demanding "Free Jeanette now!"* Fight Back News, (2025),
https://fightbacknews.org/articles/protesters-block-geo-detention-facility-in-aurora-co-
demanding-free-jeanette (last visited Sept. 29, 2025). Instead of a flight risk, Ms.
Vizguerra-Ramirez is a pillar of her community, cemented and firm. Instead of a danger,

Ms. Vizguerra-Ramirez fervently protects those around her. Ms. Vizguerra-Ramirez's

life work may have gotten her detained, but it champions her release.

  124. An equitable remedy in immigration court will be most likely delivered if an

immigration judge is required to meaningfully consider alternatives to imprisonment

such as community-based alternatives to detention including conditional release, parole,

as well as Ms. Vizguerra-Ramirez's ability to pay a bond.

## PRAYER FOR RELIEF

Wherefore, Petitioner respectfully requests this Court to grant the following:

(1)    Assume jurisdiction over this matter.

(2)    Issue an Order to Show Cause ordering Respondents to show cause why this
       Petition should not be granted.

(3)    Declare that Petitioner's detention violates the Due Process Clause of the Fifth
       Amendment, 8 U.S.C. § 1231(a)(5), and 8 C.F.R. § 241.8(b).

(4)    Declare that Respondents' retaliatory actions in detaining Petitioner and
       compromising her rights to access to counsel violated her free speech rights
       under the First Amendment.

(5)    Issue a Writ of Habeas Corpus ordering Respondents to release Petitioner
       immediately.

(6)    Enter an injunction restraining Respondents from taking any action to deport
       Petitioner unless Respondents demonstrate that such action is untainted by
       unlawful First Amendment retaliation and discrimination.

(7)    Require the Respondents to provide, within seven days of this Court's order, a
       constitutionally adequate, individualized bond hearing before an impartial
       adjudicator in which DHS bears the burden of establishing by clear and
       convincing evidence that continued detention is justified.

(7)(8)    Award Petitioner attorney's fees and costs under the Equal Access to
          Justice Act, and on any other basis justified under law.

(8)(9)    Grant any further relief this Court deems just and proper.

Dated: April 8September 29, 2025

Respectfully submitted,

/s/ Laura L. Lichter_____

*Counsel for Plaintiff-Petitioner*

| | |
|---|---|
| Laura L. Lichter | Brian Scott Green |
| Lichter Immigration | Law Office of Brian Green |
| 1601 Vine Street | 9609 S. University Boulevard, #630084 |
| Denver, CO 80206 | Highlands Ranch, CO 80130 |
| (303) 554-8400 | (443) 799-4225 |
| LLichter@LichterImmigration.com | BrianGreen@greenUSimmigration.com |

| | |
|---|---|
| Mark R. Barr | Laura Lunn |
| Lichter Immigration | Rocky Mountain Immigrant Advocacy Network |
| 1601 Vine Street | 7301 N. Federal Blvd., Suite 300 |
| Denver, CO 80206 | Westminster, CO 80030 |
| (303) 554-8400 | Telephone: (303) 433-2812 |
| MBarr@LichterImmigration.com | Llunn@rmian.org |

| | |
|---|---|
| Shira Herald | Elizabeth Jordan |
| Rocky Mountain Immigrant Advocacy Network | Student Law Office |
| 7301 N. Federal Blvd., Suite 300 | University of Denver Sturm College of Law |
| Westminster, CO 80030 | 2255 East Evans Avenue Suite 335 |
| Telephone: (303) 433-2812 | Elizabeth.jordan@du.edu |
| Shereld@rmian.org | |

Shannon Long
Student Law Office
University of Denver Sturm College of Law
2255 East Evans Avenue Suite 335
Shannon.Long@du.edu

**VERIFICATION PURSUANT TO 28 U.S.C. § 2242**

I represent Petitioner-Plaintiff, Jeanette Vizguerra-Ramirez, and I submit this

verification on her behalf. I hereby verify that the factual statements made in the

foregoing Amended and Verified Petition for Writ of Habeas Corpus are true and correct

to the best of my knowledge.


Dated ~~this 8th day of April~~: September 29, 2025.


/s/ Laura L. Lichter

*Counsel for Plaintiff-Petitioner*


**INDEX OF ATTACHED EXHIBITS**

| Ex. | Document |
|-----|----------|
| A | Putative Reinstatement Order (July 24, 2013). |
| B | Declaration of Jenny Delgado, LCSW. |
| C | Amended Petition Showing Additions and Deletions, pursuant to D.C.COLO.LCivR 16.2. |